# EXHIBIT A – COLLABORATION AGREEMENT

# COLLABORATION AGREEMENT

THIS COLLABORATION AGREEMENT (this "Agreement") is made as of June 30, 2017 (the "Effective Date") by and between Student Resource Center, LLC ("SRC"), located at 1540 Pontiac Avenue, Suite B in Cranston, RI 02920, and Eastern Gateway Community College, a community college, located at 4000 Sunset Blvd in Steubenville Ohio 43952 ("EGCC" and, with SRC, each a "Member Party" and collectively, the "Member Parties").

WHEREAS, SRC and EGCC desire to collaborate on implementation of an online strategy, which will include, but not be limited to, the following: (i) Assisting in the development and marketing of high quality online courses and programs to members of unions along with necessary services in support of student success inclusive of addressing the development needs of some students; (ii) Accelerating the growth of EGCC's online offerings through strategies specific to attracting adult learners interested in online learning options; (iii) identifying additional offerings not currently available through EGCC that meet unmet needs within available markets; (iv) providing professional development opportunities for full-time and adjunct faculty related to online teaching, learning and student success; (v) providing support of all ancillary efforts around making online products available including assistance with faculty development, marketing, recruiting, enrollment, and academic support, e.g. mentoring and online tutoring; (collectively, the "Collaboration"); and

WHEREAS, EGCC desires to establish a free college benefit (the "Initiative") under the auspices of EGCC for the purposes of facilitating the Collaboration and providing new online educational instruction and services to participating students.

NOW, THEREFORE, in consideration of these premises and the mutual covenants, agreements, representations and warranties herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## Section 1. Definitions.

The following terms shall have the meanings set forth below. Other capitalized terms used herein are defined in other sections of this Agreement.

1.1 "Accrediting Body" means any entity or organization, whether governmental or government-chartered, private or quasi-private, which engages in the granting or withholding of accreditation of public postsecondary institutions or educational programs provided by such institutions in accordance with standards and requirements related to the performance, operations, financial condition or academic standards of such institution.

1.2 "Affiliate" with respect to any Person, shall mean any other Person directly or indirectly controlling, controlled by or under common control with, such Person. For purposes of this Agreement, "control" (including with correlative meanings, the terms "controlling", "controlled by" or "under common control with") as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

1908929_3

1.3    "Annual Budget" means the annual operating and capital budget agreed to by the Parties for each Fiscal Year, as may be amended by mutually written consent of the Parties, as more particularly described in Section 7.2.

1.4    "Board of Trustees" means the Board of Trustees of EGCC.

1.5    "Campaign" or "Promotional Campaign" means one or a series of pre-arranged and coordinated promotional activities with respect to the Educational Programs.

1.6    "Course Completion PTV" means the Ohio Department of Higher Education's definition thereof.

1.7    "Day" means calendar day.

1.8    "DOE" means U.S. Department of Higher Education.

1.9    "HLC" means Higher Learning Commission.

1.10   "Education Records" means all such records described by 34 CFR § 99.3 maintained by, for or on behalf of EGCC.

1.11   "Educational Agency" means any Person, Accrediting Body, entity or organization, whether governmental, government chartered, private, or quasi-private, that engages in granting or withholding Educational Approvals for, or otherwise regulates, postsecondary institutions or educational programs provided by such institutions, their agents or employees in accordance with standards relating to performance, operation, financial condition or academic standards of such institutions, and the provision of financial assistance to such institutions or students attending such institutions.

1.12   "Educational Approval" means any license, permit, consent, franchise, approval, authorization, certification or accreditation issued by any Educational Agency in connection with the operations of postsecondary institutions or participation of such institutions in any student financial assistance programs including the Title IV Programs.

1.13   "Educational Programs" means the online educational programs offered by EGCC through the Initiative to provide online degrees, certificates and courses as more fully set forth in the economic model attached as Exhibit A, as may be amended from time to time.

1.14   "Enforceability Exceptions" means (a) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and (b) general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or equity).

1.15   "Fees" means all tuition charges, fees, and subsidies collected by EGCC in order to participate in the Educational Programs as more fully set forth in the economic model attached as Exhibit A, subject to changes that may be negotiated in the future to account for changes in fees or structure.

2

1.16    "Fiscal Year" means July 1 - June 30. For purposes of this Agreement, the Fiscal Year shall include EGCC's Summer (split to coincide with the fiscal year's accrual of revenues and expenses), Fall, and Spring semesters, in that order, to coincide with EGCC's annual audited financial statements.

1.17    "Governmental Authority" means any governmental agency, authority, department, commission, board, bureau, court or instrumentality of the United States, any domestic state, or any foreign country, and any political subdivision or agency thereof, and includes any authority having governmental or quasi-governmental powers, including any administrative agency or commission, but expressly excludes any Educational Agency.

1.18    "Initial Budget" means the budget more particularly described in Section 7.1 and which (to the extent it is completed) is set forth in the economic model attached as Exhibit A, attached hereto and made a part hereof.

1.19    "Initial Educational Programs" means the Educational Programs that are proposed to be offered by EGCC through the Initiative during its first twelve (12) months of educational program offerings, as set forth in the Initial Budget.

1.20    "Initiative" means the Initiative as described in the Recitals.

1.21    "Initiative Students" means those EGCC students enrolled in an Educational Program pursuant to the Initiative, including those EGCC students who enrolled in Initiatives program.

1.22    "Joint Marketing Plan" means the mutually agreeable plan of marketing activities, responsibilities of the Parties for those activities and agreement on the actual materials, whether written or electronic, prior to the display or distribution of same. Such plan shall be in writing and determined by the Operating Committee on a periodic basis.

1.23    "Law" means any federal, national, supranational, state, provincial, local or similar statute, law, ordinance, regulation, rule, code, order, requirement, rule of law (including common law), or Accrediting Body standard or policy.

1.24    "Marketing Materials" means any written materials created specifically for the Educational Programs to encourage or promote student enrollment in the Educational Programs, including without limitation, advertisements, brochures, pamphlets, newsletters, statement stuffers, fulfillment materials, seminars, convention exhibits, telemarketing scripts or talking points, take-one displays, emails, website postings and any other advertisement or marketing materials for the Educational Programs of the Collaboration in any media.

1.25    "Operating Expenses" shall have the meaning set forth in Section 3.1 of this Agreement.

1.26    "Organizational Documents" means the articles or certificate of incorporation, by-laws, certificate of limited partnership, partnership agreement, certificate of formation, limited

liability company operating agreement, trust agreement and all other similar organizational documents of any Person other than an individual.

1.27 "Parties" (collectively) or "Party" (individually) shall refer to SRC and/or EGCC.

1.28 "Person" means any individual, partnership, limited liability company, corporation, cooperative, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Authority, Educational Agency, body or entity or any department, agency or political subdivision thereof.

1.29 "Revenue" means, collectively, the following:

(a) all related charges, fees (as more specifically noted in 1.15 supra), grants (including. but not limited to so-called Pell Grants), collections, and revenue recognized or collected by EGCC with respect to Initiative Students, including, without limitation, participation or material fees, tuition, or rental payments;

(b) State Subsidy relating to Initiative Students; provided, however, State Subsidy shall only be included in Revenue for purposes of calculating amounts due pursuant to Exhibit B when and if such Revenue is actually collected by EGCC;

(c) any other subsidies received from any municipal, state, or federal agency, board, entity, or from any other source from or on behalf of Initiative Students;

(d) any other Fees and revenue collected by EGCC as a result of Tuition Reimbursement Plans; and

(e) any other Fees arising from the enrollment of Initiative Students.

1.30 "Standard Academic Administrative Practices" means the educational, operational and business standards, practices and procedures used by comparable colleges located in the State of Ohio offering similar academic programs.

1.31 "State Subsidy" means any and all funds collected by EGCC relating to the state share of instruction ("SSI") attributable to Initiative Students and arising from following factors utilized by the Ohio Department of Higher Education: (a) Course Completion, (b) Degree Completion, Certificate Completion, and Transfers, and (c) Success Points. SSI will first be allocated to the Collaboration based on the Course Completion FTEs described in this Agreement. SSI will also be allocated to the Collaboration based on the specific contribution of Initiative Students to the EGCC's share of SSI for Degree Completion, Certificate Completion, Transfers, and Success Points. The Operating Committee will review and approve the final allocation after receiving the specific data from the EGCC submitted to the Ohio Department of Higher Education as part of the subsidy calculation process. The Parties agree to provide the resources as necessary to extract the needed data from the EGCC system to allow for the review. If required, the Parties will meet with the Ohio Board of Higher Education to insure a full and complete understanding of all Success Point metrics.

4

1.31 "Teach Out Period" means the period of time during which EGCC shall continue offering the Educational Programs following the expiration or termination of this Agreement in accordance with Section 10.3. For purposes of this Agreement, the Teach Out Period shall continue from the expiration or termination of this Agreement through the date of completion or graduation of all Initiative Students who are enrolled in any Educational Program that is in session at the time of said expiration or termination, not to exceed maximum of two (2) years from the date of such termination or expiration of this Agreement. (Example: If the Agreement expires on December 31, 2026, then the Teach Out Period would expire on December 31, 2028).

1.32 "Term" means, together, the Initial Term and the Extended Term as described in Section 10.1.

1.33 "Title IV Programs" means the programs of federal student financial assistance administered pursuant to Title IV of the Higher Education Act of 1965, as amended.

1.34 "Tuition Reimbursement Plans" means employer tuition reimbursement plans and/or programs for which Initiative Students are eligible. The Parties shall work together to maximize the collection of Revenue from Tuition Reimbursement Plan arising from Initiative Students. EGCC will require eligible Initiative Students to apply for benefits from such Tuition Reimbursement Plans.

**Section 2. Collaboration.**

2.1 Collaboration Activities. The Parties shall conduct all activities reasonably related to the Collaboration in accordance with the terms and conditions set forth in this Agreement and in the various Exhibits to this Agreement (the "Collaboration Activities").

2.2 EGCC Controlled Activities. Notwithstanding any other provision of this Agreement, the Parties expressly acknowledge and agree that the operation of the Initiative shall be under the exclusive control of EGCC, subject to the terms of this Agreement. Without limiting the foregoing, EGCC shall have sole responsibility for, and control over, the following activities, which shall be carried out in accordance with Law, existing collective bargaining agreements and established EGCC policies and procedures including, but not limited to:

(a) establishment of standards for the admission of students to the Educational Programs and management of student admission and enrollment services;

(b) management of all general administrative and operational services related to the Initiative and the Educational Programs to include without limitation the following:

(i) the provision of academic student services and student completion, satisfaction and monitoring services;

(ii) financial management services, including student billing services, Fee collection services, and other bursar services; and

(iii) general human resources and employee administrative services and functions, including assignment of staff, approval of leave and travel, and payroll services;

(c) administration and management of financial aid for students enrolled in the Educational Programs, and management of relationships with providers of student financial aid;

(d) design, development and adoption of each Educational Program and the curricula and course materials therefor, including approval of the courses to be offered and the nature and level of the credit ascribed thereto;

(e) establishment for the Educational Programs of (i) the applicable standards, prerequisites. requirements, and measures of student performance, (ii) the standards for the evaluation of the performance of students enrolled in such Educational Programs, and (iii) the processes for the evaluation of such student performance;

(f) establishment of procedures and requirements for the awarding of academic degrees and other credentials to students enrolled in the Educational Programs, and awarding, in accordance with such procedures, all academic degrees and other credentials to such students who have qualified to receive them;

(g) procurement and maintenance of all necessary Educational Approvals for the Educational Programs and the locations at which the Educational Programs are offered;

(h) recruitment and selection of faculty and other instructional staff for the Initiative and the Educational Programs; and

(i) implementation of standards for the appointment, supervision and evaluation of faculty and other instructional staff for the Initiative and the Educational Programs and supervision and management of such faculty and staff.

(j) EGCC shall have full control over the number of sections for each Education Program, along with the number of students enrolled the Educational Programs and each sections of the Educational Programs.

2.3 SRC Controlled Activities. SRC, directly or indirectly through its subcontractors, shall perform the following with respect to the Collaboration, as determined by agreement of the Operating Committee (collectively, "SRC Controlled Collaboration Activities"):

(a) Assist in the development and marketing of high quality online course and /or program offerings along with necessary services in support of student success inclusive of addressing the development needs of some students;

(b) Accelerate the growth of EGCC's online offerings through strategies specific to attracting adult learners interested in online learning options;

(c) Identify additional online offerings not currently available through EGCC that meet unmet needs within the defined markets;

(d) Provide professional development opportunities for full-time and adjunct faculty related to online teaching, learning and student success;

(e) Provide support of all ancillary efforts around making online products available including assistance with faculty development, marketing, recruiting, enrollment, and academic support, e.g. mentoring and online tutoring;

(f) Provide an up-start investment strategy for launching the online initiative with no upfront capital investment by EGCC, but with a contractual agreement specific to addressing profit and losses.

2.4    Joint Approval Collaboration Activities. Notwithstanding any other provision of this Agreement, the Parties expressly acknowledge and agree not to undertake any of the following Collaboration Activities without the prior written consent of each member of the Operating Committee:

(a) to the extent permitted under Ohio law increase or decrease the Fees for Educational Programs other than as set forth in the Initial Budget or Annual Budget (as hereinafter defined), unless required by Board of Trustees, Educational Agency or Governmental Authority;

(b) make expenditures in type or amount, or make or roll out new Educational Programs within the Initiative other than in accordance with the Initial Budget or Annual Budget;

(c) make any expenditure or hire any personnel (whether employee or consultant) contemplated in the Initial Budget or the Annual Budget, accept as may be approved in writing, prior to such hiring or expenditure on the forms provided for such purpose(s);

(d) design and implement Marketing Materials other than in accordance with the Joint Marketing Plan (as hereinafter defined);

(e) any material change in the nature of the Collaboration, the Initiative or the Collaboration Activities;

(f) any action to initiate, settle or defend legal actions on behalf of the Collaboration that could reasonably be expected to result in financial liability for either party;

(g) any action that could reasonably be expected to adversely affect in any material respect the tax liabilities or tax and financial reporting positions of each Party;

2.5    Level of Service. Each of the Parties agrees that, in performing the Collaboration Activities under this Agreement, it shall (i) allocate to the performance of such activities sufficient personnel with appropriate experience, knowledge and competence, and (ii) perform such Collaboration Activities at a performance level equal to the level at which each Party is then providing such Collaboration Activities (or the same or similar services) with respect to its own

7

business and operations. Each Party shall have responsibility for and complete discretion with respect to supervision and management of its employees and third-party contractors providing the Collaboration Activities.

2.6     Operating Committee. The Parties hereby establish an operating committee to facilitate the governance of the Collaboration as follows:

(a)     The Collaboration shall be conducted under the direction of a joint operating committee comprised of one (1) representative of SRC and one (1) representative of EGCC (the "Operating Committee"). Each Member Party may designate up to three (3) individuals, who may at any given time, individually serve as the representative for a Member Party during meetings of the Operating Committee. Each Member Party may change its designated representatives to the Operating Committee from time to time, in its sole discretion, effective upon notice to the other Member Parties of such change. These representatives shall have appropriate credentials, experience and knowledge, and ongoing familiarity with the Collaboration. Additional representatives or consultants may from time to time, by mutual consent of the Member Parties, be invited to attend Operating Committee meetings, subject to such representative's or consultant's written agreement to comply with the confidentiality requirements of Section 14. Each Member Party shall bear its own expenses related to the attendance of such meetings by its representatives.

(b)     The Operating Committee acknowledges that there is a need for a controlled "up-scaling" of resources to meet the needs of the Initiative. Accordingly, as set forth in Section 2.4 (c), authorizations to hire and purchase orders shall be processed within five (5) business days of receipt. Electronic signatures shall have the same force and effect as original written signatures. Approvals of all matters by the Operating Committee shall not be unreasonably withheld.

(c)     The Operating Committee shall meet in accordance with a schedule established by mutual written agreement of the Member Parties, but no less frequently than quarterly. Special meetings of the Operating Committee may be called by a Member Party upon a reasonable request with five (5) days prior written notice from the other Member Parties. The location for all such meetings to be determined by the Operating Committee. Alternatively, the Operating Committee may meet by means of teleconference, videoconference or other similar communications equipment. The Operating Committee shall confer regarding the status of the Collaboration, review relevant data and the progress of the applicable activities under the Collaboration, and consider and advise on any operational issues that arise relating to the Collaboration that may be referred to, or invited for referral by, the Operating Committee. Decisions of the Operating Committee shall be effective upon unanimous vote of the Member Parties. Notwithstanding the foregoing, this Agreement may only be amended, modified or changed by a writing executed by SRC and EGCC.

2.7     Board of Trustees. EGCC shall provide SRC with notice of all Board or Board Subcommittee meetings where the agenda includes a discussion about the operation of the Collaboration or the Initiative.

2.8     Joint Marketing Plan.

8

(a)    The Parties will collaborate and use commercially reasonable efforts to establish, and conduct the applicable activities under, joint marketing plans that include, among other things, the activities and requirements regarding the production of Marketing Materials and all other activities relating to the promotion of the Educational Programs (each, a "Joint Marketing Plan"). The Parties agree to consult and negotiate with each other in good faith and to amend or modify the Joint Marketing Plan on an annual basis or more frequently as the Parties may agree, operating within the constraints of the marketing budget delineated in the Initial Budget.

(b)    Subject to SRC's compliance with the terms and conditions of this Agreement, EGCC hereby grants to SRC a limited and nonexclusive license to use any trademarks and logos approved by EGCC in the Joint Marketing Plan solely in connection with exercising its rights and performing its obligations under the Joint Marketing Plan. Said license shall be transferable and assignable to SRC's subcontractors solely for purposes of promoting the activities of the Collaboration and furthering the Initiative. Said license shall otherwise be nontransferable and nonassignable. Said license shall terminate upon the termination or expiration of this Agreement.

**Section 3.**    **Operating Expenses and Consideration.**

3.1    Operating Expenses. The Collaboration shall be responsible for the payment of all normal and customary operating expenses incurred in furtherance of the Collaboration, including but not limited to, costs and expenses relating to SRC Controlled Collaboration Activities, to the extent set forth in the Initial Budget or Annual Budget (as hereinafter defined) (hereinafter "Operating Expenses"). Operating Expenses shall be paid out of the Collaboration Account in the priority set forth in Exhibit B upon approval of the Operating Committee. Each Party shall be responsible for the payment of all expenses incurred by such Party that are not set forth in the Initial Budget or Annual Budget. The Annual Budget may be amended as mutually agreed upon in writing by SRC and EGCC. If the Revenue collected by EGCC from the Educational Programs are insufficient to cover the Operating Expenses as set forth in the Initial Budget or Annual Budget, as the case may be, and provided that such insufficiency is not caused by EGCC's failure to comply with the terms of this Agreement, then (a) SRC shall be responsible for paying the amount of the Operating Expenses each year that are not covered by said Revenue; and (b) EGCC shall not be liable or have to pay for any Operating Expenses not covered by the Revenue collected from the Educational Programs.

3.2    SRC shall make a one-time payment to EGCC in the amount of Five Hundred Thousand Dollars ($500,000), the amount being a monetarization of EGCC's previous efforts towards the Collaboration and shall not be subject to any repayment or reduction of EGCC's financial interest hereunder.

3.3    Payment for Services. The Collaboration shall pay SRC pursuant to the terms set out in Exhibit B.

3.4    Terms and Method of Payment. All amounts payable by any party hereunder shall be remitted to the recipient party in United States dollars to a bank to be designated in the

9

invoice or otherwise in writing by the recipient party, unless otherwise provided for and agreed upon in writing by the parties.

**Section 4.        Representations and Warranties of EGCC.**

EGCC hereby represents and warrants to SRC as follows:

4.1        Organization and Good Standing. EGCC is an institution of higher education in the State of Ohio duly organized, validly existing and in good standing under the laws of the State of Ohio, with all requisite corporate power and authority to carry on the business in which it is engaged, to own the properties it owns and to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. EGCC is duly qualified to do business and is in good standing in each jurisdiction in which the nature of its business or the ownership of its assets makes such qualification necessary and where the failure to be so qualified would have a material adverse effect on EGCC.

4.2        Authorization and Validity. The execution, delivery and performance by EGCC of this Agreement, and the consummation of the transactions contemplated hereby and thereby, have been approved and duly authorized by the Board of Trustees and no other organizational approvals are necessary to properly authorize such transactions. This Agreement has been duly executed and delivered by EGCC and, assuming the due authorization, execution and delivery thereof by SRC constitutes valid and binding obligations of SRC, enforceable against EGCC in accordance with its terms, subject to the Enforceability Exceptions.

4.3        Consents. Except as set forth on Schedule 4.3, no authorization, consent, approval, permit or license of, or filing with, any Governmental Authority, Educational Agency or any other Person, is required to authorize, or is required in connection with, the execution, delivery and performance of this Agreement or any other agreements contemplated hereby or thereby on the part of EGCC.

4.4        Educational Approvals. EGCC has (a) all approvals required pursuant to its policies and procedures to offer the Initial Educational Programs and (b) all material Educational Approvals, to offer the Initial Educational Programs and to award Title IV Program funds and other student financial assistance in connection with such Initial Educational Programs.

4.5        No Violation. Assuming receipt of the consents and approvals set forth on Schedule 4.3, neither the execution and performance of this Agreement, nor the consummation of the transactions contemplated hereby, will directly or indirectly (with or without notice or lapse of time): (a) contravene, conflict with, or result in a violation of (i) any provision of the Organizational Documents or EGCC, or (ii) any resolution adopted by the Board of Trustees; or (b) contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any material contract to which EGCC is a party. EGCC is not in violation of any judgment, decree, order, statute, rule, regulation, standard or policy of any Governmental Authority or Educational Agency having jurisdiction over EGCC, which violation could reasonably be likely to have a material adverse effect on EGCC, the Collaboration or the Initiative.

1908929_3

4.6     Claims and Proceedings. No inquiry, action or proceeding has been asserted, instituted, or, to the knowledge of EGCC, threatened to restrain or prohibit the carrying out of the transactions contemplated hereby or to challenge the validity of such transactions or any part thereof or seeking damages on account thereof.

4.7     EGCC Content. EGCC has the authority to grant SRC use of EGCC's trademarks and logos pursuant to Section 2.8. Such logos and trademarks will be free and clear of any claims or encumbrances and will not infringe any patent, copyright or other proprietary right or violate or misappropriate a trade secret, of or relating to any EGCC personnel or, to EGCC's knowledge, any other person or entity.

4.8     Compliance with Laws. (a) EGCC has all material licenses, permits, authorizations, certifications, accreditations and similar approvals necessary to conduct the business and operations of EGCC, in the manner and to the full extent that they are now being conducted and in accordance with applicable Law, including with respect to participation in the Title IV Programs; (b) no proceeding for the suspension or cancellation of any Educational Approval is pending or, to the knowledge of EGCC, threatened; (c) EGCC has not received any notice that any Educational Approval will not be renewed, and EGCC has no knowledge of any basis for non-renewal; and (d) EGCC has no knowledge of any threatened or pending investigation, audit, or review of any Educational Approval.

**Section 5.     Representations of SRC.**

SRC hereby represents and warrants to EGCC as follows:

5.1     Organization in Good Standing. SRC is a company duly organized, validly existing and , with all requisite corporate power and authority to carry on the business in which it is engaged, to own the properties it owns and to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby. SRC is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction in which the nature of its business or the ownership of its assets makes such qualification necessary and where the failure to be so qualified would have a material adverse effect on MEP.

5.2     Authorization and Validity. The execution, delivery and performance by SRC of this Agreement and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by the Board of Directors of SRC and no other corporate approvals are necessary to properly authorize such transactions. This Agreement has been duly executed and delivered by SRC and, assuming the due authorization, execution and delivery thereof by EGCC constitute valid and binding obligations of SRC enforceable against SRC in accordance with their respective terms, subject to the Enforceability Exceptions.

5.3     Consents. No authorization, consent, approval, permit or license of, or filing with, any Governmental Authority or any other Person is required to authorize, or is required in connection with, the execution, delivery and performance of this Agreement or any other agreements contemplated hereby or thereby on the part of SRC.

5.4     No Violation. Neither the execution and performance of this Agreement (including the Collaboration Activities), nor the consummation of the transactions contemplated

1908929_3

hereby and thereby, will directly or indirectly (with or without notice or lapse of time) (a) contravene, conflict with, or result in a violation of (i) any provision of the Organizational Documents of SRC, or (ii) any resolution adopted by the Board of Directors of SRC; (b) contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate or modify, any material contract to which SRC is a party; or (c) infringe upon, or misappropriate the subject matter of any, intellectual property rights of any third party. SRC is not in violation of any judgment, decree, order, statute, rule, regulation, standard or policy of any Governmental Authority having jurisdiction over SRC, which violation could reasonably be likely to have a material adverse effect on the Collaboration.

5.5     Claims and Proceedings. No inquiry, action or proceeding has been asserted, instituted, or, to the knowledge of SRC, threatened to restrain or prohibit the carrying out of the transactions contemplated hereby or to challenge the validity of such transactions or any part thereof or seeking damages on account thereof.

**Section 6.     Signing Deliverables.**

6.1     Deliverables by EGCC. Concurrent with the execution of this Agreement, and to the extent such documents exist independently from those currently maintained by EGCC for said purposes, EGCC shall deliver the following documents to, as set forth below;

(a)     EGCC will deliver all third party consents set forth on Schedule 4.3; and

(b)     EGCC will deliver documents that demonstrate that EGCC has all Educational Approvals necessary to offer the Initial Educational Programs and to award Title IV Program funds and other student financial assistance in connection with such Initial Educational Programs.

**Section 7.     Annual Budget and Financial Information covenants.**

7.1     Annual Budget. The budget for the period commencing on the Effective Date and ending June 30, 2017 shall be as set forth in the economic model attached as Exhibit A (the "Initial Budget"). The Parties acknowledge that the Initial Budget is likely to be a work in progress in the early stages of the Initiative and the Collaboration. Accordingly, the Member Parties shall work together in good faith to revise, adjust, or amend the Initial Budget as conditions warrant. The annual budget for each Fiscal Year (July 1 - June 30) thereafter (the "Annual Budget") will include the following:

(a)     a projected income statement including an operational and capital expenditure budgets for the forthcoming academic year;

(b)     a projected cash flow statement on a semester basis;

(c)     projected student enrollment numbers for each Educational Program and other additional data reasonably necessary for budgetary planning purposes (collectively, the "Enrollment Data") as more fully set forth in the economic model attached as Exhibit A.

1908929_3

(d)     projected Fees and Revenues as more fully set forth in the economic model attached as Exhibit A;

(e)     projected Collaboration costs and expenses incurred by the Parties; and

(f)     such other items reasonably requested by either Party.

7.2     Annual Budget Approval Process. At least one hundred and twenty (120) days before the beginning of each academic year, EGCC will provide SRC with projected Student Enrollment Data for each Educational Program and projected Fees for the following academic year. The Member Parties will then consult and negotiate with each other in good faith and use their reasonable best efforts to mutually agree upon an Annual Budget for the following academic year. lithe Member Parties are unable to mutually agree upon an Annual Budget on or before the date that is sixty (60) days (the "Annual Budget Approval Date") prior to the commencement of the following academic year, then the Annual Budget in effect on the Annual Budget Approval Date shall be the Annual Budget for the following academic year until such time as the Member Parties mutually agree to a new Annual Budget.

7.3     Three Year Forecast. On the date that the Parties agree to each Annual Budget, the Member Parties will mutually agree upon a projected Annual Budget for the two (2) academic years following the academic year for the then current Annual Budget. The projected budgets shall be for planning purposes only and shall have no binding effect on subsequent budget plans.

7.4     Audit Rights.

(a)     EGCC shall be responsible for maintaining full and accurate accounts and records of the Collaboration, including the Collaboration Account described in Exhibit B (the "EGCC Controlled Accounts and Records"). EGCC shall keep such EGCC Controlled Accounts and Records available, during all reasonable business hours during the Term of this Agreement, at its principal offices, or at such other location as required by applicable laws, for audit, inspection and copying by SRC and Persons authorized by it or any Governmental Authority having jurisdiction over SRC.

(b)     SRC shall be responsible for maintaining full and accurate accounts and records of the SRC Controlled Collaboration Activities (the "SRC Controlled Accounts and Records"). SRC shall keep such SRC Controlled Accounts and Records available, during all reasonable business hours during the Term of this Agreement, at its principal offices, or at such other location as required by applicable laws, for audit, inspection and copying by EGCC and Persons authorized by it or any Governmental Authority or Educational Agency having jurisdiction over EGCC.

(c)     SRC shall have the right, upon reasonable written notice to EGCC, to audit, or have its agents or representatives audit, subject to such confidentiality requirements as may reasonably be imposed by EGCC, the EGCC Controlled Accounts and Records, and supporting documents and materials in the possession of or under the control of EGCC with respect to such matters, at the place or places where such records are normally retained by EGCC. SRC, or its agents and representatives, shall have free and full access thereto during

13

normal business hours for such purposes and shall be permitted to make copies thereof and extracts therefrom.

(d)     EGCC shall have the right, upon reasonable written notice to SRC, to audit, or have its agents or representatives audit, subject to such confidentiality requirements as may reasonably be imposed by SRC, the SRC Controlled Accounts and Records, and supporting documents and materials in the possession of or under the control of SRC with respect to such matters, at the place or places where such records are normally retained by SRC. EGCC, or its agents and representatives, shall have free and full access thereto during normal business hours for such purposes and shall be permitted to make copies thereof and extracts therefrom.

(e)     In the case of a dispute as a result of such audit over amounts due under this Agreement by one Party to the other Party, the individuals appointed pursuant to Section 7.6 hereof shall consult together with a view to resolving the dispute. If the dispute is not resolved within thirty (30) days, either Party may seek resolution pursuant to Section 13.4 hereof.

7.5     Financial Records.  EGCC shall prepare and maintain the financial records for the Collaboration with respect to the EGCC Controlled Accounts and Records and SRC shall prepare and maintain the financial records specified in this Section 7.5 for the Collaboration with respect to the SRC Controlled Accounts and Records (together, the "Collaboration's Financial Records"). Such financial records shall be separate and distinct from the financial statements of each Party. All Revenue and Fees arising from the enrollment of Initiative Students in the Educational Programs shall be allocated to the Collaboration, deposited into the Collaboration Account, and included in the Collaboration's Financial Records, provided however, that any pass-through fees or fees assessed to EGCC student for non-academic services, including but not limited to parking fees and activity fees, shall be excluded from Revenue.

7.6     Coordinators. Each of the Member Parties shall appoint one individual who shall serve as a contact person for purposes of communicating with the other Member Party and carrying out the information, inspection and audit rights set forth under this Agreement, and who shall be authorized to act on behalf of his or her respective party as to matters pertaining to this Agreement (each, a "Coordinator").

7.7     Insurance. Except to the extent that EGCC is self-insured as a public institution of higher education within the State of Ohio, both SRC and EGCC shall at all times maintain professional liability insurance, general liability insurance, worker's compensation and such other types of insurance as the Parties shall mutually agree.

7.8     Notification of Certain Matters. Each Party shall give prompt notice to the other of (a) the occurrence or non-occurrence of any event that results in the breach of any covenant or agreement herein, (b) any notice or other communication from any Person alleging that the authorization, license, permit, consent, waiver or approval of such Person is or may be required in connection with this Agreement and the transactions contemplated hereby, (c) any notice or other communication from any Governmental Authority or Educational Agency in connection with this Agreement and the transactions contemplated hereby, and (d) any fact, event, change, development, circumstance or effect occurring after the date hereof (or of which it became aware

14

1908929_3

after the date hereof) that has or could reasonably be expected to have caused reputational harm to the Collaboration.

**Section 8.    Noncompetition.**

During the Term, neither SRC nor EGCC shall take any action for the purpose of entering into any joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members; provided however, if SRC wishes to pursue an agreement with a 4 year institution of higher learning that compliments the Collaboration, it shall seek written permission, in advance, from EGCC and such permission shall not be unreasonably withheld.

**Section 9.    Accreditation and Licenses.**

(a)    The Parties have set forth the terms, conditions and responsibilities in this Agreement in the good faith belief that they are fully in compliance with all legal and accreditation requirements generally applicable to EGCC or SRC or specifically applicable to the Collaboration; provided, however, in the event that either Party reasonably determines that the performance of any particular service by either Party is in violation of such legal or accreditation requirements, the Parties agree that such service shall be promptly modified to the extent reasonably necessary to secure continued compliance with such legal and accreditation requirements.

(b)    EGCC shall maintain in full force and effect, as required for the offering of the Educational Programs through the Initiative, (i) state authorization where such authorization is material to the Initiative, (ii) accreditation by HLC and any other Accrediting Body where such accreditation is material to the Initiative, and (iii) eligibility and certification to participate in the Title IV Programs, including but not limited to complying with the Higher Education Act of 1965, as amended, and its implementing regulations and the terms and conditions of the Program Participation Agreement between EGCC and DOE, as in effect from time to time.

**Section 10.    Term and Termination.**

10.1 Term. Unless earlier terminated in accordance with Section 12.3 of this Agreement, this Agreement shall be effective as of the Effective Date and shall remain in full force and effect until June 30, 2022 (the "Initial Term"). The Initial Term of this agreement shall automatically renew up to two (2) times for a period of five (5) years per extension (each an "Extended Term") unless the parties mutually agree to terminate the Initial or Extended Term by notifying each other, in writing at least one hundred and twenty (120) day prior to the expiration of the term.

10.2 Termination. This Agreement shall be terminated prior to expiration of the Term as follows:

(a)    upon the mutual written agreement of the Parties;

(b)    by either Party for material breach of any of the terms hereof by the other party if such breach shall not have been cured within sixty (60) calendar days after written notice of

15

breach is delivered to the defaulting party (or, if such breach requires more than sixty (60) days to cure, if such cure is not commenced within sixty (60) days and thereafter diligently prosecuted);

(c)    If voluntary or involuntary proceedings by or against a Party are instituted in bankruptcy under any insolvency law, or a receiver or custodian is appointed for such Party, or proceedings are instituted by or against such Party for corporate reorganization, dissolution, liquidation or winding-up of such Party, which proceedings, if involuntary, shall not have been dismissed within sixty (60) days after the date of filing, or if such Party makes an assignment for the benefit of creditors, or substantially all of the assets of such Party are seized or attached and not released within sixty (60) days thereafter, the other Party may immediately terminate this Agreement effective upon notice of such termination; or

(d)    In accordance with Section 14.3, a Party shall have the right to immediately terminate this Agreement upon written notice to the other Party if a Force Majeure Event prohibits the other Party's performance under this Agreement for a period of at least ninety (90) consecutive days.

10.3 Effect of Termination

(a)    If this Agreement is terminated for any reason other than a breach by SRC, EGCC shall pay for the portion of Collaboration Activities performed by SRC through the effective date of such termination. Under no circumstances shall any financial obligations imposed on EGCC under this Agreement exceed the total amount of Fee revenues collected by EGCC during the then current Fiscal Year up to the date of termination.

(b)    If this Agreement is terminated, each of parties may, but shall not be required to, negotiate in good faith and enter into a transition services agreement under which SRC would continue to provide the services related to the Collaboration Activities (including all Operating Costs) to EGCC, on terms and conditions substantially similar to the terms and conditions set forth in this Agreement and existing as of immediately prior to such termination until the conclusion of the Teach Out Period. Without limiting the foregoing, all Operating Expenses payable to EGCC and amounts due for goods and services provided by SRC to EGCC during the Teach Out Period shall be paid in accordance with Section 3 and Exhibit B hereto.

(c)    In the event of a termination or expiration of this Agreement in accordance with the terms hereof, this Agreement shall immediately become null and void and have no further force or effect, and neither SRC nor EGCC, nor any of their respective Affiliates, shall have any liability of any nature whatsoever hereunder, or in connection with the transactions contemplated hereby, except that Sections 10, 12, 13 and 14 and all other obligations of the parties specifically intended to be performed after the termination or expiration of this Agreement shall survive any termination or expiration of this Agreement.

## Section 11.    Independent Contractor Status.

SRC shall be deemed to be an independent contractor to EGCC with respect to the Collaboration Activities to be performed by SRC hereunder. Nothing contained in this Agreement shall create or be deemed to create an employment relationship. partnership, association or joint venture relationship between SRC, on the one hand, and EGCC, on the other.

The terms of this Agreement are not intended to cause any of the parties or their Affiliates to become a joint employer for any purpose.

**Section 12.** **Confidentiality.**

Understanding that EGCC is subject to being a public entity and except as otherwise provided in this Section 12, all information exchanged by the Parties pursuant to and in execution of their obligations and in exercise of their rights under this Agreement shall he deemed confidential. Disclosure of confidential and proprietary information hereunder, whether orally or in written form, shall be safeguarded by the recipient and shall not be disclosed to third parties and shall be made available only to the receiving Party's employees or other agents who have a need to know such information for purposes of performing the Party's obligations, or for purposes of exercising the Party's rights, under this Agreement and such employees or other agents shall have a legal obligation to the employer or principal, as applicable, not to disclose such information to third parties. Each Party shall treat any and all such confidential information in the same manner and with the same protection as such Party maintains its own confidential information. Notwithstanding the foregoing, a Party may disclose Confidential Information as follows:

12.1     disclosures to the Party's Affiliates and its or its Affiliates' employees, lenders, actual or potential investors, counsel, accountants or other representatives; provided that the disclosing Party causes such Persons to comply with this Section 12;

12.2     in order to comply with any applicable law, stock exchange rule, tax audit or tax compliance procedures, governmental regulation or any other governmental requirement; provided that prior to making any such disclosure the Party making the disclosure will notify the other Party of any proceeding of which it is aware that may result in disclosure, and use reasonable efforts to limit or prevent such disclosure;

12.3     to the extent that the Confidential Information is or becomes publicly available through no fault of the Party making such disclosure or use:

12.4     to the extent that the same information is in the possession of the Party making such disclosure or use prior to receipt of the Confidential Information;

12.5     to the extent that the same information is independently developed by the Party that received the Confidential Information without in any way relying on any Confidential Information;

12.6     to the extent that the same information becomes available to the Party making such disclosure or use on a non-confidential basis from a source other than the other Party or its Affiliates, which source is not prohibited from disclosing or using such information;

12.7     to the other Party in connection with this Agreement; and

12.8     in connection with bona fide potential purchasers of the ownership interests of either SRC or EGCC or bona fide potential purchasers of equity of one or more of Affiliates of either SRC or EGCC if such potential purchasers have agreed in writing (i) to only use the

Confidential Information for purposes of evaluating the purchase of an ownership interest or such equity and (ii) to abide by the terms of this Section 14 or reasonably similar obligations.

**Section 13.     Other Agreements.**

13.1    EGCC and SRC Responsibilities. SRC agrees and shall be responsible for any Loss arising out of or by virtue of or resulting from any breach of any representation, warranty, covenant or agreement made or to be performed by EGCC pursuant to this Agreement. SRC shall be responsible for any Loss arising out of or by virtue of or resulting from any breach of any representation, warranty, covenant or agreement made or to be performed by SRC pursuant to this Agreement.

13.2    Limitation of Liability. NO PARTY WILL BE LIABLE TO ANY OTHER PARTY (NOR TO ANY PERSON CLAIMING RIGHTS DERIVED FROM ANY OTHER PARTY'S RIGHTS) FOR PUNITIVE, EXEMPLARY, SPECIAL, CONSEQUENTIAL OR INDIRECT DAMAGES OF ANY KIND AS A RESULT OF BREACH OF ANY TERM OF THIS AGREEMENT.

13.3    Express Disclaimer of Warranty. SRC MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WITH RESPECT TO THE SRC SERVICES, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY, AND FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT.

13.4    Dispute Resolution. In the event of any controversy or claim, whether based on contract, tort, statute, or other legal or equitable theory (including any claim of fraud, misrepresentation, or fraudulent inducement), arising out of or related to this Agreement (the "Dispute), arises between the Parties, then either Party may give written notice of such Dispute to the other Party and the matter at issue shall be immediately referred to each Party's Coordinator for resolution. During the ten (10) day period after delivery of such notice (the "Coordinator Resolution Period"), the Coordinator for each Party shall meet and negotiate in good faith to resolve the Dispute. If the Coordinators are unable to resolve the Dispute during Coordinator Resolution Period, then the matter at issue shall be immediately referred to the Chief Executive Officer (or equivalent executive officer) of each of the Parties for resolution. During the fifteen (15) day period after expiration of the Coordinator Resolution Period (the "CEO Resolution Period"), the Chief Executive Officer (or equivalent executive officer) of each of the Parties shall meet and negotiate in good faith to resolve the Dispute. If the Chief Executive Officer (or equivalent executive officer) of each of the Parties is unable to settle the Dispute during the CEO Resolution Period, then the Parties shall make a good faith effort to settle the Dispute by confidential third party mediation within the State of Ohio, with such mediator being chosen by agreement of the Parties, before initiating litigation and the costs of such mediation shall be shared by the parties. Notwithstanding the foregoing, either party may seek interim equitable relief pursuant to Section 13.5 against another party through any court of competent jurisdiction to protect its rights and interests, or to enforce the obligations of the other party while participating in good faith negotiations or mediation.

13.5    Specific Performance. Nothing in this Section 13, including without limitation should be construed to preclude either Party from seeking specific enforcement or temporary

and/or preliminary injunctive relief from any court of competent jurisdiction, including without limitation, for purposes of enforcing its rights under Section 10.

**Section 14.  Miscellaneous.**

14.1  Amendment. This Agreement may not be amended or modified except (a) by an instrument in writing signed by or on behalf of SRC and EGCC, or (b) by a waiver in accordance with Section 14.2.

14.2  Waiver. SRC and EGCC, by mutually written consent, may (a) extend the time for the performance of any of the obligations or other acts of the other Parties, (b) waive any inaccuracy in the representations and warranties of another Party contained herein or in any document delivered by such Party pursuant hereto or (c) waive compliance with any agreement of another Party or condition to another Party's obligations contained herein. Any such extension or waiver shall be valid only if set forth in a writing executed by the Party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or waiver of the same term or condition or as a waiver of any other term or condition of this Agreement. The failure of any Party to assert any of its rights under this Section 14.2 shall not constitute a waiver of any of such rights. No course of dealing between or among any persons having any interest in this Agreement shall be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any Party under or by reason of this Agreement. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

14.3  Force Majeure. No Party hereto shall have any liability under this Agreement for such Party's failure or delay in performing any of the obligations imposed by this Agreement to the extent such failure or delay is the result of any of the following events (each, a "Force Majeure Event"): (i) any fire, explosion, unusually severe weather, natural disaster or Act of God; (ii) epidemic; any nuclear, biological, chemical, or similar attack: any other public health or safety emergency; any act of terrorism; and any action reasonably taken in response to any of the foregoing; (iii) any act of declared or undeclared war or of a public enemy, or any riot or insurrection; (iv) damage to machinery or equipment; any disruption in transportation. communications, electric power or other utilities, or other vital infrastructure; or any means of disrupting or damaging internet or other computer networks or facilities; (v) any strike, lockout or other labor dispute or action; (vi) any action taken in response to any of the foregoing events by any civil or military authority; or (vii) any other similar event beyond such Party's control; provided that financial inability in and of itself shall not be a Force Majeure Event.

14.4  Expenses. Except as otherwise provided herein, each of the Parties shall pay all of its own fees, costs and expenses (including fees, costs and expenses of legal counsel, investment bankers, brokers or other representatives and consultants and appraisal fees, costs and expenses) incurred in connection with the performance of its obligations hereunder, and the consummation of the transactions contemplated hereby.

14.5  Further Assurances. Each of the Parties hereto shall use reasonable best efforts to take or cause to be taken all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable law and to execute and deliver such documents and other papers as may be required to carry out the provisions of this Agreement and to consummate and make effective the transactions contemplated hereby.

1908929_3

14.6    Notices. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly signed or made as of the date delivered if delivered personally or by overnight courier, when confirmed by telephone if delivered by facsimile, when confirmed by telephone or by response e-mail if delivered by electronic transmission or three (3) Business Days after being mailed by registered or certified mail (postage prepaid, return receipt requested), to the Parties at the following addresses (or at such other address for a party as shall be specified by like notice, except that notices of changes of address shall be effective upon receipt):

if to EGC:              Eastern Gateway Community College
                        4000 Sunset Blvd.
                        Steubenville Ohio 43952
                        Attention: Jimmie Bruce

if to SRC :             Student Resource Center, LLC
                        c/o Michael J. Perik
                        1540 Pontiac Avenue, Suite B
                        Cranston, RI 02920

14.7    Binding Agreement Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns; provided that neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned by a Party by operation of law or otherwise without the prior written consent of the other Party. Notwithstanding anything to the contrary in this Section 14.7, without the consent of the other Party, each Party and its permitted assigns may at any time, in their sole discretion, assign, in whole or in part, their rights under this Agreement to any subsequent purchaser of such assigning Party, such permitted transferee or any of their divisions or any material portion of their assets (whether such sale is structured as a sale of stock, sale of assets, merger, recapitalization or otherwise).

14.8    Public Announcements. All press releases and public announcements pertaining to the Collaboration shall be approved by the Coordinators appointed pursuant to Section 7.6, unless such release is otherwise required by Law or the rules and regulations of any national securities exchange.

14.9    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law or public policy, such provision shall be ineffective only to the extent of such prohibition or invalidity, and all other terms of this Agreement shall remain in full force and effect for so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.

14.10   Construction. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any person. The Parties intend that each representation, warranty and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not

breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty or covenant. The word "including" shall mean including without limitation regardless of whether such words are included in some contexts but not others.

14.11 Captions. The captions used in this Agreement are for convenience of reference only and do not constitute a part of this Agreement and shall not be deemed to limit, characterize or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no caption had been used in this Agreement.

14.12 Entire Agreement. The Exhibits and Schedules identified in this Agreement are incorporated herein by reference. This Agreement and the documents referred to herein contain the entire agreement between the Parties and supersede any prior understandings, agreements or representations by or between the Parties, written or oral, which may have related to the subject matter hereof in any way, including the Summary of Principle Terms.

14.13 Counterparts. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original but all of which taken together shall constitute one and the same instrument.

14.14 Governing Law and Forum Selection. This Agreement is governed by and construed and enforced in accordance with the laws of the State of Ohio without regard to the conflict of law provisions thereof, and each Party irrevocably agrees that any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively in the United States District Court for the State of Ohio, or in the state courts of the State of Ohio, if the legal action, suit or proceeding lacks the subject matter jurisdiction to be brought in the United States District Court for the District of Ohio and irrevocably accepts and submits to the sole and exclusive jurisdiction of the aforesaid courts in person, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party.

14.15 Parties in Interest. Nothing in this Agreement, express or implied, is intended to confer on any Person other than the Parties and their respective successors and assigns any rights or remedies under or by virtue of this Agreement.

14.16 Delivery by Facsimile or PDF. This Agreement, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or by means of portable document format ("PDF") transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any Party hereto or to any such contract, each other Party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No Party hereto or to any such contract shall raise the use of a facsimile machine or PDF transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or PDF transmission as a defense to the formation of a contract and each such Party forever waives any such defense.

THE NEXT PAGE IS THE SIGNATURE PAGE

IN WITNESS WHEREOF, each of the Parties hereto has executed this Agreement, or has caused this Agreement to be executed by its respective officer thereunto duly authorized, all as of the day and year first above written.

STUDENT RESOURCE CENTER, LLC

By:_____
Name: Michael J. Perik
Title: Manager

EASTERN GATEWAY COMMUNITY COLLEGE

By:_____
Name: Dr. Jimmie Bruce, Ed.D.
Title: President

# EXHIBIT A

## Economic Model

See attached.

## EXHIBIT B

### OPERATING EXPENSES REIMBURSEMENT AND SERVICE FEE PAYMENT

1.      Deposit of Collaboration Revenue

EGCC agrees that all Revenue, including funds collected by the EGCC arising out of the enrollment of Initiative Students including fees, tuition and the allocation of State Subsidy for Ohio Initiative Students, will be transferred to the Collaboration Account, held by EGCC, within ten (10) days of the end of the month in which such Revenue was collected, less any of the EGCC's Operating Expenses approved by the Operating Committee. EGCC shall provide a monthly report to SRC of such Revenue and Operating Expenses.

2.      Reimbursement of SRC Operating Expenses

SRC will invoice the Collaboration for its Operating Expenses incurred in the previous month. SRC will be paid by the Collaboration from the Collaboration Account within five (5) days of the receipt of the monthly deposit of Revenue from the EGCC for all open invoices that are part of the Initial Budget or Annual Budget and for which the Collaboration has been invoiced, assuming there are sufficient funds in the Collaboration Account. Provided however, EGCC agrees that SRC Operating Expenses shall only be reimbursed in the event that content fee obligations to BNED LC have been satisfied and no amounts are due and outstanding. Should there not be sufficient funds to pay SRC's monthly installment of Operating Expenses, any outstanding amounts due to SRC will be accrued and paid at such time as the Collaboration Account has sufficient funds.

3.      Payment of SRC Fees

Within thirty (30) days of the end of the Summer and Fall Semesters, EGCC will provide SRC with a semester reconciliation of the Revenue collected and Operating Expenses paid in each such semester ("Semester Reconciliation"). The Semester Reconciliations shall be in accordance with GAAP. If there is a surplus of funds remaining in the Collaboration Account as shown by the Semester Reconciliation ("Surplus"), EGCC will distribute the Surplus from the Collaboration Account as follows: 50% to SRC and 50% to EGCC. EGCC will also make Surplus payments at the end of the Spring Semester; however, the Spring Semester Surplus payments will be made promptly after the receipt of final numbers generated as part of EGCC's audited statements, but no later than September 30th of the following Fiscal Year.

4.      Hold Harmless of EGCC

SRC agrees to hold EGCC harmless for any financial liability for Operating Expenses related to this Initiative. Should in any month, or at the end of the Fiscal Year, EGCC not have generated enough Revenue to cover all of its Operating Expenses and should the Collaboration not have sufficient funds to cover the deficit, SRC agrees to deposit sufficient funds into the Collaboration Account to cover EGCC's deficit.

5.      Collaboration Account

1908929_3

The Collaborative Account held by EGCC for the benefit and execution of the Collaborative Agreement shall be a restricted fund and no Collaborative funds shall be commingled with other EGCC funds. Expenditures from the Collaborative Account shall be made in accordance with the Collaborative Agreement and at the direction of the Operating Committee.

6.     State Subsidy Calculation Methodology

This Exhibit acknowledges that at the time of the execution of this Agreement, the Ohio Department of Higher Education utilizes a three (3) year average with a one (1) year lag for calculation of State Subsidy based on defined factors. Accordingly, the methodology applied to State Subsidy is subject to change at the direction of the Ohio Department of Higher Education and therefore its application to this Agreement, should such a change occur, the impact of the change in methodology will be mutually negotiated by the Operating Committee.

1908929_3

## AMENDMENT NO. 1 TO COLLABORATION AGREEMENT

This Amendment No. 1 to Collaboration Agreement is entered into as of October ___, 2019 ("Effective Date") by and between Student Resource Center, LLC ("SRC"), located at 1540 Pontiac Avenue, Suite B in Cranston, RI 02920, and Eastern Gateway Community College, a community college, located at 4000 Sunset Blvd in Steubenville, Ohio 43952 ("EGCC" and, with SRC, each a "Member Party" and collectively, the "Member Parties").

(a)    Whereas, the Member Parties wish to amend certain provisions of that certain Collaboration Agreement dated June 30, 2017 by and between the Member Parties ("Agreement"),

(b)    Now, therefore, in consideration of the foregoing and the mutual covenants set forth below, the receipt and sufficiency of which are acknowledged, the parties agree to the changes described below.

(c)    Current Section 8 of the Agreement is hereby deleted in its entirety and is replaced with the following new Section 8:

> "During the Term, neither SRC nor EGCC shall take any action for the purpose of entering into any joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members; provided however, that once EGCC passes through an enrollment threshold of twenty-three thousand (23,000) or more Initiative Students , SRC may enter into arrangements similar to, or the same as, the Collaboration with other existing colleges if SRC, in its sole discretion, determines that such arrangements are necessary to (a) comply with state regulatory requirements or (b) ensure regional diversity. For the avoidance of doubt, if the number of EGCC-enrolled Initiative Students should be reduced below twenty-three thousand (23,000) after such additional arrangements have been entered into by SRC, those additional arrangements shall survive such reduction and shall not terminate merely as a consequence of such reduction."

(d)    Section 10.1 Term will be modified to remain in full force and effect to June 30th, 2027.

(e)    Section 10.2(d) of the Agreement is hereby amended by deleting the period at the end of that section and inserting the following in its place: "; or".

(f)    Section 10.2 of the Agreement is hereby amended by adding the following new Section 10.2(e) after existing Section 10.2(d):

> "In the event that SRC's agreement with Union Plus is terminated by Union Plus, then SRC, by written notice to EGCC, shall be entitled to terminate this Agreement to be effective as of the later of (i) the effective date of termination of SRC's agreement with Union Plus and (ii) the date that is six (6) months after the date SRC provides such written notice to EGCC."

(g)     Section 10.3 of the Agreement is hereby amended by adding the following new Section 10.3(d) after existing Section 10.3(c):

> "In the event this Agreement is terminated, EGCC shall continue the Initiative for each Initiative Student enrolled as of the date of termination for the balance of such Initiative Student's then current academic year, if any, plus the next two following academic years."

(h)     All the foregoing amendments are effective as of the Effective Date.

(i)     As amended as described above, the Agreement continues in full force and effect.


Exhibit B Item 3 will be amended to include the following paragraph.

The parties may agree to pay out from the Collaboration Account monthly payments approximating 1/12 of the estimated annual surplus as reported to the College's Board of Directors in their budget presentation. The decision to make such monthly payments must have the consent of the College's CFO given his responsibility for the overall cash flows of EGCC. Should the parties decide not to continue monthly payments, then surplus profit payments will be made after each Semester in accordance with the above paragraph.

THE NEXT PAGE IS THE SIGNATURE PAGE

Executed to be effective as of the Effective Date.

STUDENT RESOURCE CENTER, LLC

By: _____

Name: Michael J. Perik
Title: Manager


EASTERN GATEWAY COMMUNITY COLLEGE

By: _____

Name: James Miller
Title: Executive Vice President

## AMENDMENT NO. 2 TO COLLABORATION AGREEMENT

This Amendment No. 2 to Collaboration Agreement is entered into as of February 1, 2021 ("Effective Date") by and between Student Resource Center, LLC ("SRC"), located at 101 Dyer Street, Suite 3A, Providence, Rhode Island 02903, and Eastern Gateway Community College, a community college, located at 4000 Sunset Blvd in Steubenville, Ohio 43952 ("EGCC" and, with SRC, each a "Member Party" and collectively, the "Member Parties").

Whereas, the Member Parties wish to amend certain provisions of that certain Collaboration Agreement dated June 30, 2017 by and between the Member Parties, as amended by that certain Amendment N. 1 to Collaboration Agreement, dated October 28, 2019 (as amended the "Agreement"),

Now, therefore, in consideration of the foregoing and the mutual covenants set forth below, the receipt and sufficiency of which are acknowledged, the parties agree to the changes described below.

(a)     Section 2.3 of the Agreement is hereby amended by (i) deleting the text at subparts (a) and (d) and inserting in the place of such text "[intentionally deleted]" and (ii) revising the text at subpart (e) to read as follows:  "(e) Provide support of all ancillary efforts around making online products available including assistance with marketing, recruiting and enrollment."

(b)     All of the foregoing amendments are effective as of the Effective Date.

(c)     As amended as described above, the Agreement continues in full force and effect.

THE NEXT PAGE IS THE SIGNATURE PAGE

Executed to be effective as of the Effective Date.

STUDENT RESOURCE CENTER, LLC

By: _____

Name: Michael J. Perik

Title: Manager

EASTERN GATEWAY COMMUNITY COLLEGE

By: _____

Name: Mr. Michael Geoghegan, MBA, CPA

Title: President

2747888_1                                    2