UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STUDENT RESOURCE CENTER, | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:22-cv-2653** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| EASTERN GATEWAY COMMUNITY | : | **Magistrate Judge Chelsey M. Vascura** |
| COLLEGE, | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

This matter is before the Court on Plaintiff's Motion for a Preliminary Injunction (ECF No. 2). The Court held a preliminary injunction hearing on Thursday, July 7, 2022, and issued an oral ruling **GRANTING** Plaintiff's Motion. This written Opinion and Order follows.

### I.    BACKGROUND

This is a contract case brought by Student Resource Center ("SRC"), a private educational services company, against Eastern Gateway Community College ("EGCC"), a public two-year college based in Steubenville, Ohio. (ECF No. 1). Based on the affidavits, hearing testimony, and documentary evidence, the Court has discerned the following facts. The parties entered a Collaboration Agreement in June 2017, which remains in effect today. (ECF No. 2-3, Braithwaite aff., ¶ 3). The purpose of the Agreement is "to develop, market, and offer online courses to members of unions and professional associations. As part of the collaboration, SRC partners with unions and other professional associations to provide education programs offered by EGCC on a free or heavily-discounted basis." (*Id.* ¶ 8). SRC's main services under the Agreement are to interface with unions, field inquiries from union members, advise those members on course

1

enrollment (in conjunction with EGCC staff), and assist them with the admissions process. (Braithwaite test.; Geoghegan test.). All academic instruction is by EGCC alone. (*Id.*).

In October 2019, the parties extended their contract through June 30, 2027. (ECF No. 2-2, Collaboration Agreement, Amend. No. 1 ¶ (d)). The partnership has been, until recently, harmonious. It accounts for approximately 95% of SRC's revenue (ECF No. 2-3 ¶ 10); and on EGCC's side, enrollment has grown from approximately 5,500 union members before the Agreement to upwards of 40,000 in fall semester 2021. (*Id.* ¶ 9; Geoghegan test.; Hearing Ex. P-4). Recent enrollments have declined moderately, though the parties dispute the cause. Compared to the previous year, spring 2022 enrollment is down 4.7%, and summer 2022 enrollment is down 16.6%. (*Id.*).

On March 23, 2022, SRC terminated its CEO, Michael Perik, for "questionable conduct related to the sale of SRC." (ECF No. 2-3 ¶ 11; Hearing Ex. P-6). The Complaint alleges "that Perik and others knew approximately six months before closing their deal with Sterling [SRC's purchaser] that EGCC was out of compliance with HLC's [the Higher Learning Commission's] accreditation and was headed toward probation." (ECF No. 1 ¶ 44). The Higher Learning Commission placed EGCC on probation on November 8, 2021, about four and a half months after Sterling entered its purchase agreement. (*Id.* ¶¶ 35, 42). Sterling commenced an investigation, which resulted in SRC removing Perik as CEO and placing three other executives—Rowe, Haseley, and Jones—on probation. (Braithwaite test.). Those executives later resigned. (*Id.*). Last month, Sterling filed a civil lawsuit for fraud against Perik, the resignees, and other defendants. *See Sterling Small Market Educ. Fund, L.P. v. Perik*, Case No. 1:22-cv-00790 (D. Del.).

EGCC's President, Michael Geoghegan, learned of Perik's firing the same day it occurred, and demanded SRC rescind the action. (Geoghegan test.). Instead, SRC hired a new CEO, Phillip

Braithwaite, along with a new Chief of Staff, Senior Vice President of Marketing, Vice President of Student Operations, and Vice President of Partnership Development. (Braithwaite test.; ECF No. 2-3 ¶¶ 12–13). All had prior management experience in online education. (*Id.*). On or about April 1, 2022, Braithwaite met with Geoghegan to discuss their continued partnership. (Braithwaite test.). Communication between the parties has been sparse since then. (*Id.*).

On May 12, 2022, EGCC served SRC with a "Written Notice of Material Breach and Intention to Terminate the Collaboration Agreement." (ECF No. 2-4, Notice, at 1; No. 2-3 ¶ 14). The Notice, signed by Geoghegan, stated that "SRC has fundamentally changed the nature of the Collaboration without proper notice and consultation with EGCC resulting in a material breach of the Agreement." (ECF No. 2-4 at 1). More specifically, it asserted that SRC violated Sections 2.4(e) and 7.8(d) of the Agreement when it terminated Perik. (*Id.*). The pertinent provisions of the Agreement read as follows:

> 2.4    Joint Approval Collaboration Activities. Notwithstanding any other provision of this Agreement, the Parties expressly acknowledge and agree not to undertake any of the following Collaboration Activities without the prior written consent of each member of the Operating Committee:
>     . . .
>         (e)    any material change in the nature of the Collaboration, the Initiative or the Collaboration Activities;
>     . . . .
>
> 7.8    Notification of Certain Matters. Each Party shall give prompt notice to the other of . . . (d) any fact, event, change, development, circumstance or effect occurring after the date hereof (or of which it became aware after the date hereof) that has or could reasonably be expected to have caused reputational harm to the Collaboration.

(ECF No. 2-2 §§ 2.4(e), 7.8(d)).

According to the Notice, SRC's termination of Perik "constituted a breach by SRC which led to the termination of other leadership team members" who, together with Perik, "were part of the SRC management team that was deeply familiar with the terms of the Agreement and the

Collaboration's operation and growth." (ECF No. 2-4 at 1). Continuing, the Notice claimed that SRC's decisions to "unilaterally remove[] these individuals," and to replace the CEO with "an executive with substantially less experience in the community college industry," have constituted "a material change to the nature of the Collaboration" to which the Operating Committee did not consent. (*Id.* at 2). Furthermore, EGCC stated that the change in CEO "could reasonably be expected to cause reputational harm to the Collaboration given the previous CEO's experience with EGCC and this program." (*Id.*). "Because SRC did not obtain the Operating Committee's approval of the material change in the nature of the Collaboration," the Notice concluded, "SRC is in material breach of the Agreement." (*Id.*).

SRC contests the characterizations in the Notice and alleges that EGCC is the breaching party. In a Response dated May 20, 2022, SRC contended it is not in material breach because "[t]he retention of Mr. Perik as CEO . . . was never an element of the Agreement." (ECF No. 2-5, Response, at 2). Additionally, it stated, "Braithwaite[] holds extensive prior experience as an executive and SRC continues to meet its duties under the Agreement." (*Id.*). SRC claimed its acts were within the "complete discretion" reserved by Section 2.5, which reads:

> 2.5    Level of Service. Each of the Parties agrees that, in performing the Collaboration Activities under this Agreement, it shall (i) allocate to the performance of such activities sufficient personnel with appropriate experience, knowledge and competence, and (ii) perform such Collaboration Activities at a performance level equal to the level at which each Party is then providing such Collaboration Activities (or the same or similar services) with respect to its own business and operations. Each Party shall have responsibility for and complete discretion with respect to supervision and management of its employees and third-party contractors providing the Collaboration Activities.

(ECF No. 2-2 § 2.5; *see* ECF No. 2-5 at 2). SRC's Response concluded: "the nature of the Collaboration has not changed by and EGCC suffered no harm from SRC's removal of Mr. Perik from his prior position as SRC's CEO." (*Id.*).

EGCC believes its best path forward is to terminate the Agreement and shift SRC's services in-house by hiring more academic advisers and working directly with the unions. (Geoghegan test.). Absent intervention, EGCC intends to terminate the contract on July 11, 2022—that being 60 days after service of the Notice, which marks the end of the cure period in Section 10.2(b). (*Id.*; ECF No. 2-3 ¶ 15; No. 2-2 § 10.2(b)).

On June 30, 2022, SRC filed its Complaint and Motion for a Preliminary Injunction. (ECF Nos. 1 & 2). According to SRC's Motion, *EGCC* has breached the Agreement in at least three ways. First, SRC claims EGCC has attempted to terminate the Agreement improperly, based on false allegations of material breach by SRC and without invoking the dispute resolution clause. (ECF No. 2 at 14–15). That clause reads:

> 13.4    Dispute Resolution. In the event of any controversy or claim, whether based on contract, tort, statute, or other legal or equitable theory . . . arising out of or related to this Agreement (the "Dispute["]), arises between the Parties, then either Party may give written notice of such Dispute to the other Party and the matter at issue shall be immediately referred to each Party's Coordinator for resolution. [The Section then delineates iterative stages of negotiation, beginning with the Coordinators for a period of ten days and progressing to the CEOs for a period of fifteen days.] If the Chief Executive Officer (or equivalent executive officer) of each of the Parties is unable to settle the Dispute during the CEO Resolution Period, then the Parties shall make a good faith effort to settle the Dispute by confidential third party mediation within the State of Ohio, with such mediator being chosen by agreement of the Parties, before initiating litigation and the costs of such mediation shall be shared by the parties. . . .

(ECF No. 2-2 § 13.4).[1] Braithwaite attested "SRC has received no Section 13.4 Notice, no negotiations took place between the Parties' Coordinators or CEOs, and no third party mediation has taken place." (ECF No. 2-3 ¶ 17).

---

[1] The dispute resolution clause also includes an explicit exception for seeking preliminary injunctive relief, as SRC does in the instant Motion: "Notwithstanding the foregoing, either party may seek interim equitable relief pursuant to Section 13.5 ["Specific Performance"] against another party through any court of competent jurisdiction to protect its rights and interests, or to enforce the obligations of the other party while participating in good faith negotiations or mediation." (*Id.*). Section 13.5 reads: "Nothing in this Section 13, including without limitation [*sic*] should be construed to preclude either Party from seeking specific enforcement or temporary and/or preliminary injunctive relief

The second allegation of breach concerns EGCC's failure to make payments owed. (ECF No. 2 at 13–14). According to Braithwaite, "EGCC has wrongfully withheld payments of over $2,650,000 due and owed to SRC under the Agreement," including past-invoiced operating expenses and unreconciled profit share payments, "in order to induce SRC's consent to [EGCC's] wrongful termination attempts." (*Id.* ¶¶ 18–22). Hearing testimony from SRC's CFO established that Geoghegan has disputed some line items in SRC's invoices, but those account for only a small share of the outstanding payments. (Leishure test.).

Third, SRC argues that EGCC has "scheme[d] to usurp SRC business opportunities under the Agreement by setting up a new partnership directly with SRC's union partners," in violation of the Agreement's non-competition clause. (ECF No. 2 at 10, 15–16). As amended in 2019, the clause reads:

> During the Term, neither SRC nor EGCC shall take any action for the purpose of entering into any joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members; provided however, that once EGCC passes through an enrollment threshold of twenty-three thousand (23,000) or more Initiative Students, SRC may enter into arrangements similar to, or the same as, the Collaboration with other existing colleges if SRC, in its sole discretion, determines that such arrangements are necessary to (a) comply with state regulatory requirements or (b) ensure regional diversity. . . .

(ECF No. 2-2 Amend. No. 1 ¶ (c) (emphasis original)). Braithwaite declared "three of SRC's union partners replaced the SRC subdomain pages and links on their websites to recently created websites controlled by EGCC," demonstrating "EGCC's direct contact with SRC's union partners and EGCC's attempt to compete with SRC in clear violation of the Agreement." (ECF No. 2-3 ¶ 28).

---

from any court of competent jurisdiction, including without limitation, for purposes of enforcing its rights under Section 10 ["Term and Termination"]." (*Id.* § 13.5).

SRC moves the Court for a preliminary injunction to "prohibit EGCC from: (1) terminating the Agreement dated June 30, 2017, as amended on or around October 2019 and February 1, 2021; and (2) breaching the Agreement's non-competition provisions under Section 8 (as amended by Amendment No. 1) by starting and operating a competing business." (ECF No. 2 at 19).

## II.  LEGAL STANDARD

In determining whether a preliminary injunction is warranted, the Court considers four factors: "(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction." *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 590–91 (6th Cir. 2012). While a strong likelihood of success is crucial, all four factors must be balanced rather than treated as prerequisites. *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459 (6th Cir. 1997). Irreparable harm also is of great importance: "Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis removed).

Preliminary injunctions are a discretionary remedy intended "to maintain the status quo pending determination of an action on its merits." *Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 965 (6th Cir. 1976). "[T]he preliminary injunction is an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (alteration incorporated, internal quotation marks omitted). Any preliminary injunction must be stated in specific terms, describe in reasonable detail the act or acts to be restrained, and give the reasons for its issuance.

Fed. R. Civ. P. 65(d). Furthermore, "it should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978) (internal quotation marks omitted).

Though the plaintiff carries the burden in this analysis, the plaintiff need not "establish his right to an injunction wholly without doubt," *Id.* (internal quotation marks omitted); nor "prove his case in full." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). For a strong likelihood of success, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997).

### III.  LAW & ANALYSIS

### A.  Likelihood of Success on the Merits

SRC's *prima facie* case for breach of contract requires them to "show that a contract existed, the plaintiff performed, the defendant breached, and the plaintiff suffered damages." *Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 565 (6th Cir. 2006) (citing *Wauseon Plaza Ltd. P'ship v. Wauseon Hardware Co.*, 807 N.E.2d 953, 957 (Ohio Ct. App. 2004)). SRC's likelihood of success on the merits turns largely on the Court's construction of the contract—specifically, the interpretation of materiality and the scope of the non-competition provision. Under Ohio law,[2] "[w]here the written instrument is unambiguous, a court must give effect to the parties' expressed intentions." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E. 2d 1201, 1208 (Ohio Ct. App. 1998) (citing *Aultman Hosp. Ass'n v. Cmty. Mut. Ins. Co.*, 544 N.E.2d 920, 922–23 (Ohio

---

[2] The Agreement specifies it "is governed by and construed and enforced in accordance with the laws of the State of Ohio without regard to the conflict of law provisions thereof." (ECF No. 2-2 § 14.14).

1989)). "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations. If an ambiguity exists in a contract, then it is proper for a court to consider 'extrinsic evidence,' *i.e.*, evidence outside the four corners of the contract, in determining the parties' intent." *Id.* (internal citations omitted).

Since Plaintiff seeks two forms of injunctive relief, the Court has two issues of contractual interpretation to consider: first, whether EGCC properly may terminate the Agreement on July 11; and second, whether EGCC is violating the non-competition clause.

### 1.  Whether EGCC Properly May Terminate the Agreement on July 11

The first issue is a narrow one. If the Agreement is to be terminated on July 11, it must be for the reasons set out in the Notice. Several *post hoc* arguments developed by EGCC are irrelevant for present purposes—including SRC's "unilateral[] disbanding [of] the Operating Committee," SRC's purported violation of the non-competition clause by communicating with other colleges, declining enrollment numbers, regulatory issues, and SRC's sale to private equity. (ECF No. 10 at 10–11; Geoghegan test.). Because those grounds were not stated in EGCC's Notice of May 12, 2022, the mandatory 60-day cure period in Section 10.2(b) has not begun to run. (*See* ECF No. 2-2 § 10.2(b)). EGCC's imminent termination of the contract is predicated *only* on material breach by SRC—to wit, violation of Sections 2.4(e) and 7.8(d) by failing to provide EGCC with notice of Perik's firing and failing to obtain EGCC's prior consent to that change. (ECF No. 2-4).

The Agreement does not define a "material" breach, but Ohio courts ascribe the meaning at common law: "a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 897 N.E.2d 184, 186 (Ohio Ct. App. 2008) (citing

Williston on Contracts, Chapter 63:3). For several reasons, SRC is likely to show the Notice's claims of "material" breach are unfounded.

Foremost, the Agreement expressly reserves for each party "responsibility for and complete discretion with respect to supervision and management of its employees." (ECF No. 2-2 § 2.5). By its plain meaning, this clause extends to the selection of a CEO. Perik was himself an SRC employee, as well as a high-level supervisor and manager of SRC's other staff. (Braithwaite test.). To read the contract as requiring prior consent to replace a CEO, the Court would have to disregard the clear language of Section 2.5. It follows that SRC's conduct, permitted by the Agreement, cannot be said to "defeat[] the essential purpose of the contract." *Marion Family YMCA*, 897 N.E.2d at 186. Executive turnover might give rise to a material breach *if* it caused SRC to fail its assurance, contained in the same clause, that each party "shall" maintain "a performance level equal to the level at which each Party is then providing such Collaboration Activities." (ECF No. 2-2 § 2.5). Yet, the Notice gives no objective evidence of a drop in performance related to the change in CEO. The sole performance-based accusation in EGCC's Notice is that Braithwaite has "substantially less experience in the community college industry." (ECF No. 2-4 at 2). At most, this shows concern about a *potential* drop in SRC's performance, not an actual one attributable to the new CEO.

Likewise, it strains this Court's credulity to view the appointment of a new CEO as a material breach of the clause requiring "prompt notice" of events "reasonably . . . expected to have caused reputational harm to the Collaboration." (ECF No. 2-2 § 7.8(d)). According to the Notice, "[e]xternal partners of the Collaboration have already voiced concern to EGCC regarding SRC's new management team's focus on for-profit education rather than community college education, the new management team's lack of experience and ability in servicing high quality online courses

10

and programs, and the new management team's lack of connection to groups with adult learners." (ECF No. 2-4 at 2). The admissible evidence did not corroborate such a concern. In any event, the Agreement requires only "prompt notice" of the potentially harmful event. (ECF No. 2-2 § 7.8(d)). Geoghegan expected advance notice (Geoghegan test.); and while that might be the sounder business practice, the Agreement does not expressly call for it. Moreover, given that Geoghegan did learn of Perik's termination the same day it occurred (*Id.*), any deficient notice by SRC is a technical breach at most, not a material one undermining the "essential purpose of the contract." *Marion Family YMCA*, 897 N.E.2d at 186.

EGCC's other *post hoc* evidence does not undermine SRC's likelihood of success on these points. Evidence regarding declining enrollment numbers and lower inquiry conversion rates (Geoghegan test.; Hearing Ex. D-3) do not necessarily suggest a drop in SRC's performance. In the Court's preliminary assessment, other variables—such as EGCC's probationary status, nationwide enrollment trends, and EGCC's own attempts to cut SRC out of the referral pipeline— may be the more likely culprits. Similarly, concerns about the qualifications of SRC's new executive team appear pretextual. By Geoghegan's own testimony, EGCC was inclined to exit the contract from the day Perik was terminated, unless Perik and the other executives were hired back. (Geoghegan test.). No other cure was acceptable. On the current evidence, it seems EGCC's consternation is rooted more in the old team's absence than in the new one's abilities.

In sum, the reasons for termination contained in the Notice do not appear to support a material breach by SRC. SRC thus is likely to succeed in showing that EGCC's attempt to terminate the contract for cause on July 11 is improper.[3]

---

[3] The Court declines to rest on the dispute resolution clause, as it is a prerequisite to litigation, not termination. (*See* ECF No. 2-2 § 13.4 ("the Parties shall make a good faith effort to settle the Dispute by confidential third party mediation within the State of Ohio . . . *before initiating litigation*") (emphasis added)). Moreover, invoking the clause is voluntary. (*See id.* ("In the event of any controversy or claim . . . then either Party *may* give written notice of such

### 2. *Whether EGCC is Violating the Non-Competition Clause*

SRC also has established a likelihood of success on breach of the non-competition clause. By its plain language, the clause broadly prohibits "*any action* for the purpose of entering into *any* joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members." (ECF No. 2-2 § 8 (emphasis added)). EGCC argues the clause should be narrowed to "*third-party*" collaborations, thus permitting EGCC to "work[] directly with the unions." (ECF No. 10 at 7). That reading, however, asks the Court to graft a term into a seemingly unambiguous provision. Insofar as EGCC seeks to launch "any . . . collaboration . . . that is competitive" with the existing partnership, it likely is within the scope of the non-competition clause.

The evidence indicates that EGCC already is taking preparatory steps for such a collaboration, despite the Agreement remaining, for the moment, in full effect. Braithwaite attested that "three of SRC's union partners replaced the SRC subdomain pages and links on their websites to recently created websites controlled by EGCC," indicating "direct contact" between EGCC and the unions. (ECF No. 2-3 ¶ 28; Braithwaite test.). Some of those union partners then "made SRC aware of their possible need to permit their union members to enroll directly through EGCC without SRC's involvement if the Agreement is no longer enforceable." (ECF No. 2-3 ¶ 30). EGCC's preparatory steps threaten to appropriate SRC's union relationships, likely bringing them

---

Dispute to the other Party and the matter at issue shall be immediately referred to each Party's Coordinator for resolution.") (emphasis added)). Currently, neither party has so elected. EGCC chose to utilize the procedure for termination, contained in Section 10.2, by providing written notice and 60 days to cure (*see id.* § 10.2(b)); and SRC chose to "seek interim equitable relief" under the carveout to Section 13.4. (*See id.* § 13.4). As such, it does not appear either party has violated the dispute resolution clause.

within the broad ambit of the non-competition clause. As such, SRC is likely to show a breach of contract on that basis, which weighs in favors of an injunction.[4]

## B. Irreparable Injury

The irreparability factor is nearly as crucial to the preliminary injunction analysis as the likelihood of success on the merits. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Such a harm might occur, for instance, "if the nature of the plaintiff's loss would make damages difficult to calculate," *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992); or if "severe financial hardship" would "completely 'wipe[] out'" a movant such that a delay in relief "would render a later judgment on the merits meaningless." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 924 (6th Cir. 1978).

Here, the irreparability factor favors injunctive relief. First, SRC established that the Agreement constitutes *95%* of its revenues—such a great share that SRC quickly would reach "dire straits" financially if EGCC is permitted to terminate the contract as planned. (Braithwaite test.; ECF No. 2-3 ¶ 10). SRC's financial hardship is made even more immediate by the estimated $2.65 million purportedly withheld by EGCC. (*Id.* ¶ 22). If SRC is "completely 'wiped out' long before a final decision could be expected," then that later decision is "meaningless" without interim relief. *Stenberg*, 573 F.2d at 924.

---

[4] SRC's other theory of breach, based on the withholding of payments, is premature. The requested injunction seeks only to prohibit EGCC from terminating the Agreement and from violating the non-competition clause—not from continuing to withhold any payments. (*See* ECF No. 2 at 19). The Complaint (filed simultaneously with the Motion for a Preliminary Injunction) further clarifies that the disputed payments are a future concern: "Although injunctive relief is *not presently sought* for the repayment of funds due and owed to SRC, should EGCC's egregious conduct continue, SRC may be required to separately seek injunctive relief for the immediate repayment of those funds *in the future*." (ECF No. 1 ¶ 16 n.1 (emphasis added)). The withheld payments do bear on SRC's financial injuries, so the Court reserves further discussion for the next section.

EGCC disputes this point, arguing that SRC can replace its lost revenue through new collaborations with other educational partners. (ECF No. 10 at 9). However, new business takes time to cultivate, and EGCC neglects how its own actions have rendered SRC quite unlikely to survive that transitional period. The Agreement tethered SRC to EGCC through its long duration and restriction on competing ventures with other schools. (*See* ECF No. 2-2 § 8 & Amend. No. 1 ¶ (d)). SRC inevitably built its business around that contract and justifiably expected the revenues to continue so long as SRC performed its end. Now, EGCC has cut the revenue stream by suddenly withholding payments, pressuring SRC to "consent to [EGCC's] wrongful termination attempts." (ECF No. 2-3 ¶ 22; Leishure test.). News of the intended termination also caused SRC to lose 10 or more operational employees (Braithwaite test.), diminishing its capacity to serve new partners. In light of these facts, it is somewhat simplistic for EGCC to claim, "this case is really only about money." (ECF No. 10 at 6). It also is about SRC's lifeblood as a business. That SRC theoretically could build other revenue streams does not render their injury "speculative or unsubstantiated" (*Id.*, quoting *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006)), when EGCC has set SRC on a clear path to insolvency.

Second, EGCC's apparent breach of the non-competition provision presents the type of injury for which damages are "difficult to calculate" or compensate in monetary terms. *Basicomputer Corp.*, 973 F.2d at 511. In *Basicomputer*, the Sixth Circuit noted that "loss of customer goodwill" and "loss of fair competition . . . from the breach of a non-competition covenant" both support a finding of irreparable injury. *Id.* at 511–12. The Court concurs. If EGCC is permitted to sever SRC's union relationships by establishing a competing collaboration, then the injury to SRC will be hard to quantify or unwind. As Braithwaite stated, "SRC will face devastating disruption to its business operations and even greater damage to the enterprise value

14

of its business." (ECF No. 2-3 ¶ 31). This, too, supports interim relief to avert the injury and preserve SRC's rights while the Agreement remains in force.

### C. Substantial Harm to Others; Public Interest

This being a private contractual dispute, the remaining two factors—substantial harm to others, and service to the public interest—play a diminished role in the Court's analysis. At the hearing, the parties generally agreed on this weighting. The only relevant interests besides the contracting parties are the EGCC students; and from their perspective, so long as support services are rendered effectively, the provider is immaterial.

Of course, EGCC's hardships are relevant and are not lost on the Court. The injunction will, for the moment, require EGCC to maintain a contractual relationship it would prefer to exit. Nonetheless, EGCC willingly entered into (and extended) the multi-year contract with SRC. (*See* ECF No. 2-2 Amend. No. 1 ¶ (d)). The Agreement does not provide for termination at will, and it authorizes either party to "seek interim equitable relief" and "specific performance." (*Id.* §§ 10.2, 13.4, 13.5). These provisions were a part of the bargain; they protected EGCC from SRC spontaneously withdrawing its services, and now they protect SRC from EGCC spuriously severing its main revenue source. While EGCC will bear some burden from this injunction, it pales against the greater stakes for SRC. Moreover, the burden is not an unfair one, as the Court sees no inequity in requiring EGCC to honor its contractual obligations.

### IV. CONCLUSION

For the reasons stated, Plaintiff's Motion for a Preliminary Injunction (ECF No. 2) is **GRANTED**. The Court **ENJOINS** Defendant EGCC, preliminarily, from: (1) terminating the Agreement as set in motion by the Notice of May 12, 2022; and (2) breaching the Agreement's

non-competition provisions by starting and operating a competing business while the Agreement remains in effect. This injunction will remain in place until further notice.

As a condition of this preliminary injunction, the Court also will order SRC to give some security for "costs and damages" if EGCC later is "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). *See Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538–39 (6th Cir. 1978) (noting "the requirement is discretionary," but the district court must "expressly consider[] the question"); *Bunn Enters., Inc. v. Ohio Operating Eng'rs Fringe Ben. Programs*, 2013 WL 3147956, at *15 (S.D. Ohio June 19, 2013) ("The amount of security required and whether a bond is needed is up to the discretion of the district court."). Under the circumstances, a nominal bond is proper and sufficient. Accordingly, SRC **SHALL POST A BOND** in the nominal amount of **$100,** which it must deliver to the Clerk of Court without delay.

**IT IS SO ORDERED.**

_____
**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED: July 11, 2022**

16