# EXHIBIT 1

# REAL ESTATE PURCHASE AGREEMENT

This Real Estate Purchase Agreement dated as of this _____ day of _____, 2024 (the "Effective Date").

WITNESSETH, that the parties hereto have agreed as follows:

## ARTICLE 1. DEFINITIONS.

As used herein the words capitalized in this Article and AGREEMENT shall have the meaning or identity or represent the amount set forth after each word:

(a)  AGREEMENT:  This Real Estate Purchase Agreement

(b)  SELLER:  Eastern Gateway Community College, formerly known as Jefferson Community College

Fred Ransier, Executive Director of
the Governance Authority of
Eastern Gateway Community College ("EGCC")

(c)  PURCHASER:  Steubenville City School
District Board of Education ("BOE")
611 N. 4th Street
Steubenville, OH  43952

(d)  PROPERTY:

(i)  The real estate known for street numbering purposes as 110 John Scott Highway, Steubenville, OH  43952 containing a two (2) story commercial building and other improvements on approximately 3.701 acres of land and commonly known as the Pugliese Building ("Pugliese Building") owned by Seller, Jefferson County Auditor Parcel No. 07-11934-001 (the "Pugliese Parcel"), as more fully described on **Exhibit "A"** attached hereto and made a part hereof;

ii.  The real estate located adjacent to the Pugliese Parcel ("Adjacent Parcel") containing approximately 1.131 acres of land, together with any improvements thereon, owned by Seller, Jefferson County Auditor Parcel No. 07-10454-000, a more detailed description of which is attached as **Exhibit "B"** (the Pugliese Parcel and the Adjacent Parcel are collectively referred to as the "Property");

{M0504271.1 }

Page 1 of 20

        iii.     All right, title and interest, if any, of Seller in and to any land lying in the bed of any street, road or access way, open or proposed, in front of, or in the back of, or at the side of the Property;

        iv.     All right, title and interest of Seller, reversionary or otherwise, in and to all easements in or upon the Property and all other rights and appurtenances belonging or in any way pertaining thereto, if any, and all of Seller's rights under any and all deed restrictions, rights-of-way, reciprocal easement agreements, party wall agreements, or similar matters affecting the Property;

        v.     All coal, mineral, oil, gas and other subterranean interests and rights, if any; and

(e)     PURCHASE PRICE:  Two Million One Hundred Thousand and No/100 Dollars ($2,100,000.00) for the Property.

(f)     DEED:  A good and sufficient limited warranty deed (the "Deed") conveying good and marketable title to the Property, free and clear of all liens, encroachments, encumbrances, restrictions, reservations, reversions and other conditions of title whatsoever except (i) those approved in writing by Purchaser in accordance with Articles 2 and 5; (ii) zoning and city and county resolutions and ordinances; and (iii) if applicable, real estate taxes and assessments, both general and special, not yet due and payable on the date of Closing (but which shall be prorated to the day of the Closing).  The Deed shall name Purchaser as being the sole Grantee.

(g)     TITLE POLICY:  If Purchaser so requests, ALTA Owner's Title Policy of Insurance for the amount of the Purchase Price for the Property with, if requested by Purchaser in writing to the Title Company (defined below) at least three (3) business days before Closing, such standard title endorsements offered by the Title Insurance Company for which the Title Company is the agent as the Purchaser may deem advisable.

(h)     TITLE COMPANY/CLOSING OR ESCROW AGENT:

        Ohio Valley Title Inc.
        500 Market Street, Suite 700
        Steubenville, OH  43952

(i)     CLOSE, CLOSED AND CLOSING:  The Closing, Close, or Closed or similar words shall mean the date when the Title Company/Closing Agent (i) received the Deed fully executed in form and substance acceptable to the Purchaser, the Title Company, the County Recorder, and the County Auditor for filing; (ii) has all funds

necessary to carry out this transaction, including the funds necessary to pay all costs and prorations, and sufficient funds required for delivery of the net Purchase Price due to the Seller as will be indicated on a Settlement Statement which shall be prepared by the Closing or Escrow Agent and delivered to and approved by both Seller and Purchaser prior to Closing and which approval must be acknowledged by the signing thereof by all parties, and (iii) has delivered the Deed to the Jefferson County Recorder's Office for filing and recording and the Jefferson County Recorder's office has in fact accepted and recorded the Deed; with the date upon which the last of the above-stated events shall have occurred being the Closing, Close, Closed, and/or the Closing Date. The parties will use their good faith reasonable efforts to Close within ten (10) business days of the Judge's Order (defined in Article 11 below).

(j)     POSSESSION DATE: Possession shall occur simultaneous with the Closing.

(k)     SELLER'S AUTHORIZED OFFICER OR AGENT:

Fred Ransier, Executive Director of the Governance Authority of
Eastern Gateway Community College, formerly known as
Jefferson Community College

110 John Scott Highway
Steubenville, OH 43952
Telephone: 614-671-3125
E-Mail: FRansier@egcc.edu

Fred Ransier as Executive Director is hereby authorized by the Governance Authority to execute this Purchase Agreement and all related closing documents, and to have authority to legally bind the Seller and to accept all notices required or permitted under this Agreement. All warranties or representations made herein to the knowledge of Seller are specifically limited to and apply only to the actual knowledge of Fred Ransier, of 110 John Scott Highway, Steubenville, OH 43952, Chairman of the Governance Authority of Eastern Gateway Community College, after due investigation and inquiry of persons who he knows or believes might have knowledge.

(l)     PURCHASER'S AUTHORIZED OFFICER OR AGENT:

Melinda Young, Superintendent
Steubenville City Schools
611 North Fourth Street
Steubenville, OH 43952

{M0504271.1 }

Telephone: 740-283-3767
E-Mail: myoung@rollred.org

Melinda Young is hereby warranted by Purchaser to have authority to legally bind the Purchaser and to accept all notices required or permitted under this Agreement. All warranties or representations made herein to the knowledge of Purchaser are specifically limited to and apply only to the actual knowledge of Melinda Young, Superintendent, authorized officer or agent of Purchaser, after due inquiry of persons who she knows or believes might have knowledge.

(m)    SELLER'S ATTORNEY:

Martha L. Bushey, Esq.
Manchester Newman & Bennett
201 E. Commerce Street, Atrium Level 2
Youngstown, Ohio 44503
Telephone: (330) 743-1171
Facsimile: (330) 743-1190
E-Mail: MBushey@MNBLawyers.com

(n)    PURCHASER'S ATTORNEY:

Amy S. Bartemes, Esq.
Bricker Graydon LLP
100 S. Third Street
Columbus, OH 43215
Telephone: (614) 227-2379
Facsimile: (614) 227-2390
Email: ABartemes@BrickerGraydon.com

## ARTICLE 2. SURVEY, TESTING, RIGHT OF ENTRY.

A.    Seller hereby states and confirms that it has provided Purchaser with any and all due diligence items in Seller's possession and control or reasonably accessible by Seller ("Seller's Due Diligence Items") including but not limited to the following: (a) environmental, geotechnical, and property condition reports and any other reports pertaining to the condition of the Property in Seller's possession; (b) survey of the Property in Seller's possession; (c) all certificates, permits, certificates of occupancy, licenses, approvals, and other items relating to the development, construction, operation, use, maintenance, and occupancy of the Property in Seller's possession; and (d) building and construction plans and drawings.

B.      Purchaser confirms that it has completed all of its due diligence related to the Property, including but not limited to assessments, inspections, investigations, evaluations, studies and testing of the Property (collectively and individually "Due Diligence") and that no additional time is needed for Purchaser's Due Diligence.

C.      Seller shall be responsible, at its sole cost and expense, to contract for a survey to be completed for the Property if a new legal description is required by the Jefferson County, Ohio Auditor and/or Recorder office and/or the Jefferson County Tax Map Department in order to transfer the Property to Purchaser. However, it is not anticipated that a new legal description will be required based on Seller's discussion with the Jefferson County Tax Map Department.

D.      Attached hereto as **Exhibit "C"** is a list of all service contracts, utility contracts, maintenance contracts, management contracts, equipment leases, and any other agreements entered into by Seller and related to the Property (collectively, the "Property Contracts"). Purchaser shall advise which, if any, of the Property Contracts that Purchaser wants to assume and Seller shall be responsible for any and all amounts owed under the Property Contracts not assumed by Purchaser.

### ARTICLE 3.  CONDITION OF PROPERTY AND FIXTURES.

If Purchaser exercises Purchaser's rights to Close, then the Purchaser, by such act of Closing, acknowledges and agrees that the Property is being purchased in its present physical condition, after examination and Due Diligence by the Purchaser, or after Purchaser was granted the above rights of Due Diligence (whether or not Purchaser elected to exercise those rights), but only with reference to physical condition, value, character and size of the Property and its improvements and fixtures, if any, ("the Property's existing Condition and State of Repair") and the Property, as to such items only, is sold "AS IS" and WITHOUT WARRANTY OF ANY KIND, WHETHER EXPRESS OR IMPLIED, AS TO THE PROPERTY'S EXISTING CONDITION AND STATE OF REPAIR, AND SUBJECT TO ALL FAULTS AND DEFECTS, BOTH LATENT AND PATENT, IF ANY, EXCEPT AS SET FORTH IN ARTICLE 6 HEREOF, OR AS SPECIFICALLY SET FORTH IN ANY OTHER PROVISION OF THIS AGREEMENT, IF ANY.

### ARTICLE 4.  SALE AND PURCHASE/CONVEYANCE/POSSESSION.

A.      Seller hereby agrees to sell to Purchaser and Purchaser shall purchase from Seller, for the consideration and upon the conditions and terms herein set forth, the Property for the Purchase Price as set forth in Article 1(e) and Article 10 herein; subject to Purchaser's satisfactory Due Diligence as permitted herein.

B.      Seller warrants to Purchaser that to the best of Seller's actual knowledge and belief, Seller is the owner of the Property in fee simple absolute and has full authority, right and title to

bargain and sell the Property and convey the same as herein provided. Seller shall convey title to Property by Deed to Purchaser as provided in Article 1(f) hereof.

  C.  Possession of the Property shall be delivered by Seller to Purchaser on or before the Possession Date.

  D.  Seller represents and warrants that Seller has all the requisite power and authority to sell, transfer and convey the Property to the Purchaser, and that Seller, by its authorized agent, will execute and deliver to Purchaser and to the Title Company issuing the Title Policy, such certificates, affidavits or other documentation as reasonably requested to document the authority of the Seller to sign, deliver and preform this Agreement, any documents of transfer as to the Property, and to otherwise complete the sale and transfer of the Property to the Purchaser as herein required.

## ARTICLE 5.  TITLE POLICY.

  Purchaser has ordered from the Title Company: (i) a Preliminary Title Commitment ("Title Commitment") for an ALTA Owner's Title Policy of Insurance ("Title Policy") issued by and through the Title Company, and (ii) a special tax search, both of record and with the appropriate governmental authorities for any unpaid and future tax installments or assessments or reassessments, which are levied or assigned or which will be levied or assigned against the Property. Purchaser has no objections to the Title Commitment. Purchaser shall have the right to request, at Purchaser's sole cost and expense, endorsements to the final Title Policy.

## ARTICLE 6.  SELLER'S WARRANTIES.

  Seller warrants and represents to the Purchaser (and such warranties and representations shall survive Closing hereof for a time period of one (1) year from the Closing Date (with no merger by deed) that:

  (a)  The Property is served by county, municipal, or city water and sewer lines, and by gas, electric and telephone services;

  (b)  There is no pending or threatened condemnation or similar proceeding, nor any special assessment affecting the Property, or any part thereof, nor to the best knowledge and belief of Seller are any such proceedings or assessments contemplated by a governmental authority;

  (c)  There is no service, maintenance, nor other contracts pertaining to the Property to which Seller is obligated other than those which are and will be cancelled by Seller prior to Closing or transferred to Purchaser in writing, in Purchaser's sole discretion consistent with Article 2, Section (D) of this Agreement.

(d)     No labor has been performed or material furnished for or other service provided for or to the Property at the request of Seller or requested on Seller's behalf for which Seller has not heretofore fully paid, or will pay, or to which a mechanic's or material men's lien or any other lien can be claimed by any person, party, or entity; and Seller agrees not to enter into any new agreement after the Effective Date for the performance of work, service or labor to or upon or for the benefit of the Property or for the furnishing of materials to or for the Property, without Purchaser's express written consent, which consent will not be unreasonably withheld nor delayed, except for any unexpected emergency repairs which Seller may undertake.

(e)     To the best of Seller's knowledge and belief, the Property in its present condition does not violate any laws, ordinances, regulations, statutes, rules or restrictions whether public or private or whether of record or not;

(f)     As to the Property and the present use thereof, Seller has not received notice of any claimed violation of any applicable laws, ordinances, regulations, statutes, rules or restrictions;

(g)     The water, gas, electric and sewer lines to the Property are presently in proper working order;

(h)     The Property has full and free access to and from at least one public highway, street or road and, to the best knowledge and belief of Seller, there is no pending or threatened governmental proceeding which would impair or result in the permanent or long-term termination of such access;

(i)     To the best of Seller's knowledge, there are no persons, parties or other entities in possession of any part of the Property as trespassers, or as persons who under the laws of the State of Ohio would be considered an adverse possessor;

(j)     Seller has not entered into any contracts, land leases, oil leases, gas leases, coal or mineral leases, easements, rights-of-way, or any other contracts or agreements, whether written or oral, which are unrecorded and which would affect the Property which have not been previously disclosed to Purchaser in writing (and such previously disclosed contracts or agreements, whether written or oral, specifically being (i) the Land Lease Agreement dated January 13, 2015 by and between Seller, as landlord, and Southern Cross Tower Group, INC, as tenant; and (ii) the unwritten lease between EGCC, as landlord, and the City of Steubenville, as tenant, for the Steubenville Fire Department – West End located on the Property with its own address of 3900 Sunset Blvd., Steubenville, Ohio 43952);

(k)     There are no pending or threatened (in writing) voluntary or involuntary bankruptcy or other insolvency proceedings under federal or state law, relating to the Seller,

{M0504271.1 }

nor is Seller currently contemplating seeking protection under any state or federal law protecting against creditor rights or actions, nor has Seller made any general assignment for the benefit of creditors nor is Seller contemplating such actions;

(l)    The execution and delivery of this Agreement by the Seller and the consummation by Seller of the transactions contemplated by this Agreement will not, to the best of Seller's knowledge and belief, violate any judgment, order, injunction, decree or ruling binding upon the Seller following the entry of the Judge's Order referenced in Article 11(1) herein, conflict with, result in a breach of, or constitute a default under any of agreements or documents binding upon the Seller or under any note or other evidence of indebtedness, any mortgage, deed of trust or indenture, or any other material agreement or instrument to which Seller is a party or by which Seller or the Property may be bound, and which may adversely in any material way affect this Agreement or the transaction described herein;

(m)    There are no legal actions, suits or similar proceedings pending and served upon the Seller, nor, to the best of Seller's knowledge, threatened in writing, against the Seller relative to the Property or against the Property itself, except for the Motion for Prejudgment Attachment (the "Motion") and related filings by Student Resource Center, LLC ("SRC") against Seller in the United States District Court for the Southern District of Ohio, known as Case No. 2:22-cv-2653 filed (the "Federal Court Action");

(n)    Seller is not a "foreign person" or "foreign corporation" as those terms are defined in the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder;

(o)    Seller has taken or will take all actions required by any applicable law, agreement, or otherwise so that Seller has full authority in compliance with any Order of the Court in the Federal Court action to enter into this Agreement and to fully perform the transactions described in this Agreement on the part of Seller, and to sell and transfer the Property to Purchaser as herein required. Seller represents and warrants that it is duly organized, validly existing under the laws of the State of Ohio, and that its Governance Authority has all requisite power and authority to enter into and to perform the Agreement on Seller's part; and

(p)    Seller has no knowledge of any flooding occurring on the Property during the last ten (10) years.

## ARTICLE 7. PURCHASER'S WARRANTIES.

Purchaser warrants and represents on behalf of Purchaser, and such warranties and representations shall survive the Closing for a time period of one (1) year from the Closing Date (with no merger by deed) that:

(a)    Purchaser is solvent and has the present ability to pay Purchaser's debts when they become due, and further, Purchaser has not suffered, nor does Purchaser expect to suffer any material change, event or condition which will adversely affect Purchaser's ability to timely perform Purchaser's obligation under this Agreement;

(b)    There are no pending or threatened (in writing) or voluntary or involuntary bankruptcy or other insolvency proceedings under Federal of State law, relating to the Purchaser, nor is Purchaser currently contemplating seeking protection under any State or Federal law protecting against creditor rights or actions, nor has Purchaser made any general assignment for the benefit of creditors, nor is Purchaser contemplating such actions;

(c)    Purchaser has no outstanding agreements or contracts, oral or written, or any other commitment whatsoever that will restrict or in any way materially adversely affect Purchaser's ability to enter into and complete the transactions described in this Agreement;

(d)    To the best of Purchaser's knowledge, there are no claims, legal actions, arbitrations, government investigations or other legal administrative proceedings pending, in progress, or threatened against the Purchaser or Purchaser's property, either in law or in equity, or before any Federal, State, Municipal or other governmental agency or instrumentality, domestic or foreign, which would adversely affect Purchaser's ability to enter into this Agreement, and to perform the terms thereof, and to perform and complete the transactions described therein;

(e)    The execution and delivery of this Agreement by the Purchaser and consummation by Purchaser of the transactions contemplated by this Agreement will not, to the best of Purchaser's knowledge and belief, violate any judgment, order, injunction, decree or ruling binding upon the Purchaser, conflict with, result in a breach of, or constitute a default under any agreements binding upon the Purchaser or to which the Purchaser may be bound or which may adversely in any way materially affect this Agreement or the transactions described herein; and

(f)    Purchaser has taken, or will take all actions required by applicable law, agreement, or otherwise so that Purchaser has full authority to enter into this Agreement and to fully perform the transactions described in this Agreement on the part of Purchaser, and Purchaser will use Purchaser's good faith best efforts to purchase the Property,

{M0504271.1 }

as herein required. Purchaser represents and warrants that it is duly organized and validly existing under the laws of the State of Ohio, and that Purchaser will otherwise honor and comply with the requirements of Article 1(l) above, and that Purchaser does and will have all requisite power and authority to enter into and perform this Agreement on Purchaser's part.

## ARTICLE 8. HAZARDOUS SUBSTANCES.

Seller represents and warrants that to the actual knowledge of Seller, but without any specific investigation being undertaken by or on behalf of Seller or inquiry to others, no hazardous, toxic or dangerous waste, substance or material defined as such in (or for purposes of) any state, federal or local environmental or other laws, regulations, decrees or ordinances, or in the Comprehensive Environmental Response, Compensation and Liability Act, as amended, the Resource Conservation and Recovery Act, as amended, or in any so called state or local "Super Fund," "Super Lien," or "Cleanup Lien" law or any other federal, state or local laws, regulations, orders or decrees relating to or imposing liability or standards of conduct concerning any such substances or material (or any amendments or successor statutes thereto) (collectively referred to as "Hazardous Substances") has been discharged, disbursed, released, stored, treated, generated, disposed, or allowed to escape on, under, or from the Property in violation of such laws, regulators' orders, decrees or ordinances. No third party has alleged or, to Seller's knowledge, suffered any damage or injury, including, without limitation, damage or injury alleging noncompliance with any Laws regulating Hazardous Substances related to any Hazardous Substances in any way connected to the Property. To the actual knowledge of Seller, no mold or PCBs are located on the Property and no products containing asbestos or lead paint are a part of any improvements located on the Property.

## ARTICLE 9. ZONING.

Seller represents and warrants that the Property is zoned to permit its intended use by Purchaser as a school building. If prior to Closing it is determined that all of the Property is not zoned to permit its use as above stated, then Purchaser shall have the option of either accepting the Property "As Is" as zoned or terminating this Agreement and receiving back from Seller all sums previously received by or on behalf of Seller towards the Purchase Price, including the Good Faith Deposit received from the Purchaser, and upon the election of Purchaser to terminate and upon Seller's refund of the funds previously received from Purchaser, both parties shall be relieved from any further liability or obligations hereunder. If the Property is not zoned to permit its use as above stated, Purchaser shall have the right to seek a zone change or variance, at Purchaser's cost and expense, and Seller agrees to use his best efforts to assist and cooperate with Purchaser in this regard (at Purchaser's expense); however, the zone change and/or variance may not take effect until the Closing without Seller's prior written consent.

## ARTICLE 10. PURCHASE PRICE.

The Purchase Price for said Property shall be paid by deposit in escrow with the Title Company, by wire transfer of immediately available federal funds, no later than the Closing.

## ARTICLE 11. PURCHASER'S CONTINGENCIES TO CLOSING.

Purchaser's obligation to purchase the Property and to Close the transaction described in this Agreement shall be contingent upon the following:

1. An order issued by Judge Marbley in Case No. 2:22-cv-2653 in the United States District Court for the Southern District of Ohio, Eastern Division, permitting the sale of the Property to Purchaser (the "Judge's Order").

2. Seller's ability to convey title to the Property as required by this Agreement.

3. Seller being in a position to deliver the Property to Purchaser at the Closing, as herein required.

4. Complete performance and/or satisfaction by Seller of all terms and conditions contained in this Agreement to be performed on Seller's part, and that the representations and warranties of the Seller herein made being determined to be true and correct, both when initially made and at the time of Closing.

5. All other contingencies for the benefit of Purchaser specifically set forth in this Agreement, if any, having been met.

7. There shall have been no material adverse change in the physical condition of the Property.

8. Approval by the f Governance Authority of Seller and the Board of Education of the Steubenville City School District.

In the event that any of the above contingencies contained herein are not met or completed as herein required and the Purchaser not being in material breach or default of the terms of this Agreement binding on Purchaser, Purchaser shall have the right to terminate this Agreement and receive back all money previously paid to the Seller or into escrow, if any, and in such event Seller shall return to Purchaser all sums paid to Seller or shall sign a document permitting the escrow agent to return such funds to the Purchaser if such funds are held in escrow, and this Agreement shall, upon the return of such funds to the Purchaser, terminate with each party released from any further obligations or liability hereunder, except as set forth in Article 17.

{M0504271.1 }

## ARTICLE 12.  SELLER'S CONTINGENCIES TO CLOSING.

Seller's obligation to sell the Property and to Close the transaction described in this Agreement shall be contingent upon the following:

1.  Purchaser's ability to Close this transaction within ten (10) business days of the issuance of the Judge's Order referenced in Article 11(1) herein.  IF PURCHASER IS UNABLE TO CLOSE THIS TRANSACTION, OR IS UNWILLING TO CLOSE THIS TRANSACTION WITHIN TEN (10) BUSINESS DAYS OF THE COMPLETION OF THE ISSUANCE OF THE JUDGE'S ORDER, then Seller may terminate this Agreement and transaction as herein stated;

2.  Complete performance and/or satisfaction by Purchaser of all terms and conditions contained in this Agreement to be performed on Purchaser's part, and that the representations and warranties of the Purchaser herein made being determined to be true and correct, both when initially made and at the time of Closing; and

3.  Purchaser being in a position to deliver the Purchaser Price on or before Closing, as herein required.

In the event that any of the above contingencies contained herein are not met, or completed as herein required, Seller has the right to terminate this Agreement without liability on Seller's part.  In such an event, Seller shall return to Purchaser all sums paid on the Purchase Price to Seller or into escrow, if any, and upon the return to Purchaser said sums, each party hereto will be released from any further obligations or liability hereunder.

## ARTICLE 13.  ESCROW.

In the event Purchaser exercises Purchaser's right to Close, the following provisions of this Article shall serve as Closing instructions, subject to the usual escrow conditions of the Escrow Agent/Title Company, provided, however, that if there is any conflict between the Title Company's usual conditions and this Agreement, the terms and provisions hereof shall govern.

As to the Closing/Escrow, the parties hereto agree as follows:

A.  All documents and funds necessary for the Closing of the transaction described in this Agreement shall be deposited in escrow with the Title Company no later than the date scheduled for the Closing and the transaction Closed as soon thereafter as possible. Escrow Agent shall be the agent for the Title Company issuing the Title Policy.

B.  Upon receipt of funds and documents as aforesaid, the escrow agent shall cause the Deed to be filed for record whereupon the Title Company will, as soon thereafter as reasonable,

issue its Title Policy, effective as of the date and time of the recording of the Deed to Purchaser in accordance with the conditions and terms set forth herein.

      C.     At the Closing, after causing the filing of the Deed, Escrow Agent shall Close this transaction as follows:

      (i)    credit Seller with

      (a)    all of the Purchase Price including any funds previously deposited in escrow with the Title Company by the Purchaser, if any.

      (ii)    charge Seller with

      (a)    the transfer tax and/or conveyance fee, although it is anticipated that this transfer shall be exempt from the conveyance fee since Purchaser is a political subdivision;

      (b)    one-half (1/2) of the Escrow Agent's fee;

      (c)    real estate taxes and assessments, both general and special, prorated to and including the day before Closing based upon the latest available tax rate and valuation using a 365-day year, and giving effect to: (y) recent changes in valuation (whether certified or not); and (z) recently voted millage increases (whether certified or not);

      (d)    any amounts necessary to remove any liens, encumbrances or other title conditions whether of record or not of record which are removable or curable upon the payment of a fixed sum or by the filing of a document in order to convey title of the Property to Purchaser as herein provided;

      (e)    the cost of Deed preparation; and

      (iii)    charge Purchaser with:

      (a)    the Purchase Price, less any funds previously deposited in escrow with the Title Company by the Purchaser, if any;

      (b)    cost of Deed recording;

      (c)    cost of the title search, Title Commitment fee, and Title Policy Insurance premium and the cost of any endorsements to the Title Policy requested by Purchaser and which are not specifically needed to address or

cure any defect in title discovered or reported in the Title Commitment or the Survey, which Seller has agreed to cure;

    (d)    one-half (½) of the escrow agent's fee; and

  (iv)    credit Purchaser with

    (a)    the full Purchase Price paid;

    (b)    any other funds deposited with Escrow Agent by or for Purchaser to be applied to the Purchaser Price or Purchaser's costs of this transaction; and

    (c)    the amount of the real estate taxes and assessments, both general and special, prorated to and including the day before the Closing based upon the latest available tax rate and valuation which was charged as an obligation of Seller as set forth in Article 13C.(ii)(c) above.

  (v)    All other costs, if any, shall be charged and paid as is customary in commercial real estate transactions in Jefferson County, Ohio, as reasonably and in good faith determined by the Title Company.

D.    At or within one (1) business day following the day of Closing, Escrow Agent shall deliver the funds and documents as follows:

  (i)    to the person(s) or account(s) designated in Judge's Order, and

  (ii)    to Purchaser (or Purchaser's Attorney if Purchaser is represented by legal counsel and Purchaser has requested delivery to said legal counsel in writing) the funds and documents due Purchaser together with duplicate copies of the escrow or closing statement.

E.    At the Closing, Seller shall provide and Escrow Agent will furnish to or obtain for the Purchaser, the certificate or affidavit of Seller as required by Section 1445 of the Internal Revenue Code.

## ARTICLE 14. NOTICES.

Any notices required or permitted to be given by or on behalf of either party upon the other shall be in writing and shall be given either personally with written signed receipt obtained and with a copy to be mailed by ordinary mail to such party's attorney, if any, or by mailing such notice by certified mail addressed to the other party at the address set forth in Article 1 hereof with a copy

{M0504271.1 }

to be mailed by ordinary mail to such party's attorney, if any, or shall be delivered by a nationally recognized delivery service such as Federal Express, United Parcel Service, Airborne Express, United States Express Mail, etc., addressed to the other party at the address set forth in Article 1, with a copy to be mailed by ordinary mail to such party's attorney, if any.

### ARTICLE 15. CASUALTY LOSS
### (FIRE, STORM, VANDALISM, OR OTHERWISE)

A.    Property Insurance.  Seller is responsible for and shall carry fire and casualty insurance on the Property until the Closing Date in an amount no less than the Purchase Price, and Seller assumes all risk and liability as to any casualty loss up to the date of Closing.

### ARTICLE 16. NO BROKER.

Seller and Purchaser each represent and warrant to the other that no broker, real estate agent or other similar agent or consultant has been retained by them or to their knowledge otherwise involved in this transaction on their behalf. Seller agrees to indemnify and hold Purchaser harmless from any claims for commission or monies due made by any other broker, real estate agent, consultant, or other agent retained or claimed to have been retained by Seller.

### ARTICLE 17. DEFAULT.

A.    Purchaser Default.

(i)    Subject to the satisfaction or waiver of the contingencies set forth herein, in the event this transaction fails to Close as a result of the material default by Purchaser, and such failure to Close continues for a period of ten (10) days after Seller notifies Purchaser of such event, Seller's sole and exclusive remedy for such material default shall be the right to cancel and terminate this Agreement and transaction and Seller shall receive the damages as set forth herein. Unless the Seller shall waive the Purchaser's material default within five (5) days after the expiration of the 10-day period specified in the preceding sentence, or such default is cured within such 10-day period, this Agreement shall automatically terminate effective fifteen (15) days after the notice of default is given without the necessity of further notice being given, and upon such termination each party shall be released from all duties or obligations contained herein except for the applicable default remedies set forth below.

B.    Seller Default.

(i)    Subject to the satisfaction or waiver of the contingencies set forth herein if Seller fails to perform any of its material obligations as set forth herein,

{M0504271.1 }

Purchaser may, at Purchaser's option, elect: (a) to terminate this Agreement, in which event neither party shall have any further rights or obligations hereunder except for the applicable default remedies granted to Purchaser as set forth below; or (b) seek specific performance of Seller's obligations hereunder in any court of competent jurisdiction.

If Purchaser elects to terminate this Agreement per the option set forth in Article 17.B(i)(a) above, then:

> (1) Seller shall pay to Purchaser as damages the amount Purchaser paid for any appraisal, title work, survey, property inspections and/or Phase I ESA report within ten (10) days of the date of Purchaser's notice to Seller of Seller's default and Purchaser's decision to proceed with said termination of this Agreement and transaction; all to compensate Purchaser for its time and other costs incurred, and Seller agrees to the reasonableness of the above sums to be paid; and
>
> (2) Purchaser hereby releases and/or waives any right of Purchaser to seek specific enforcement of this Agreement or to sue or bring any type of claim whatsoever for damages of any kind whatsoever, other than those damages above specifically provided for. This damage provision has been agreed upon due to the difficulty in calculating Purchaser's exact actual damages in the event of default by Seller, especially given fluctuating property values and the difference in and of opinions with respect to such matters.

C. <u>Attorneys' Fees</u>.

> (i) Should either Seller or Purchaser employ attorneys to enforce any of the terms and provisions hereof in an arbitration or lawsuit or to otherwise protect their rights, titles or interests as a result of a default under this Agreement by the other, or otherwise incur such expense in connection with a cause of action by one party against the other arising from a legal dispute as to this Agreement, the prevailing party to such legal action shall be entitled to recover from the other party its reasonable attorneys' fees and expenses incurred in connection therewith.

## ARTICLE 18. ENTIRE AGREEMENT.

This Agreement and the exhibits referred to herein or attached, if any, set forth all the agreements, conditions, covenants, provisions and terms between the Seller and Purchaser concerning the Property. Other than this Agreement and the specific terms of the other documents

{M0504271.1 }

to be used for this transaction as set forth in this Agreement, there are no other agreements, conditions, covenants, provisions, representations, terms and/or warranties, whether oral or written, between the Seller and Purchaser concerning the Property. No amendment or modification hereof shall be binding upon Seller and Purchaser unless in writing and signed by the party to be charged therewith. It is completely understood between the parties that the representations, warranties, covenants and agreements of this Agreement shall not be affected or diminished in any way by any investigation (or failure to investigate), verification or approval at any time by or on behalf of the party for whose benefit such representations, warranties, covenants and agreements were made. It is further specifically agreed and understood by all parties, that all representations, warranties, covenants, obligations and agreements made by the parties hereto in this Agreement or any agreement made or entered into pursuant to the terms of this Agreement shall survive the Closing and shall not be merged in the Deed or otherwise for the period of time herein stated.

## ARTICLE 19. INTERNAL REVENUE CODE COMPLIANCE.

The accountant for Seller or the Escrow Agent, as the case may be, shall complete and file with the Internal Revenue Service prior to January 31 of the year following the delivery of the Deed for the Property, a Form 1099-B in compliance with the regulations of the Internal Revenue Code. A copy of such form shall also be provided to the Seller and Purchaser prior to the above-described January 31 date.

For purposes of filing Form 1099-B:

(i)     the Closing shall be the date of the recording of the Deed for Property transferred hereunder;

(ii)    the gross proceeds shall be the Purchase Price paid for the Property;

(iii)   the Property to be purchased is generally described as commercial real property;

(iv)    the social security or tax identification number of Seller is 34-1015707 (or if not provided herewith, shall be provided to escrow agent prior to Closing); and

(v)     the employee or tax identification number of Purchaser is 34-6002730 (or if not provided herewith, shall be provided to escrow agent prior to Closing).

## ARTICLE 20. MISCELLANEOUS.

A.      Parties. This Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective heirs, executors, administrators, legal representatives, and permitted

{M0504271.1 }

successors and assigns. This Agreement may only be assigned by a party with the prior written consent of the other party, which consent may not be unreasonably withheld nor delayed.

B.      Choice of Law. The laws of Ohio shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties, provided, however, that no presumption or special rule of construction shall be deemed to exist in favor of or against either party hereto as a result of the preparation or negotiation of this Agreement. Any action arising out of this Agreement or the transaction contemplated hereby must be commenced by the parties in the Common Pleas Court of Jefferson County, State of Ohio, or in the US Federal District Court for the Southern District of Ohio, Eastern Division, and each of the parties hereto hereby consent to the exclusive jurisdiction and venue of the above courts in any such action and as to the laying of venue in said courts.

C.      Section and Other Headings. Section, paragraph, and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

D.      Counterpart Execution. This Agreement may be executed in two or more counterparts none of which need have the signatures of both parties, each of which shall be deemed an original, and all of which together shall constitute but one and the same instrument.

E.      Gender and Number. All personal pronouns used in this Agreement shall include the other genders whether used in the masculine, feminine, or neuter gender, and the singular shall include the plural whenever and as often as may be appropriate.

F.      Schedules and Exhibits. All exhibits annexed hereto now or subsequently are made a part of this Agreement for all purposes.

G.      N/A

H.      Business Days. In the event that any date or period provided for in this Agreement shall end on a Saturday, Sunday or legal holiday, the applicable date or period shall be extended to the first business day following such Saturday, Sunday or legal holiday.

{BALANCE OF PAGE INTENTIONALLY LEFT BLANK}

IN WITNESS WHEREOF, Seller and Purchaser have executed and dated this Agreement with the intent to be legally bound hereby.

**SELLER:**

EASTERN GATEWAY COMMUNITY
COLLEGE FORMERLY KNOWN
AS JEFFERSON COMMUNITY COLLEGE

By:_____

            Fred Ransier,
            Executive Director of the
            Governance Authority

Date:_____

**PURCHASER:**

STEUBENVILLE CITY SCHOOL
DISTRICT BOARD OF EDUCATION

By:_____

Date:_____

{M0504271.1 }

Page **19** of **20**

STATE OF OHIO           )
                                   )     SS:
COUNTY OF MAHONING   )

The foregoing instrument was acknowledged before me this _____ day of _____, 2024, by **FRED RANSIER,** Executive Director, of the **GOVERNANCE AUTHORITY of EASTERN GATEWAY COMMUNITY COLLEGE FORMERLY KNOWN AS JEFFERSON COMMUNITY COLLEGE,** the Seller.

_____
Notary Public

STATE OF OHIO           )
                             )     SS:
COUNTY OF JEFFERSON )

The foregoing instrument was acknowledged before me this _____ day of _____, 2024, by _____, the _____of the **STEUBENVILLE CITY SCHOOL DISTRICT BOARD OF EDUCATION,** on behalf of the Purchaser.

_____
Notary Public

# EXHIBIT A

Case: 2:22-cv-02653-ALM-CMV Doc #: 100-6 Filed: 09/05/24 Page: 2 of 19 PAGEID #: 3383

NOV 21 2003

**178320**

Patrick J. Marshall
Jefferson County Auditor
By
No

LIMITED WARRANTY DEED

OR VOL 609 PG 676

OHIO POWER COMPANY, an Ohio corporation having an office at 700 Morrison Road, Gahanna, Ohio 43230 ("Grantor"), for valuable consideration, receipt of which is hereby acknowledged subject to the exceptions, reservations, and conditions hereinafter set forth, hereby grants with limited warranty covenants to JEFFERSON COMMUNITY COLLEGE, whose tax mailing address is 4000 Sunset Boulevard, Steubenville, Ohio 43952 ("Grantee"), its successors and assigns, pursuant to O.R.C. §5302.07, the following real estate situated in Cross Creek Township, City of Steubenville, Jefferson County, Ohio, being more particularly described as follows:

Parcel 1:

Located in Jefferson County, Ohio, and being in the City of Steubenville, in Cross Creek Township, Section 12, Twp 6, Range 2, and being the combination of a portion of Vol. 613, Pg. 247, with a portion of Vol. 613, Pg. 3, and a portion of Lot 15 in Bexley Place Subdivision, recorded in Cabinet B, Slide 142, as owned by the Ohio Power Company, and recorded in Vol. 631, Pg. 502, and being more particularly described as follows:

Beginning at a capped iron pin (CIP) set in the south right of way line of Sunset Blvd, marking the NE corner of the tract owned by the Ohio Power Company as recorded in Vol. 613, Pg. 3, and also marking the NW corner of Lot 15 in Bexley Place Subdivision, recorded in Cabinet B, Slide 142, and also marking the NW corner of the tract owned by the Ohio Power Company as recorded in Vol. 631, Pg. 502, and also marking an angle point in the northern boundary of the parcel here-in described.

Thence with the north line of Lot 15, and with the north line of the aforementioned Ohio Power tract of Vol. 631, Pg. 502, and with the south right of way line of Sunset Blvd, S 57°33'13" E 32.394 ft. to a mag nail set in said line, marking an angle point on the northern boundary of a 0.999210 acre tract, yet to be conveyed, and also marking the NW corner of a proposed 0.126903 acre right of way, and also marking the NE corner of the parcel here in described.

Thence crossing over and into the aforementioned

Approved by Steubenville Planning & Zoning Commission

Case: 2:22-cv-02653-ALM-CMV Doc #: 100-6 Filed: 06/05/24 Page: 3 of 19 PAGEID #: 3344

OR VOL 609 PG 677

Ohio Power tract of Vol. 631, Pg. 502, and further crossing over and into the aforementioned Ohio Power tract of Vol. 613, Pg. 3, and with the northern boundary of the aforementioned 8.999218 acre tract, yet to be conveyed, and with the western boundary of the aforementioned 0.120983 acre proposed right of way, and being more or less 1 ft. west of the edge of an existing paved entry road, S 32°29'44" W 146.153 ft. to a mag nail set in the pavement, marking an angle point in the common boundary between the aforementioned 8.999218 acre tract, yet to be conveyed, and the parcel here-in described.

Thence continuing with the north line of the aforementioned 8.999218 acre tract, yet to be conveyed, the following 7 bearings and distances;

1.   N 72°55'20" W  42.585 ft. to a nail set in the corner of the pavement where the north edge of the aforementioned entry meets the existing parking lot, marking an angle point in the boundary of the proposed 0.120983 acre right of way.

2.   Crossing the entry way, S 16°24'37" W  26.329 ft. to a nail set in the corner of the pavement where the south edge of the aforementioned entry meets the existing parking lot, marking the common SW corner of the aforementioned proposed right of way, and also marking the SE corner of a proposed 24 ft. wide right of way.

3.   N 73°50'11" W, along the south edge of a lane through the parking lot, and with the south line of said 24 ft. proposed right of way, and crossing over and into the Ohio Power tract of Vol. 631, Pg. 247, 101.742 ft. to a mag nail set, where the south edge of said lane intersects the extension of the west curb line of the parking lot directly south of said lane.

4.   S 16°05'18" W, along said curb line, and further leaving the parking lot, 139.411 ft. to a CIP set 1 ft. north of an existing chain link fence.

5.   N 79°09'17" W, 1 foot north of, and parallel to said fence,  30.648 ft. to a CIP set near the fence corner.

6.   S 10°40'16" W, 1 foot west of, and parallel to said fence, 124.600 ft. to a CIP set 4' 3" north of

2

OR VOL 609 PG 678

the fence corner.

7. N 79°28'12" W, being north of the light standards, and parallel to said fence, 190.154 ft. to a CIP set in the west line of the aforementioned Ohio Power tract of Vol. 613, Pg. 247, marking a point in the east right of way line of John Scott Highway, and also marking a point in the east line of the Ohio Power tract of Vol. 613, Pg. 243, and also marking the NW corner of the aforementioned 8.99921 acre tract, yet to be conveyed, and also marking the SW corner of the parcel here-in described.

Thence with the common boundary between the aforementioned Ohio Power tracts of Vol. 613, Pg. 247, and Vol. 613, Pg. 243, and with the east right of way line of John Scott Highway, and with a line 80 ft. east of, and parallel to, the centerline of John Scott Highway, N 12°22'41" E 167.399 ft. to a CIP set marking a point of curve in said common line, and also marking a point of curve in the western boundary of the parcel here-in described.

Thence continuing with the common boundary between the aforementioned Ohio Power tracts of Vol. 613, Pg. 247, and Vol. 613, Pg. 243, and leaving the original east right of way line of John Scott Highway, and continuing with a line 80 ft. east of, and parallel to, the centerline of John Scott Highway as it now exists, the following two bearings and distances:

1. With a curve to the left, having a radius of 1989.000 ft., an arc length of 306.678 ft., and a chord bearing N 6°48'40" E 306.070 ft. to a CIP set.

2. N 1°14'38" E 49.050 ft. to a cross cut made in the sidewalk, at the intersection of the south right of way line of Sunset Blvd, and also marking the NE corner of the aforementioned Ohio Power tract of Vol. 613, Pg. 243, and also marking the NW corner of the Ohio Power tract of Vol. 613, Pg. 247, and thereby marking the NW corner of the parcel here-in described.

Thence with the south right of way of Sunset Blvd, and with the northern boundary of the aforementioned Ohio Power tract of Vol. 613, Pg. 247, the following four bearings and distances:

OR VOL 609 PG 679

1.   With a curve to the right (non-tangent to the last bearing) having a radius of 912.326 ft., an arc length of 110.644 ft., and a chord bearing S 64°13'42" E 110.560 ft. to a CIP set;

2.   With a curve to the right having a radius of 912.326 ft., an arc length of 120.197 ft., and a chord bearing S 56°47'16" E 120.110 ft. to a drill hole found in the sidewalk.

3.   S 52°58'20" E 5.360 ft. to a PK nail found in the sidewalk.

4.   S 10°51'07" W 5.850 ft. to a CIP set marking the NW corner of the aforementioned Ohio Power tract of Vol. 613, Pg. 3, and also marking an angle point in the northern boundary of the parcel here-in described.

Thence continuing with the south right of way line of Sunset Blvd, and with the northern boundary of the aforementioned Ohio Power tract of Vol. 613, Pg. 3, the following two bearings and distances:

1.   S 52°58'31" E 103.980 ft. to a CIP set.

2.   S 57°33'13" E 127.338 ft. to the place of beginning, containing 3.701027 acres, more or less, and subject to all legal highways, rights of way, and/or easements, and subject to any and all restrictions, and/or reservations, and/or exceptions as may be applicable.

The above described 3.701027 acre tract is subject to the rights of ingress and egress, reserved by the Grantor, over a proposed common right of way leading from John Scott Highway, in an easterly direction, over and across the above described 3.701027 acre tract, to the northwest boundary of a 8.999218 acre tract, yet to be conveyed, said right of way being located on an existing paved drive within the above described conveyance, and is intended to be used by the Grantor in common with the Grantee, said proposed right of way being 12 ft. on each side of the following described centerline:

Beginning for description at a cross cut made in the sidewalk in the south right of way line of Sunset Blvd, marking the NE corner of the Ohio Power tract of Vol. 613, Pg. 243, and also marking the NW corner of the Ohio Power tract of Vol. 613, Pg. 247, and

4

Case: 2:22-cv-02653-ALM-CMV Doc #: 100-6 Filed: 09/05/24 Page: 6 of 17 PAGEID #: 3285

OR VOL 609 PG 680

also marking the NW corner of the above described 3.701027 acre tract, yet to be conveyed, thence with the common line between the aforementioned Ohio Power tracts of Vol. 613, Pg. 243, and Vol. 613, Pg. 247, the following 2 bearings and distances;

1. S 1°14'38" W 49.850 ft. to a CIP set.

2. With a curve to the right having a radius of 1689.000 ft., an arc length of 140.920 ft., and a chord bearing S 3°16'22" W 140.891 ft. to a point in the center of an existing paved driveway, marking the TRUE PLACE OF BEGINNING of the centerline here-in described.

Thence crossing over and into the Ohio Power tract of Vol. 613, Pg. 247, and crossing over and into the aforementioned 3.701027 acre tract, yet to be conveyed, and with the center of the existing paved driveway, the following 6 bearings and distances;

1. S 87°27'23" E 70.204 ft. to a point of curve.

2. With a curve to the right having a radius of 67.000 ft., an arc length of 85.048 ft., and a chord bearing S 51°05'29" E 79.452 ft. to a point of tangent.

3. S 14°43'34" E 64.417 ft. to a point of curve.

4. With a curve to the left, having a radius of 49.000 ft., an arc length of 46.810 ft., and a chord bearing S 42°05'30" E 45.051 ft. to a point of tangent.

5. S 69°27'42" E 34.249 ft. to a point.

6. S 73°50'11" E 102.459 ft. to a point in the northern boundary of a 0.999218 acre tract, yet to be conveyed, marking the terminus of the centerline of the right of way here-in described.

The above described 3.701027 acre tract is conveyed together with the rights of ingress and egress over a proposed common right of way leading from Sunset Blvd, in a southwesterly direction, over and across a 0.999218 acre tract, yet to be conveyed, to the eastern boundary of the above described 3.701027 acre tract, said right of way being located on an existing paved drive within lands retained by the Grantor, and is intended to be used by the Grantor, in common with the Grantee, said proposed right of

OR VOL. 609 PG. 601

way being more particularly described as follows;

Beginning for description at a capped iron pin (CIP) set in the south right of way line of Sunset Blvd, marking the NE corner of the tract owned by the Ohio Power Company as recorded in Vol. 613, Pg. 3, and also marking the NW corner of Lot 15 in Bexley Place Subdivision, recorded in Cabinet B, Slide 142, and also marking the NW corner of the tract owned by the Ohio Power Company as recorded in Vol. 631, Pg. 502, and also marking a point in the north line of the above described 3.701027 acre tract, thence with the north line of Lot 15, and with the north line of the aforementioned Ohio Power tract of Vol. 631, Pg. 502, and with the south right of way line of Sunset Blvd,

S 57°33'13" E 32.394 ft. to a mag nail set in said line, marking the NE corner of the above described 3.701027 acre tract, and also marking an angle point in the northern boundary of a 0.999210 acre tract, yet to be conveyed, and also marking the NW corner and TRUE PLACE OF BEGINNING of the right of way here-in described,

Thence crossing over and into the aforementioned Ohio Power tract of Vol. 631, Pg. 502, and further crossing over and into the aforementioned Ohio Power tract of Vol. 613, Pg. 3, and with the common boundary between the above described 3.701027 acre tract, and the aforementioned 0.999210 acre tract, yet to be conveyed, and being more or less 1 ft. west of the edge of an existing paved entry road, S 32°29'44" W 146.153 ft. to a mag nail set in the pavement, marking an angle point in the western boundary of the right of way here-in described,

Thence continuing with the aforementioned common boundary, the following 2 bearings and distances;

1. N. 72°55'20" W 42.585 ft. to a nail set in the corner of the pavement where the north edge of the aforementioned entry meets the existing parking lot,

2. Crossing the entry way, S.16°24'37" W 26.329 ft. to a nail set in the corner of the pavement where the south edge of the aforementioned entry meets the existing parking lot, marking the SW corner of the right of way here-in described,

Thence crossing over and into the aforementioned

6

OR VOL 609 PG 602

0.999218 acre tract, yet to be conveyed,
S 73°37'10" E 61.287 ft, to point in the east edge
of pavement of an existing entry road, marking the
SE corner of the right of way here-in described.

Thence, along the edge of the existing pavement, and
with the extension there-of, and crossing back over
and into the aforementioned Ohio Power tract of Vol.
631, Pg. 502, N 32°29'44" E 165.827 ft. to a point
in the north line of said tract of Vol. 631, Pg.
502, marking a point in the south right of way line
of Sunset Blvd, and also marking a point in the
north line of the aforementioned 0.999218 acre
tract, yet to be conveyed, and also marking the NE
corner of the right of way here-in described.

Thence with the south right of way line of Sunset
Blvd, and with the north line of said tract of Vol.
631, Pg. 502, and with the north line of the
aforementioned 0.999218 acre tract, yet to be
conveyed, N 57°39'30" W 25.121 ft, to the place of
beginning, containing 0.120903 acres, more or less,
and subject to all legal highways, rights of way,
and/or easements, and subject to any and all
restrictions, and/or reservations, and/or exceptions
as may be applicable.

The above described 3.701027 acre tract is subject
to the rights reserved by the Grantor, to use an
area of proposed perpetual easement located within
the above described conveyance, intended to be used
by the Grantor, in common with the Grantee, said
easement being more particularly described as
follows;

Beginning at a mag nail set in the south right of
way line of Sunset Blvd, marking the NE corner of
the above described 3.701027 acre tract, and also
marking an angle point in the northern boundary of a
0.999218 acre tract, yet to be conveyed, and also
marking a point in the north line of the tract owned
by the Ohio Power Company as recorded in Vol. 631,
Pg. 502, and also marking a point in the north line
of Lot 15 in Bexley Place Subdivision, recorded in
Cabinet D, Slide 142, and also marking the NW corner
of a proposed 0.120903 acre right of way, and also
marking the NE corner of the easement here-in
described.

Thence crossing over and into the aforementioned
Ohio Power tract of Vol. 631, Pg. 502, and with the

7

OR VOL 609 PG 683

common boundary between the above described 3,701027
acre tract, and the aforementioned 8,999218 acre
tract, yet to be conveyed, and being more or less 1
ft. west of the edge of an existing paved entry
road, S 32°29'44" W 33.074 ft. to a point in said
line, marking the SE corner of the easement here-in
described.

Thence crossing over and into the above described
3,701027 acre tract, the following 3 bearings and
distances:

1. N 52°06'44" W 14.561 ft. to a point.

2. N 2°44'06" W 21.896 ft. to a point.

3. N 37°39'35" E 14.666 ft. to a point in the
south line of Sunset Blvd, marking a point in the
north line of the aforementioned Ohio Power tract of
Vol. 631, Pg. 502, and also marking a point in he
north line of the above described 3,701027 acre
tract, and also marking the NW corner of the
easement here-in described.

Thence with the south right of way line of Sunset
Blvd, and with the north line of the aforementioned
Ohio Power tract of Vol. 631, Pg. 502, and with the
north line of the above described 3,701027 acre
tract, S 67°33'13" E 25.002 ft. to the place of
beginning, containing 0.017648 acres, more or less,
and subject to all legal highways, rights of way,
and/or easements, and subject to any and all
restrictions, and/or reservations, and/or exceptions
as may be applicable.

The above described 3,701027 acre tract is subject
to a 15 ft. permanent easement for storm sewer
purposes, said easement is located within the above
described conveyance, and is intended to be used by
the Grantor in common with the Grantee, said
easement being 7.5 ft. on each side of the following
described centerline:

Beginning for description at a capped iron pin (CIP)
set in the south right of way line of Sunset Blvd,
marking the NE corner of the tract owned by the Ohio
Power Company as recorded in Vol. 613, Pg. 3, and
also marking the NW corner of Lot 15 in Bexley Place
Subdivision, recorded in Cabinet B, Slide 142, and
also marking the NW corner of the tract owned by the
Ohio Power Company as recorded in Vol. 631, Pg. 502,

8

OR VOL 609 PG 684

and also marking an angle point in the northern boundary of the above described 3.701027 acre tract, yet to be conveyed, thence crossing over and into the lands owned by the Ohio Power Company as recorded in Vol. 613, Pg. 3, and Vol. 613, Pg. 247, S 57°35'40" W 233.392 ft. to a mag nail set, marking an angle point in the common boundary between the above described 3.701027 acre tract, and a 0.999218 acre tract, yet to be conveyed, Thence with the common line between the above described 3.701027 acre tract, and the 0.999218 acre tract, yet to be conveyed,

S 16°05'18" W 90.737 ft. to a point in the center of a storm sewer line, marking the TRUE PLACE OF BEGINNING of the centerline herein described,

Thence with the centerline of the existing storm sewer line, and crossing over and into the above described 3.701027 acre tract, the following 6 bearings and distances;

1. S 77°04'27" W 18.103 ft, to a point in the center of a manhole,

2. S 80°43'15" W 40.816 ft, to a point in the center of a catch basin,

3. N 32°30'14" W 44.261 ft, to a point in the center of a manhole,

4. N 78°56'49" W 61.149 ft, to a point in the center of a catch basin,

5. N 77°33'26" W 61.570 ft, to a point in the center of a manhole,

6. N 79°17'17" W, and crossing over and into the remaining lands of the Grantor as recorded in Vol. 613, Pg. 243, 49.297 ft, to a point in the centerline of an outlet pipe, marking the terminus of the centerline of the easement herein described; together with the right to spill the flow of said storm water from the terminus above described into an existing drainage ditch, together with the right to maintain said line.

The above described 3.701027 acre tract is conveyed together with a 15 ft. permanent easement for storm sewer purposes, said easement is located within lands retained by the Grantor, and is intended to be

9

OR VOL 609 PG 685

used by the Grantor in common with the Grantee, said easement being 7.5 ft. on each side of the following described centerline;

Beginning for description at a capped iron pin (CIP) set in the south right of way line of Sunset Blvd, marking the NE corner of the tract owned by the Ohio Power Company as recorded in Vol. 613, Pg. 3, and also marking the NW corner of Lot 15 in Bexley Place Subdivision, recorded in Cabinet B, Slide 142, and also marking the NW corner of the tract owned by the Ohio Power Company as recorded in Vol. 631, Pg. 502, and also marking an angle point in the northern boundary of the above described 3.701027 acre tract, yet to be conveyed, thence crossing over and into the lands owned by the Ohio Power Company as recorded in Vol. 613, Pg. 3, and Vol. 613, Pg. 247; S 57°35'40" W

233.392 ft. to a mag nail set, marking an angle point in the common boundary between the above described 3.701027 acre tract, and the 8.999218 acre tract, yet to be conveyed, Thence with said common line, S 16°05'18" W 30.217 ft. to a point in the center of an existing storm sewer line, marking the TRUE PLACE OF BEGINNING of the centerline herein described,

Thence crossing over and into the 8.999218 acre tract, yet to be conveyed, and with the centerline of the existing storm sewer line, the following 2 bearings and distances;

1. S 3°46'23" W 55.231 ft. to a point in the center of a catch basin,

S 77°04'27" W 13.471 ft. to a point in the common line between the above described 3.701027 acre tract and the 8.999218 acre tract, yet to be conveyed, marking the terminus of the centerline here-in described, together with the right to maintain said line.

The above described 3.701027 acre tract is subject to a 15 ft. permanent easement for storm sewer purposes, said easement is located within the above described conveyance, and is intended to be used by the Grantor in common with the Grantee, said easement being 7.5 ft. on each side of the following described centerline;

Doc #179117.v3 Date: 10/06/2003 3:06 PM

OR VOL 609 PG 686

Beginning for description at a CIP set marking the
SW corner of the above described 3.701027 acre
tract, yet to be conveyed, and also marking a point
on the east boundary of a 2.14 acre tract owned by
the Ohio Power Company as recorded in Vol. 613, Pg.
243, and also marking a point on the west boundary
of the Ohio Power tract of Vol. 613, Pg. 247; thence
with the aforementioned common boundary, N 12°22'41"
E 13.562 ft. to the TRUE PLACE OF BEGINNING of the
centerline of the easement here in described.

Thence with the centerline of an existing storm
sewer, and crossing over and into the aforementioned
3.701027 acre tract, yet to be conveyed, the
following 2 bearings and distances;

1.  N 89°12'00" E 50.714 ft. to the center of a
catch basin.

2.  S 39°24'06" E 36.535 ft. to the south line of
the aforementioned 3.701027 acre tract, and also
marking the terminus of the easement here-in
described, together with the right to spill the flow
of said storm water from the true place of beginning
of the above described centerline into an existing
drainage ditch, together with the right to maintain
said line.

The above described 3.701027 acre tract is conveyed
together with a 15 ft. permanent easement for
sanitary sewer purposes, said easement is located
within lands retained by the Grantor, and is
intended to be used by the Grantor in common with
the Grantee, said easement being 7.5 ft. on each
side of the following described centerline;

Beginning for description at the SW corner of Lot 87
in Becker Highlands Subdivision, recorded in Cabinet
C, Slides 162 and 163, and also marking a point in
the east line of the Ohio Power tract of Vol. 613,
Pg. 247, and also marking a point in the east line
of a 0.999218 acre tract, yet to be conveyed, thence
with the east line of said Ohio Power tract, and
with the east line of the 0.999218 acre tract, yet
to be conveyed, and with the west line of Portland
Blvd, S 10°55'42" W 32.309 ft. to a point in the
centerline of an existing sanitary sewer line,
marking the TRUE PLACE OF BEGINNING of the
centerline here-in described,

Thence crossing over and into the aforementioned.

OR VOL 609 PG 687

Ohio Power tract, and crossing over and into the 8.999210 acre tract, yet to be conveyed, and with the centerline of the sanitary sewer line, the following 3 bearings and distances;

1.  N 77°48'07" W  37.770 ft. to a point in the center of a manhole.

2.  N 0°09'29" E  110.706 ft. to a point in the center of a manhole.

3.  N 53°09'49" W  221.692 ft. to a point in the common boundary between the above described 3.701027 acre tract, and the aforementioned 8.999210 acre tract, yet to be conveyed, and also marking the terminus of the centerline here-in described, together with the right to maintain said line.

The bearings given are for angle calculation only, and are not based on any known meridian.

This description from a field survey conducted in August, 2002, by Vincent Dowdle P.S. #7396.

Grantor also reserves a non-exclusive easement over that portion of the 3.701027 acre tract that is necessary to provide Grantor reasonable pedestrian access from Grantor's parking lot located at the north end of the 8.999210 acre tract to Grantor's office building located on the 8.999210 acre tract.

Subject to the rights of the Grantor, in common with the Grantee, to use and maintain the existing waterlines which traverse the above described 3.701027 acre tract, and also the remaining lands of the Grantor.

*PRIOR DESCRIPT. DEED VOL 613 Pg 247 ; 613 - 3 ; 631 502*

Parcel 2;

Located in Jefferson County, Ohio, and being in the City of Steubenville, in Cross Creek Township, Section 12, Twp 6, Range 2, and being a portion of the tract owned by the Ohio Power Company as recorded in Vol 613, pg 243, and being more particularly described as follows;



Beginning at a cross cut made in the sidewalk, in the south right of way line of Sunset Blvd., marking the NW corner of the Ohio Power Company tract of Vol 613, pg 247, and also marking the NW corner of a 3.701027 acre tract, yet to be conveyed, and also

marking the NE corner of the Ohio Power Company tract of Vol 613, pg 243, and thereby marking the NE corner of the parcel here-in described.

Thence with the common boundary between the aforementioned Ohio Power Company tracts of Vol 613, pg 243, and Vol 613, pg 247, and with the western boundary of the aforementioned 3.701027 acre tract, yet to be conveyed, and with a line 80 ft. east of, and parallel to, the centerline of John Scott Highway as it now exists, the following 3 bearings and distances;

1. S 1°14'38" W 49.850 ft. to a CIP set, marking the NE corner of the easement conveyed to the City, of Steubenville as recorded in Vol 623, pg 183.

2. With a curve to the right having a radius of 1989.800 ft., an arc length of 306.670 ft. and a chord bearing S 6°48'40" W 386.070 ft. to a CIP set.

3. With the east right of way line of John Scott Highway, S 12°22'41" W 167.399 ft. to a CIP set in the common line between the aforementioned two Ohio Power Company tracts, marking the SW corner of the aforementioned 3.701027 acre tract, yet to be conveyed, and also marking the NW corner of an 0.999218 acre tract, yet to be conveyed, and also marking the NE corner of a 1.012507 acre tract, yet to be conveyed, and also marking the SE corner of the parcel herein described.

Thence crossing over and into the aforementioned Ohio Power Company tract of Vol 613, pg 243, and with the north line of said 1.012507 acre tract, yet to be conveyed, N 79°28'1" W 80.042 ft. to a point in the centerline of John Scott Highway, marking the NW corner of said 1.012507 acre tract, yet to be conveyed, and also marking a point in the west line of the aforementioned Ohio Power Company tract of Vol 613, pg 243, and also marking the SW corner of the parcel here-in described, and passing on line a CIP set at 50 ft.

Thence with the centerline of John Scott Highway, and with the western boundary of the aforementioned tract of Vol 613, pg 243, the following 3 bearings and distances;

1. N 12°22'41" E 169.981 ft. to a point of curve.

2. With a curve to the left having a radius of

13

OR VOL 609 PG 669

1909.800 ft., an arc length of 371.137 ft., and a chord bearing N 6°48'40" E 370,553 ft., to a point of tangent.

3. N 1°14'38" E 85.290 ft. to the intersection of the south right of way line of Sunset Blvd., marking the NW corner of the aforementioned Ohio Power Company tract of Vol 613, pg 243, and thereby marking the NW corner of the parcel here-in described.

Thence with the south right of way line of Sunset Blvd., and with the north line of the aforementioned Ohio Power Company tract of Vol 613, pg 243, and with a curve to the right having a radius of 912.326 ft., an arc length of 87.534 ft., and a chord bearing S 64°51'35" E 87.501 ft. to the place of beginning, containing 1.131190 acres, more or less, and subject to all legal highways, rights of way, and/or easements, and subject to any and all restrictions, and/or reservations, and/or exceptions as may be applicable.

The bearings given are for angle calculation only, and are not based on any known meridian.

This description from a field survey conducted in August and September, 2002 by Vincent Dowdle P.S. #7396.

Subject to the easement conveyed to the City of Steubenville as recorded in Vol 623, pg 183.

Subject to John Scott Highway.

Tax Parcel Number:

Prior Deed Ref : Deed Vol 613 Pg e. 243

Excepting and reserving unto Grantor the existing electrical facilities and equipment, both overhead and underground electric lines, roof top, vault or pad mounted transformers, together with the right and easement to enter the premises at any time, to inspect, operate, maintain, repair, and remove such facilities.

By acceptance of this deed, Grantee agrees on behalf of itself and its successors and assigns, and Grantor agrees on behalf of itself and its successors and assigns that the expenses necessary to maintain and repair those portions of the waterlines, storm sewer and the sanitary sewer jointly serving the 3.701027 acre tract and the 8.999218 acre tract shall be

OR VOL 609 PG 690

shared equally between Grantor and Grantee, and that the expenses necessary to maintain and repair the common right of way retained and conveyed herein for the benefit of both tracts shall be split in a manner whereby Grantor shall be responsible for 75% of such expenses and Grantee shall be responsible for 25% of such expenses.

This conveyance is hereby made subject to the following:

1.    The lien of real estate taxes for the year 2002 and prorated 2003 taxes which Grantor agrees to pay.  Grantee shall be responsible for all real estate taxes due after Closing.

2.  All  existing  public  highways,  streets,  easements, covenants, conditions, restrictions, and reservations, if any, whether or not of record, and to all zoning ordinances and assessments, and other governmental regulations and restrictions, if any, now in force and effect, and such state of facts as an examination of the Premises and/or an accurate survey would disclose.

To Have And To Hold the above premises with the appurtenances thereunto belonging to said Grantee, its successors and assigns forever.

DATED this *17th* day of *November*, 2003.

Signed and acknowledged
in the presence of:

_____
Signature
Roy A. Strawser
Printed Name

OHIO POWER COMPANY

By: _____
      Roger L. Wheeler
      Director, Land Management
      American Electric Power Service
      Corporation
      Authorized Signer

_____
Signature
Russell C. Cowley
Printed Name

15

Case: 2:22-cv-02653-ALM-CMV Doc #: 100-6 Filed: 06/03/24 Page: 17 of 19 PAGEID #: 3236

OR VOL 609 PG 691

STATE OF OHIO           )
COUNTY OF FRANKLIN )

_17th_ The foregoing instrument was acknowledged before me this _17th_ day of _November_, 2003, by Roger L. Wheeler, Director, Land Management, American Electric Power Service Corporation, as Authorized Signer for Ohio Power Company, an Ohio corporation on behalf of the corporation.

_Russell C. Cowley_
Notary Public
My Commission Expires: 4/19/2004

RUSSELL C. COWLEY
Notary Public, State of Ohio
My Commission Expires April 19, 2004
Recorded in Franklin County

This instrument was prepared by Thomas G. St. Pierre, Senior Counsel - Real Estate, American Electric Power Service Corporation, 1 Riverside Plaza, Columbus, Ohio 43215, for and on behalf of Ohio Power Company.

Doc #179117.v3 Date: 10/08/2003  3:08 PM

Business Name:
Property Address: 110 JOHN SCOTT

1 of 1

*07-11934-001*

STEUBEN CORP - FORT STEUBEN T
STEUBENVILLE CSD
072800002E0

## LEGAL INFORMATION

2-6-12 11-A LD & PT 15
BEXLEY 3.701A
MAP 07-2800-002E0 EX 2005-014
**JEFFERSON COMM COLLEGE**
JEFFERSON COMM COLLEGE
4000 SUNSET BLVD
STEUBENVILLE, OH 43952

Acres:3.7100 M:3.7010

| Internal Use Only 00106 |
|---|
| Map: |
| Block: |
| Card: |
| Bk:609   Pg:676 |

COMMENT
JEFFERSON COMM COLLEGE,@100%
18 REVAL  REDUCED PAV & FENCE, ADD CON PAV, NET CHG $222,900 LESS,
FIRE STATION ON PCL 0711970000, TR 10-15-18

### Sales Data

| Date | Amount | Deed:Conv# | Use | Valid | Lister: | Date |
|---|---|---|---|---|---|---|
| 11/21/2003 | 2,200,000 | 2: : 1160 | 670 | | Pricer: | |
| 11/21/2003 | 0 | 2:W1 : 1160 | | | Reviewer: | |
| | | | | | Final: | |
| | | | | | Call Back: | |
| | | | | | Visit: | |

### VALUATION SUMMARY

| VALUE YEAR | | 2021 | 2019 | 2018 | 2013... |
|---|---|---|---|---|---|
| REASON FOR CHANGE | | TRI | MISC | RAPP | MISC |
| ESTIMATED MARKET VALUE | LAND | 185,050 | 185,050 | 185,050 | 166,600 |
| | IMPR | 1,829,900 | 1,829,900 | 1,829,900 | 1,933,400 |
| | TOTAL | 2,014,950 | 2,014,950 | 2,014,950 | 2,100,000 |
| ASSESSED VALUE | LAND | 64,770 | 64,770 | 64,770 | 58,310 |
| | IMPR | 640,470 | 640,470 | 640,470 | 676,690 |
| | TOTAL | 705,240 | 705,240 | 705,240 | 735,000 |



| STREET/ROAD | | TOPOGRAPHY | | PU-UTILITIES-PR | | ZONING | |
|---|---|---|---|---|---|---|---|
| ■ PAVED | | ■ LEVEL | | ■ WATER | | □ AG-RES | |
| □ GRAVEL | | □ HIGH | | ■ SEWER | | □ COMMERCIAL | |
| □ DIRT | | □ LOW | | □ GAS | | □ INDUSTRIAL | |
| □ SIDEWALKS | | □ ROLLING | | ■ ELECTRIC | | | |
| □ CURBS | | □ STANDARD | | □ STANDARD | | | |

| INFLUENCE FACTORS | | |
|---|---|---|
| A. TOPGRHY | F. VACANCY | J. EX FRONT |
| B. ACCESS | G. RESTRICT | R. REVAL |
| D. LOCATION | H. OTHER | |
| E. SZ/SHAPE | I. Partial Interest | |

| LAND TYPE | SIZE | M | RATE | C | INF | M | VALUE | C |
|---|---|---|---|---|---|---|---|---|
| A1:Primary | A:3.701 | | 50,000 | | | | 185,050 | 0 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Totals: | Total Acres 3.7010 | | | | | | 185,050 | 0 | 185,050 |

Case 2:22-cv-02653-ALM-CMV Doc #: 116-1 Filed: 06/07/24 Page: 40 of 30 PAGEID #: 3889

| | EX WALL | A | ROOFING | A | WINDOW | A | DOORS | A | FOUNDATION | A | FRAMING | A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CLASS/QUALITY RANK | BRICK | | SHED/FLAT | | CASEMENT | | | | CRAWL | | PRE ENG | |
| A) FP STRUCT. STEEL FRAME | 1. BASIC | CON BLK | | CON DECK | | DBLH | | | | PILE/COL | | STEEL | |
| B) R.C. FRAME | 2. FAIR | WD/MTL | | MTL DECK | | SLIDE BY | | | | REINFOR | | REINF CONC | |
| C) MASONRY BEARING WALLS | 3. AVE | ENAM STL | | WD DECK | | CANOPY | A | | | STEEL | | CB/MASON | |
| D) WD OR STEEL FR EX. WALLS | 4. GOOD | ALUM/VYL | | METAL | | LIGHTED | | STEEL INS | | BRICK | | FRAME | |
| S) METAL M) MILL P) POLE | 5. EXCEL | CON PANEL | | ASPH | | SOFFITS | | WOOD | | STONE | | POLE | |
| TOTAL AREA PERIMETER | 0 | PLATE GLS | | RUBBER | | C S W | | MTL | | CON BLK | | TILT UP | |
| # STORIES STORY HT | | STUCCO | | BUILT UP | | FACADE | A | GLASS | | FRAME | | SANDWICH | |
| AGE SPRINKLER | | INSULATED | | INSULATED | | | | STANDARD | | STANDARD | | STANDARD | |

| HVAC | | FLOORS | B | 1 | 2 | 3 | U | PARTITIONS | B | 1 | 2 | 3 | U | INTERIOR FINISH | B | 1 | 2 | 3 | U |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Electric | | CONCRETE | | | | | | MASONRY | | | | | | UNFINISHED | | | | | |
| Forced Air Unit | | WOOD | | | | | | WD STUD | | | | | | FINISH OPEN | | | | | |
| Hot Water, Rad | | TILE A Q V T | | | | | | MTL STUD | | | | | | FINISH DIV | | | | | |
| Steam | | CARPET | | | | | | CEILINGS | B | 1 | 2 | 3 | U | PANEL | | | | | |
| Ventilation | | ASPHALT | | | | | | ACCUT/PANEL | | | | | | PLASTER / DW | | | | | |
| Package Unit | | GRAVEL | | | | | | PLASTER/DW | | | | | | BLOCK | | | | | |
| Hot & Cld Water | | DIRT | | | | | | SUSP/OPEN | | | | | | GLAZED TILE | | | | | |
| Floor Furnace | | STANDARD | | | | | | STANDARD | | | | | | STANDARD | | | | | |

| HVAC (cont) | | | | |
|---|---|---|---|---|
| Electric Wall | | | | |
| Hot Water | | | | |
| Space/ Wall Furnace | | | | |
| Warm & Cld Air | | | | |
| Heat Pump | | | | |
| Ind TW Heat Pump | | | | |
| Evaporated Cool | | | | |
| Co-Ray-Vac | | | | |
| No Heat | | | | |
| Standard | | | | |

| Complete HVAC | |
|---|---|
| Refrig. Cooling | |

| PLUMBING | A | LIGHTING | A |
|---|---|---|---|
| NO PLUMBING | | EXTRA FIXTURES | FLUORESCENT | METAL HALIDE |
| 2 FIXTURE BATH | | STANDARD | SODIUM VAP | STANDARD |
| 3 FIXTURE BATH | | | MERCURY VAP | |

| YARD ITEMS | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | REM | CND | GRD | S/UNIT | UNADJUSTED S | PHY | FC | EC | MARKET VALUE |
| A 901.030:Fence: Chain link, metal o | | | | 1 | | 240 | 1988 | | A | A | 8.00 | 1,920 | 34 | 0 | 0 | 1,270 |
| B 901.001:Paving: Asphalt | | | | 1 | 58,800 | | 1988 | | A | A | 2.00 | 117,600 | 50 | -30OTH | 0 | 76,440 |
| C 901.002:Paving: Concrete | | | | 1 | 1,300 | | 1988 | | A | A | 3.00 | 3,900 | 50 | 0 | 0 | 1,950 |

| ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | REM | CND | GRD | S/UNIT | UNADJUSTED S | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A 670.999:Office | | | | 1 | | | 1988 | 2004 | A | | .00 | 0 | 0 | 0 | 0 | 0 |
| 1 650.000:School | C | | | 2 | 13,446 | | 1988 | 2004S | A | A | 64.00 | 1,721,090 | 22 | -30(OTH) | 0 | 1,745,190 |
| 2 499.055:Porch: Open Brick | | | 3 X 28 | 1 | 84 | | 1988 | | A | A | 13.00 | 1,090 | 22 | 0 | 0 | 850 |
| 3 650.000:2ND FLOOR OVER PORCH | C | | 3 X 28 | 1 | 84 | | 1988 | 2004S | A | A | 64.00 | 5,380 | 22 | 0 | 0 | 4,200 |

| AMENITY TOTAL | | | | | | | | | | | | | | | | 0 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | TOTAL IMPR | | 1,829,900 |

COMMENTS

# EXHIBIT B

Business Name:
Property Address: 4000 SUNSET BV ,                    DTE Code: 670

1 of 3

*08-01519-000*

STEUBEN CORP - FORT STEUBEN T
INDIAN CREEK LSD
08280000100

**LEGAL INFORMATION**

2-6-12 35-A 8-B LAND                    Acres:74.9490
74.949A MAP-08-28-01
SPLIT
JEFFERSON COMM COLLEGE
JEFFERSON COMM COLLEGE
4000 SUNSET BOULEVARD
STEUBENVILLE, OH 43052

| Internal Use Only |
|---|
| 00108 |
| Map: |
| Block: |
| Card: |
| Bk:620 Pg:766 |

**COMMENT**
Requested   Reason   Description
Apr 23 2019 12:00AM   NC   5 BLDG PERMITS PULLED TOTALING $2255145
FIRE SUPPRESSION IN SERVER ROOM ; HVAC AND DUCTWORK ; ELECTRICAL
WORK ; EGCC RENOVATIONS AND CONSOLIDATION OF ALL STUDENT
SERVICES IN ONE LOCATION
JEFFERSON COMM COLLEGE,@100%
2019 NC INTERIOR RENOVATIONS - NVC, AJL 9/26/2019
18 ADDED MISSING BLDG ADD, INCREASED PAV SF.

| Sales Data | | | | | | Date |
|---|---|---|---|---|---|---|
| Date | Amount | Deed/Conv# | | Use | Valid | Lister:   DS 05/28/18 |
| 08/02/1995 | 0 | : 826 | 670 | | ☐ | Pricer:   TR 06/26/18 |
| | 0 | 0 : 0 | | | ☐ | Reviewer: |
| | | | | | ☐ | Final: |
| | | | | | ☐ | Call Back: |
| | | | | | ☐ | Visit: |

| VALUATION SUMMARY | | | | |
|---|---|---|---|---|
| VALUE YEAR | 2021 | 2010 | 2018 | 2016 |
| REASON FOR CHANGE | TRI | MISC | RAPP | TRI |
| ESTIMATED     LAND | 1,638,730 | 1,638,730 | 1,638,730 | 1,624,500 |
| MARKET VALUE  IMPR | 11,028,080 | 11,028,080 | 11,028,080 | 10,959,700 |
| TOTAL | 12,666,810 | 12,666,810 | 12,666,810 | 12,584,200 |
| ASSESSED      LAND | 573,560 | 573,560 | 573,560 | 568,580 |
| VALUE         IMPR | 3,859,830 | 3,859,830 | 3,859,830 | 3,835,900 |
| TOTAL | 4,433,390 | 4,433,390 | 4,433,390 | 4,404,480 |

| LAND TYPE | SIZE | M | RATE | C | INF | M | VALUE | C |
|---|---|---|---|---|---|---|---|---|
| A1:Primary | A:25 | | 50,000 | | | | 1,250,000 | 0 |
| A2:Secondary | A:6.949 | | 25,000 | | | | 173,730 | 0 |
| A3:Residual | A:43 | | 5,000 | | | | 215,000 | 0 |
| | | | | | | | | |
| Totals: | Total Acres 74.9490 | | | | | | 1,638,730 | 0 | 1,638,730 |



| STREET/ROAD | TOPOGRAPHY | PU-UTILITIES-PR | ZONING |
|---|---|---|---|
| ■ PAVED | ☐ LEVEL | ■ WATER | ☐ AG-RES |
| ☐ GRAVEL | ☐ HIGH | ■ SEWER | ☐ COMMERCIAL |
| ☐ DIRT | ☐ LOW | ■ GAS | ☐ INDUSTRIAL |
| ☐ SIDEWALKS | ■ ROLLING | ■ ELECTRIC | |
| ☐ CURBS | ☐ STANDARD | ☐ STANDARD | |

| INFLUENCE FACTORS | | |
|---|---|---|
| A. TOPORHY | F. VACANCY | J. EX FRONT |
| B. ACCESS | G. RESTRICT | R. REVAL |
| C. LOCATION | H. OTHER | |
| E. SZ/SHAPE | I. Partial Interest | |

Appraisal Research Corporation
BF002(03180)

COM/IND/UTL/EXP
Printed: 12/29/2021 13:21 By: pre1

E.J. Conn, Jefferson

| | | | EX WALL | A | ROOFING | A | WINDOW | A | DOORS | A | FOUNDATION | A | FRAMING | A |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | STONE | | GABLE/HIP | | STORE FRT | | OVERHEAD | | SLAB | | PRE ENG | |
| CLASS/QUALITY RANK | | | BRICK | | SHED/FLAT | | CASEMENT | | | | CRAWL | | STEEL | |
| A) FP STRUCT, STEEL FRAME | 1. BASIC | | CON BLK | | CON DECK | | DBLH | | | | PILE/COL | | REINF CONC | |
| B) R.C. FRAME | 2. FAIR | | WD/MTL | | MTL DECK | | SLIDE BY | | | | REINFOR | | CB/MASON | |
| C) MASONRY BEARING WALLS | 3. AVE | | ENAM STL | | WD DECK | | CANOPY | | | | STEEL | | FRAME | |
| D) WD OR STEEL FR EX. WALLS | 4. GOOD | | ALUM/VYL | | METAL | | LIGHTED | | STEEL INS | | BRICK | | POLE | |
| S) METAL M) MILL P) POLE | 5. EXCEL | | CON PANEL | | ASPH | | SOFFITS | | WOOD | | STONE | | TILT UP | |
| TOTAL AREA PERIMETER | | | PLATE GLS | | RUBBER | | C & W | | MTL | | CON BLK | | SANDWICH | |
| N STORIES STORY HT | | | STUCCO | | BUILT UP | | FACADE | A | GLASS | | FRAME | | STANDARD | |
| AGE SPRINKLER | | | INSULATED | | INSULATED | | | | STANDARD | | STANDARD | | | |

| HVAC | | | FLOORS | | | | PARTITIONS | | | | INTERIOR FINISH | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Electric | | Electric Wall | | CONCRETE | | | MASONRY | | | | UNFINISHED | | | |
| Forced Air Unit | | Hot Water | | WOOD | | | WD STUD | | | | FINISH OPEN | | | |
| Hot Water, Rad | | Space/Wall Furnace | | TILE A Q V T | | | MTL STUD | | | | FINISH DIV | | | |
| Steam | | Warm & Cld Air | | CARPET | | | | | | | PANEL | | | |
| Ventilation | | Heat Pump | | ASPHALT | | | ACOUT/PANEL | | | | PLASTER / DW | | | |
| Package Unit | | Ind TW Heat Pump | | GRAVEL | | | PLASTER/DW | | | | BLOCK | | | |
| Hot & Cld Water | | Evaporated Cool | | DIRT | | | SUSP/OPEN | | | | GLAZED TILE | | | |
| Floor Furnace | | Co-Ray-Vac | | STANDARD | | | STANDARD | | | | STANDARD | | | |
| Complete HVAC | | No Heat | | | | | | | | | | | | |
| Refrig. Cooling | | Standard | | | | | | | | | | | | |

| PLUMBING | | LIGHTING | | |
|---|---|---|---|---|
| NO PLUMBING | | EXTRA FIXTURES | FLUORESCENT | METAL HALIDE |
| 2 FIXTURE BATH | | STANDARD | SODIUM VAP | |
| 3 FIXTURE BATH | | | MERCURY VAP | |

**YARD ITEMS**

| | ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | REMS | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| C | 901.001:Paving: Asphalt | | | | 1 | 285,000 | | 1920 | 1992 | A | | 2.00 | 570,000 | 50 | 0 | 0 | 285,000 |
| D | 499.005:Roof Shelter | | | 24 X 26 | 1 | 624 | | 2000 | | A | | 11.00 | 6,860 | 18 | 0 | 0 | 5,630 |
| E | 499.033:Garage: Detached Frame/Blo | | | 60 X 80 | 1 | 4,800 | | 1990 | | F | A | 14.00 | 67,200 | 22 | 0 | 0 | 52,420 |

| | ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | REMS | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 650.000:SCHOOL | A | | | 3 | 6,674 | | | | A | N | .00 | 0 | 0 | 0 | 0 | 0 |
| 1 | 650.000:School | C | | | 2 | 38,230 | | 1966 | 2019A | G | A | 64.00 | 4,636,690 | 10(SPE) | 0 | 0 | 4,174,730 |
| 2 | 650.000:School | A | | | 3 | 1,334 | | 1966 | 2019A | G | A | 64.00 | 256,130 | 10(SPE) | 0 | 0 | 230,620 |
| 3 | 650.000:School | C | | | 1 | 7,332 | | 1966 | 2019A | G | A | 64.00 | 469,250 | 10(SPE) | 0 | 0 | 422,330 |
| 4 | 650.000:School | | | | 1 | 3,600 | | 1966 | 2019A | G | A | 64.00 | 230,400 | 10(SPE) | 0 | 0 | 207,360 |
| 5 | 650.000:School | C | | | 2 | 12,077 | | 1966 | 2019A | G | A | 64.00 | 1,661,000 | 10(SPE) | 0 | 0 | 1,494,050 |
| 6 | 650.000:School | C | | | 1 | 2,361 | | 1966 | 2019A | G | A | 64.00 | 151,100 | 10(SPE) | 0 | 0 | 135,990 |
| 7 | 650.000:School | C | | | 1 | 4,528 | | 1966 | 2019A | G | A | 64.00 | 289,790 | 10(SPE) | 0 | 0 | 260,810 |
| 8 | 650.000:School | C | | | 1 | 13,995 | | 1966 | 2019A | G | A | 64.00 | 895,680 | 10(SPE) | 0 | 0 | 806,110 |
| 9 | 670.000:1s BR | | | 12 X 103 | 1 | 1,236 | | | | A | N | .00 | 0 | 0 | 0 | 0 |
| | AMENITY TOTAL | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | TOTAL IMPR | | | | 11,028,080 |

**COMMENTS**

2 of 3

Business Name:
Property Address: 4000 SUNSET BV ,                    DTE Code: 670

*08-01519-000*

STEUBEN CORP - FORT STEUBEN T
INDIAN CREEK LSD
08280000100

## LEGAL INFORMATION

2-6-12 35-A 8-B LAND
74.949A MAP-08-28-01
SPLIT
JEFFERSON COMM COLLEGE
JEFFERSON COMM COLLEGE
4000 SUNSET BOULEVARD
STEUBENVILLE, OH 43952
COMMENT

Acres:74.9490

| Internal Use Only |
| 00106 |
| Map: |
| Block: |
| Card: |
| Bk:629   Pg:766 |

### Sales Data

| Date | Amount | Deed:Conv# | Use | Valid | I.fer: | DS | Date |
|------|--------|-----------|-----|-------|--------|-----|------|
| 08/02/1996 | 0 | ; 026 670 | ☐ | ☐ | Prior: | TR | 05/28/18 |
|  | 0 | 0; ; 0 | ☐ | ☐ | Reviewer: |  | 06/26/18 |
|  |  |  | ☐ | ☐ | Final: |  |  |
|  |  |  | ☐ | ☐ | Cell Back: |  |  |
|  |  |  | ☐ | ☐ | Visit: |  |  |

### VALUATION SUMMARY

| VALUE YEAR | | 2013 | 2011 | 2010 |
|------------|--|------|------|------|
| REASON FOR CHANGE | | MISC | MISC | MISC |
| ESTIMATED MARKET VALUE | LAND | 1,624,500 | 1,174,700 | 1,174,700 |
|  | IMPR | 10,947,600 | 10,947,600 | 10,531,800 |
|  | TOTAL | 12,572,100 | 12,122,300 | 11,706,600 |
| ASSESSED VALUE | LAND | 568,580 | 411,150 | 411,150 |
|  | IMPR | 3,831,660 | 3,831,660 | 3,686,130 |
|  | TOTAL | 4,400,240 | 4,242,810 | 4,097,280 |

### STREET/ROAD

☑ PAVED
☐ GRAVEL
☐ DIRT
☐ SIDEWALKS
☐ CURBS

### TOPOGRAPHY

☐ LEVEL
☐ HIGH
☐ LOW
☐ ROLLING
☐ STANDARD

### PU UTILITIES PR

☑ WATER
☑ SEWER
☑ GAS
☑ ELECTRIC
☐ STANDARD

### ZONING

☐ AG-RES
☐ COMMERCIAL
☐ INDUSTRIAL

### INFLUENCE FACTORS

| A. TOPGRHY | F. VACANCY | J. EX FRONT |
| B. ACCESS | G. RESTRICT | R. REVAL |
| D. LOCATION | H. OTHER | |
| E. 6Z/SHAPE | I. Partial Interest | |

| LAND TYPE | SIZE | M | RATE | C | INF | M | VALUE | C | |
|-----------|------|---|------|---|-----|---|-------|---|--|
|  |  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |  |
| Totals: | Total Acres 74.9490 |  |  |  |  |  | 1,638,730 | 0 | 1,638,730 |

Appraisal Research Corporation
BF692(03180)

COM/AND/UTL/EXP
Printed: 12/29/2021 13:21 By: pro1

E.J. Conn, Jefferson

| | | EX WALL | | ROOFING | | WINDOW | | DOORS | | FOUNDATION | | FRAMING | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | STONE | | GABLE/HIP | | STORE FRT | | OVERHEAD | | SLAB | | PRE ENG | |
| CLASS/QUALITY RANK | | BRICK | | SHED/FLAT | | CASEMENT | | | | CRAWL | | STEEL | |
| A) FP STRUCT, STEEL FRAME | 1, BASIC | CON BLK | | CON DECK | | DBLH | | | | PILE/COL | | REINF CONC | |
| B) R.C. FRAME | 2, FAIR | WD/MTL | | MTL DECK | | SLIDE BY | | | | REINFOR | | CB/MASON | |
| C) MASONRY BEARING WALLS | 3, AVE | ENAM STL | | WD DECK | | CANOPY | | | | STEEL | | FRAME | |
| D) WD OR STEEL FR EX. WALLS | 4, GOOD | ALUM/VYL | | METAL | | LIGHTED | | STEEL INS | | BRICK | | POLE | |
| S) METAL (4) MILL (7) POLE | 5, EXCEL | CON PANEL | | ASPH | | SOFFITS | | WOOD | | STONE | | TILT UP | |
| TOTAL AREA | PERIMETER | PLATE GLS | | RUBBER | | C S W | | MTL | | CON BLK | | SANDWICH | |
| # STORIES | STORY HT | STUCCO | | BUILT UP | | FACADE | | GLASS | | FRAME | | STANDARD | |
| AGE | SPRINKLER | INSULATED | | INSULATED | | | | STANDARD | | STANDARD | | | |
| HVAC | | FLOORS | | | | PARTITIONS | | | | INTERIOR FINISH | | | |
| Electric | Electric Wall | CONCRETE | | | | MASONRY | | | | UNFINISHED | | | |
| Forced Air Unit | Hot Water | WOOD | | | | WD STUD | | | | FINISH OPEN | | | |
| Hot Water, Rad | Space/Wall Furnace | TILE A Q V T | | | | MTL STUD | | | | FINISH DIV | | | |
| Steam | Warm & Cld Air | CARPET | | | | CEILINGS | | | | PLASTER / DW | | | |
| Ventilation | Heat Pump | ASPHALT | | | | ACOU/PANEL | | | | PANEL | | | |
| Package Unit | Ind TW Heat Pump | GRAVEL | | | | PLASTER/DW | | | | BLOCK | | | |
| Hot & Cld Water | Evaporated Cool | DIRT | | | | SUSP/OPEN | | | | GLAZED TILE | | | |
| Floor Furnace | Co-Ray-Vac | STANDARD | | | | STANDARD | | | | STANDARD | | | |
| Complete HVAC | No Heat | PLUMBING | | | | | | LIGHTING | | | | | |
| Refrig. Cooling | Standard | NO PLUMBING | | EXTRA FIXTURES | | | FLUORESCENT | | | METAL HALIDE | | | |
| | | 2 FIXTURE BATH | | STANDARD | | | SODIUM VAP | | | | | | |
| YARD ITEMS | | 3 FIXTURE BATH | | | | | MERCURY VAP | | | | | | |

| ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | ITEM | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |

| ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | ITEM | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16 670.099:^S 1.0 | | | 40 X 97 | 1 | 3,880 | | | | A | N | .00 | 0 | 0 | 0 | 0 | 0 |
| 15 670.099:1s BR | | | 21 X 59 | 1 | 1,239 | | | | | | .00 | 0 | 0 | 0 | 0 | 0 |
| 16 670.099:^S 1.0 | | | 57 X 22 | 1 | 1,264 | | | | | | .00 | 0 | 0 | 0 | 0 | 0 |
| 17 670.099:3s BR | | | 57 X 22 | 1 | 1,254 | | | | | | .00 | 0 | 0 | 0 | 0 | 0 |
| 18 670.099:3s BR | | | 40 X 97 | 1 | 3,880 | | | | | | .00 | 0 | 0 | 0 | 0 | 0 |
| 19 650.000:SCHOOL | C | | | 2 | 14,604 | | 1966 | 2019A | A | A | 64.00 | 1,880,830 | 10(SPE) | 0 | 0 | 1,692,760 |
| 20 650.000:SCHOOL | | | | 2 | 10,933 | | 1966 | 2019A | A | A | 64.00 | 1,399,420 | 10(SPE) | 0 | 0 | 1,259,480 |

| AMENITY TOTAL | | | | | | | | | | | | | | | | 0 |
| | | | | | | | | | | | | TOTAL IMPR | | | | 11,028,080 |

COMMENTS

08-01510-000      Printed: 12/29/2021 13:21      E.J. Conn, Jefferson

Business Name:
Property Address:　4000 SUNSET BV ,　　　DTE Code:  670　　　　　3　of 3

**||||||||||||||||||| *08-01519-000***

STEUBEN CORP - FORT STEUBEN T
INDIAN CREEK LSD
08280000100

**LEGAL INFORMATION**

2-6-12 35-A 8-B LAND　　　Acres:74.9490
74.949A MAP-08-28-01
SPLIT
JEFFERSON COMM COLLEGE
JEFFERSON COMM COLLEGE
4000 SUNSET BOULEVARD
STEUBENVILLE, OH 43952
COMMENT

| Internal Use Only |
| --- |
| 00106 |
| Map: |
| Block: |
| Card: |
| Bk:629　Pg:766 |

**Sales Data**

| Date | Amount | Deed:Conv# | Use | Valid | Lister: | DS 05/28/18 | Date |
| --- | --- | --- | --- | --- | --- | --- | --- |
| 08/02/1995 | 0 | ; 826 | 670 | ☐ | Pricer: | TR 06/26/18 | |
| | 0 | 0; ; 0 | | ☐ | Reviewer: | | |
| | | | | ☐ | Final: | | |
| | | | | ☐ | Call Back: | | |
| | | | | ☐ | Visit: | | |

**VALUATION SUMMARY**

| VALUE YEAR | | | | |
| --- | --- | --- | --- | --- |
| REASON FOR CHANGE | | | | |
| ESTIMATED | LAND | | | |
| MARKET VALUE | IMPR | | | |
| | TOTAL | | | |
| ASSESSED | LAND | | | |
| VALUE | IMPR | | | |
| | TOTAL | | | |

| STREET/ROAD | TOPOGRAPHY | PU:UTILITIES:PR | ZONING |
| --- | --- | --- | --- |
| ■ PAVED | ☐ LEVEL | ■ WATER ☐ | ☐ AG-RES |
| ☐ GRAVEL | ☐ HIGH | ☐ SEWER ☐ | ☐ COMMERCIAL |
| ☐ DIRT | ☐ LOW | ☐ GAS ☐ | ☐ INDUSTRIAL |
| ☐ SIDEWALKS | ■ ROLLING | ■ ELECTRIC ☐ | |
| ☐ CURBS | ☐ STANDARD | ☐ STANDARD ☐ | |

**INFLUENCE FACTORS**

| A. TOPGRHY | F. VACANCY | J. EX:FRONT |
| --- | --- | --- |
| B. ACCESS | G. RESTRICT | R. REVAL |
| D. LOCATION | H. OTHER | |
| E. SZ/SHAPE | I. Partial Interest | |

| LAND TYPE | SIZE | M | RATE | C | INF | M | VALUE | C | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Totals: | Total Acres 74.9490 | | | | | | 1,638,730 | 0 | 1,638,730 |

Appraisal Research Corporation
BF602(03189)

COM/IND/UTL/EXP
Printed: 12/20/2021 13:21 By: prei

E.J. Conn, Jefferson

| | EX WALL | B | ROOFING | B | WINDOW | B | DOORS | B | FOUNDATION | B | FRAMING | B |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CLASS/QUALITY RANK** | STONE | | GABLE/HIP | | STONE FRT | | OVERHEAD | | SLAB | | PRE ENG | |
| A) FP STRUCT. STEEL FRAME  1. BASIC | BRICK | | SHED/FLAT | | CASEMENT | | | | CRAWL | | STEEL | |
| B) R.C. FRAME  2. FAIR | CON BLK | | CON DECK | | DBLH | | | | PILE/COL | | REINF CONC | |
| C) MASONRY BEARING WALLS  3. AVE | WD/MTL | | MTL DECK | | SLIDE BY | | | | REINFOR | | CB/MASON | |
| D) WD OR STEEL FR EX. WALLS  4. GOOD | ENAM STL | | WD DECK | | CANOPY | B | | | STEEL | | FRAME | |
| S) METAL M) MILL P) POLE  5. EXCEL | ALUM/VYL | | METAL | | LIGHTED | | STEEL INS | | BRICK | | POLE | |
| **TOTAL AREA** | CON PANEL | | ASPH | | SOFFITS | | WOOD | | STONE | | TILT UP | |
| **# STORIES** | PLATE GLS | | RUBBER | | C S W | | MTL | | CON BLK | | SANDWICH | |
| **AGE** | STUCCO | | BUILT UP | | FACADE | B | GLASS | | FRAME | | STANDARD | |
| | INSULATED | | INSULATED | | | | | | STANDARD | | | |

| **PERIMETER** | 0 |
|---|---|
| **STORY HT** | |
| **SPRINKLER** | |

| HVAC | | FLOORS | B | 1 | 2 | 3 | PARTITIONS | B | 1 | 2 | 3 | INTERIOR FINISH | B | 1 | 2 | 3 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Electric | Electric Wall | CONCRETE | | | | | MASONRY | | | | | UNFINISHED | | | | |
| Forced Air Unit | Hot Water | WOOD | | | | | WD STUD | | | | | FINISH OPEN | | | | |
| Hot Water, Rad | Space/Wall Furnace | TILE A Q V T | | | | | MTL STUD | | | | | FINISH DIV | | | | |
| Steam | Warm & Cld Air | CARPET | | | | | CEILINGS | | | | | PLASTER / DW | | | | |
| Ventilation | Heat Pump | ASPHALT | | | | | ACCUT/PANEL | | | | | PANEL | | | | |
| Package Unit | Ind TW Heat Pump | GRAVEL | | | | | PLASTER/DW | | | | | BLOCK | | | | |
| Hot & Cld Water | Evaporated Cool | DIRT | | | | | SUSP/OPEN | | | | | GLAZED TILE | | | | |
| Floor Furnace | Co-Ray-Vac | STANDARD | | | | | STANDARD | | | | | STANDARD | | | | |
| Complete HVAC | No Heat | | | | | | | | | | | | | | | |
| Refrig. Cooling | Standard | | | | | | | | | | | | | | | |

| PLUMBING | | | LIGHTING | | B |
|---|---|---|---|---|---|
| NO PLUMBING | | EXTRA FIXTURES | FLUORESCENT | | METAL HALIDE |
| 2 FIXTURE BATH | | | SODIUM VAP | | STANDARD |
| 3 FIXTURE BATH | | | STANDARD | | |
| | | | MERCURY VAP | | |

**YARD ITEMS**

| ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | YR EM | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |

| | ITEM | CONST | HT | SIZE X SIZE | FL | AREA | UNITS | AGE | YR EM | CND | GRD | $/UNIT | UNADJUSTED $ | PHY | FC | EC | MARKET VALUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| B | 070.999:070.999 TEMP | A | | | 3 | 1,334 | | | A | N | N | .00 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | |

| **AMENITY TOTAL** | | 0 |
|---|---|---|
| | **TOTAL IMPR** | 11,028,080 |

**COMMENTS**

08-01519-000                     Printed: 12/29/2021 13:21                     E.J. Conn, Jefferson

Site Name: Steubenville Clock Tower

Site Number: OHJEF-0001

# LAND LEASE AGREEMENT

THIS LAND LEASE AGREEMENT ("Agreement") is by and between Jefferson Community College, currently known as Eastern Gateway Community College, as ("Landlord"), having an address at 4000 Sunset Blvd, Steubenville, Ohio 43952 and Southern Cross Tower Group, INC, an Ohio corporation, having an address of 7807 Addison Road, Masury, Ohio 44438, as ("Tenant")

## BACKGROUND

Landlord owns or controls that certain plot, parcel or tract of land, as described on Exhibit "A", together with all rights and privileges arising in connection therewith, located at 110 John Scott Highway, in the County of Jefferson, State of Ohio, 43952 (collectively, the "Property"). Tenant desires to use a portion of the Property to erect, operate, and maintain an unmanned telecommunications facility; and, Landlord desires to grant to Tenant the right to use a portion of the Property in accordance with this Agreement.

The parties agree as follows:

1. <u>Lease of Premises</u>. Landlord hereby leases to Tenant a certain portion of the Property, including air space above such ground space, as described in Exhibit "B" (the Premises) for the placement of Tenant's Communication Facility.

2. <u>Term</u>. The initial term of this Lease shall be Five (5) years commencing on the effective date (the "Commencement Date"), and terminating at midnight on the last day of the initial term (the "Initial Term").

3. <u>Permitted Use</u>. The Premises may be used by Tenant for the transmission and reception of radio communication signals and for the construction, installation, operation, maintenance, repair, removal or replacement of related facilities, tower and base, antennas, microwave dishes, equipment shelters and/or cabinets and related activities.

4. <u>Rent</u>. Commencing on the first day of the month following the date that Tenant completes construction (the "Rent Commencement Date"), Tenant shall pay to Landlord as a fixed rental (the "Rent") during the Initial Five (5) Year Term of this Lease for use of the Premises the following amount for the period indicated.

| <u>Period</u> | <u>Amount of Fixed Rent</u> | <u>Time of Payment of Fixed Rent</u> |
|---|---|---|
| Year 1 – 5 | $150,000.00 | Commencement Date |

5. <u>Renewal</u>. Tenant shall have the right to extend this Lease for five (5) additional, five-year terms (each a "Renewal Term"). Each Renewal Term shall be on the same terms and conditions as set forth herein. This Lease shall automatically renew for each successive Renewal Term unless Tenant notifies Landlord, in writing, of Tenant's intention not to renew this Lease, at least sixty (60) days prior to the expiration of the Initial Term or any Renewal Term.

    a.    Beginning on the anniversary date of the First Renewal Term, Tenant shall pay Landlord, as rent, Two Thousand Eight Hundred Ninety Eight and no/100 dollars ($2898.00) per month. ("Rent"). Rent will be payable monthly in advance by the fifth day of each month to Landlord's address specified in Section 13 below. If this Lease is terminated at a time other than on the last day of a month, Rent shall be prorated as of the date of termination for any reason (other than a default by Tenant) and all prepaid Rent shall be immediately refunded to Tenant.

    a.    Unless arising out of Landlord's default of any of its obligations under this Lease, no Rent shall be required to be refunded to Tenant in the event this Lease is terminated by Tenant at a time other than on the last day of a pay period or in the event Landlord terminates this Lease as a result of Tenant's default of any of its obligations under this Lease. If, however, Tenant terminates this Lease other than on the last day of a pay period as a result of Landlord's default of any of its obligations under this Lease, Rent shall be prorated as of the date of termination and all prepaid Rent shall be immediately refunded to Tenant.

    b.    On the anniversary date of year two (2) of the First Renewal Term, and each year thereafter, including throughout any Renewal Terms exercised, the monthly Rent will increase by three percent (3%) over the Rent paid during the previous year.

6. <u>Interference</u>. Tenant shall not use the Premises in any way which interferes with the use of the Property by Landlord, or lessees or licensees of Landlord with rights in the Property prior in time to Tenant's (subject to Tenant's rights under this Lease, including, without limitation, non-interference). Similarly, Landlord shall not use, nor shall Landlord permit its lessees, licensees, employees, invitees or agents to use, any portion of the Property in any way which interferes with the

1

Site Name: Steubenville Clock Tower
Site Number: OHJEF-0001

operations of Tenant. Such interference shall be deemed a material breach by the interfering party, who shall, upon written notice from the other, be responsible for terminating said interference. In the event any such interference does not cease promptly, the parties acknowledge that continuing interference may cause irreparable injury and, therefore, the injured party shall have the right, in addition to any other rights that it may have at law or in equity, to bring a court action to enjoin such interference or to terminate this Lease immediately upon written notice.

7. **Improvements; Utilities; Access.**

(a) Tenant shall have the right, at its expense, to erect and maintain on the Premises improvements, personal property and facilities necessary to operate its communications system, including, without limitation, radio transmitting and receiving antennas, microwave dishes, tower and base, equipment shelters and/or cabinets and related cables and utility lines and a location based system, including, without limitation, Cell on Wheels (COWs), antenna(s), coaxial cable, base units and other associated equipment (collectively, the "Antenna Facilities", as such location based system may be required by any county, state or federal agency/department. Tenant shall provide written notice to Landlord of the installation of a location based system on the Premises in the event such system was not a part of the initial Antenna Facilities installation. Tenant shall have the right to alter, replace, expand, enhance and upgrade the Antenna Facilities at any time during the term of this Lease. Tenant shall cause all construction to occur lien-free and in compliance with all applicable laws and ordinances. Landlord acknowledges that it shall not interfere with any aspects of construction, including, without limitation, attempting to direct construction personnel as to the location of or method of installation of the Antenna Facilities and the Easements (as defined below) ("Construction Interference"). Landlord further acknowledges that it will be responsible for any costs and damages (including, fines and penalties) that are directly attributable to Landlord's Construction Interference. The Antenna Facilities shall remain the exclusive property of Tenant. Tenant shall have the right to remove the Antenna Facilities at any time during and upon the expiration or termination of this Lease.

(b) Tenant, at its expense, may use any and all appropriate means of restricting access to the Antenna Facilities, including, without limitation, the construction of a fence.

(c) Tenant shall, at Tenant's expense, keep and maintain the Antenna Facilities now or hereafter located on the Property in commercially reasonable condition and repair during the term of this Lease, normal wear and tear and casualty excepted. Upon termination or expiration of this Lease, the Premises shall be returned to Landlord in good, usable condition, normal wear and tear and casualty excepted.

(d) Tenant shall have the right to install utilities, at Tenant's expense, and to improve the present utilities on the Property (including, but not limited to, the installation of emergency power generators). Landlord agrees to use reasonable efforts in assisting Tenant to acquire necessary utility service. Tenant shall, wherever practicable, install separate meters for utilities used on the Property by Tenant.

(e) As partial consideration for Rent paid under this Lease, Landlord hereby grants Tenant an easement in, under and across the Property for ingress, egress, utilities and access (including access for the purposes described in Section 1) to the Premises adequate to install and maintain utilities, which include, but are not limited to, the installation of power and telephone service cable, and to service the Premises and the Antenna Facilities at all times during the Initial Term of this Lease and any Renewal Term (collectively, the "Easements"). The Easements provided hereunder shall have the same term as this Lease.

(f) Tenant shall have 24-hours-a-day, 7-days-a-week access to the Premises ("Access") at all times during the Initial Term of this Lease and any Renewal Term. In the event Landlord, its employees or agents impede or deny Access to Tenant, its employees or agents, Tenant shall, without waiving any other rights that it may have at law or in equity, deduct from Rent amounts due under this Lease an amount equal to Five Hundred and no/100 dollars ($500.00) per day for each day that Access is impeded or denied.

8. **Removal / Restoration.** All portions of the Communication Facility brought onto the Property by Tenant will be and remain Tenant's personal property and, at Tenant's option, may be removed by Tenant at any time during the Term. Landlord covenants and agrees that no part of the Communication Facility constructed, erected or placed on the Premises by Tenant will become, or be considered as being affixed to or a part of, the Property, it being the specific intention of the Landlord that all improvements of every kind and nature constructed, erected or placed by Tenant on the Premises will be and remain the property of the Tenant and may be removed by Tenant at any time during the Term. Footings, foundations, and concrete will be removed to a depth of two-feet below grade. Within one hundred twenty (120) days of the termination of this Agreement, Tenant will, to the extent reasonable, restore the Premises to its condition at the commencement of the Agreement, reasonable wear and tear and loss by casualty or other causes beyond Tenant's control excepted. Notwithstanding the foregoing, Tenant will not be responsible for the replacement of any trees, shrubs, or other vegetation, nor will Tenant be required to remove from the Premises or the Property any underground utilities.

2

Site Name: Steubenville Clock Tower

Site Number: OHJEF-0001

9. <u>Termination</u>. Except as otherwise provided herein, this Lease may be terminated, without any penalty or further liability as follows:

(a) upon thirty (30) days' written notice by Landlord if Tenant fails to cure a default for payment of amounts due under this Lease within that thirty (30) day period;

(b) immediately if Tenant notifies Landlord of unacceptable results of any title report, environmental or soil tests prior to Tenant's installation of the Antenna Facilities on the Premises, or if Tenant is unable to obtain, maintain, or otherwise forfeits or cancels any license (including, without limitation, an FCC license), permit or any Governmental Approval necessary to the installation and/or operation of the Antenna Facilities or Tenant's business;

(c) upon ninety (90) days' written notice by Tenant if the Property or the Antenna Facilities are, or become unacceptable under Tenant's design or engineering specifications for its Antenna Facilities or the communications system to which the Antenna Facilities belong;

(d) immediately upon written notice by Tenant if the Premises or the Antenna Facilities are destroyed or damaged so as in Tenant's reasonable judgment to substantially and adversely affect the effective use of the Antenna Facilities. In such event, all rights and obligations of the parties shall cease as of the date of the damage or destruction, and Tenant shall be entitled to the reimbursement of any Rent prepaid by Tenant. If Tenant elects to continue this Lease, then all Rent shall abate until the Premises and/or the Antenna Facilities are restored to the condition existing immediately prior to such damage or destruction; or

(e) at the time title to the Property transfers to a condemning authority, pursuant to a taking of all or a portion of the Property sufficient in Tenant's determination to render the Premises unsuitable for Tenant's use. Landlord and Tenant shall each be entitled to pursue their own separate awards with respect to such taking. Sale of all or part of the Property to a purchaser with the power of eminent domain in the face of the exercise of the power shall be treated as a taking by condemnation.

10. <u>Default and Right to Cure</u>. Notwithstanding anything contained herein to the contrary and without waiving any other rights granted to it at law or in equity, each party shall have the right, but not the obligation, to terminate this Lease on written notice pursuant to Section 12 hereof, to take effect immediately, if the other party (i) fails to perform any covenant for a period of thirty (30) days after receipt of written notice thereof to cure or (ii) commits a material breach of this Lease and fails to diligently pursue such cure to its completion after sixty (60) days' written notice to the defaulting party.

11. <u>Taxes</u>. Landlord shall pay when due all real property taxes for the Property, including the Premises. In the event that Landlord fails to pay any such real property taxes or other fees and assessments, Tenant shall have the right, but not the obligation, to pay such owed amounts and deduct them from Rent amounts due under this Lease. Notwithstanding the foregoing, Tenant shall pay any personal property tax, real property tax or any other tax or fee which are directly attributable to the presence or installation of the Tenant's Antenna Facilities, only for so long as this Lease has not expired of its own terms or is not terminated by either party. Landlord hereby grants to Tenant the right to challenge, whether in a Court, Administrative Proceeding, or other venue, on behalf of Landlord and/or Tenant, any personal property or real property tax assessments that may affect Tenant. If Landlord receives notice of any personal property or real property tax assessment against the Landlord, which may affect Tenant and is directly attributable to Tenant's installation, Landlord shall provide timely notice of the assessment to Tenant sufficient to allow Tenant to consent to or challenge such assessment. Further, Landlord shall provide to Tenant any and all documentation associated with the assessment and shall execute any and all documents reasonably necessary to effectuate the intent of this Section 10.

12. <u>Insurance and Subrogation and Indemnification</u>.

(a) Tenant shall provide Commercial General Liability Insurance in an aggregate amount of One Million and $1,000,000.00 and no/100 dollars ($1,000,000.00). Tenant may satisfy this requirement by obtaining the appropriate endorsement to any master policy of liability insurance Tenant may maintain.

(b) Landlord and Tenant hereby mutually release each other (and their successors or assigns) from liability and waive all right of recovery against the other for any loss or damage covered by their respective first party property insurance policies for all perils insured thereunder. In the event of such insured loss, neither party's insurance company shall have a subrogated claim against the other. To the extent loss or damage is not covered by their first party property insurance policies, Landlord and Tenant each agree to indemnify and hold harmless the other party from and against any and all claims, damages, cost and expenses, including reasonable attorney fees, to the extent caused by or arising out of (a) the negligent acts or omissions or willful misconduct in the operations or activities on the Property by the indemnifying party or the employees, agents, contractors, licensees, tenants and/or subtenants of the indemnifying party, or (b) a breach of any obligation of the indemnifying party under this Lease. Notwithstanding the foregoing, this indemnification shall not extend to indirect, special, incidental or consequential

3

Site Name: Steubenville Clock Tower
Site Number: OHJEF-0001

damages, including, without limitation, loss of profits, income or business opportunities to the indemnified party or anyone claiming through the indemnified party. The indemnifying party's obligations under this section are contingent upon (i) its

receiving prompt written notice of any event giving rise to an obligation to indemnifying the other party and (ii) the indemnified party's granting it the right to control the defense and settlement of the same. Notwithstanding anything to the contrary in this Lease, the parties hereby confirm that the provisions of this section shall survive the expiration or termination of this Lease. Tenant shall not be responsible to Landlord, or any third-party, for any claims, costs or damages (including, fines and penalties) attributable to any pre-existing violations of applicable codes, statutes or other regulations governing the Property, including the Premises.

13. <u>Notices</u>. All notices, requests, demands and other communications shall be in writing and are effective three (3) days after deposit in the U.S. mail, certified and postage paid, or upon receipt if personally delivered or sent by next-business-day delivery via a nationally recognized overnight courier to the addresses set forth below. Landlord or Tenant may from time to time designate any other address for this purpose by providing written notice to the other party.

<u>If to Tenant, to:</u>

Southern Cross Tower Group, INC
7807 Addison Road
Masury, Ohio 44438
Attn: John Cooper
Telephone: (330) 448-8011
Facsimile: (330) 448-8006

<u>With a copy to:</u>

W. Chad Kelligher
Attorney at Law
108 Main Ave SW Suite 902
Warren, Ohio 44481
Telephone: (330) 306-5129
Facsimile: (330) 306-5186

<u>If to Landlord, to:</u>
Eastern Gateway Community College
4000 Sunset Blvd
Steubenville, Ohio 43952
Attn: Sherri Van Tassel

<u>With a copy to:</u>
Sherrilyn F. Van Tassel, Esq
VP for Administrative Services
4000 Sunset Blvd
Steubenville, Ohio 43952

14. <u>Quiet Enjoyment, Title and Authority</u>. Landlord covenants and warrants to Tenant that (i) Landlord has full right, power and authority to execute this Lease; (ii) it has good and unencumbered title to the Property free and clear of any liens or mortgages, except those disclosed to Tenant and which will not interfere with Tenant's rights to or use of the Premises; and (iii) execution and performance of this Lease will not violate any laws, ordinances, covenants, or the provisions of any mortgage, lease, or other agreement binding on Landlord. Landlord covenants that at all times during the term of this Lease, Tenant's quiet enjoyment of the Premises or any part thereof shall not be disturbed as long as Tenant is not in default beyond any applicable grace or cure period.

15. <u>Environmental Laws</u>. Landlord represents that it has no knowledge of any substance, chemical or waste (collectively, "Hazardous Substance") on the Property that is identified as hazardous, toxic or dangerous in any applicable federal, state or local law or regulation. Landlord and Tenant shall not introduce or use any Hazardous Substance on the Property in violation of any applicable law. Landlord shall be responsible for, and shall promptly conduct any investigation and remediation as required by any applicable environmental laws, all spills or other releases of any Hazardous Substance not caused solely by Tenant, that have occurred or which may occur on the Property. Each party agrees to defend, indemnify and hold harmless the other from and against any and all administrative and judicial actions and rulings, claims, causes of action, demands and liability (collectively, "Claims") including, but not limited to, damages, costs, expenses, assessments, penalties, fines, losses, judgments and reasonable attorney fees that the Indemnitee may suffer or incur due to the existence or discovery of any Hazardous Substances on the Property or the migration of any Hazardous Substance to other properties or the release of any Hazardous Substance into the environment (collectively, "Actions"), that relate to or arise from the indemnitor's activities on the

Property. Landlord agrees to defend, indemnify and hold Tenant harmless from Claims resulting from Actions on the Property not caused by Landlord or Tenant prior to and during the Initial Term and any Renewal Term of this Lease. The indemnifications in this section specifically include, without limitation, costs incurred in connection with any investigation of site conditions or any cleanup, remedial, removal or restoration work required by any governmental authority. This Section 14 shall survive the termination or expiration of this Lease.

16. <u>Assignment and Subleasing</u>. Tenant may assign this Lease and the Easements (as defined above) granted herein upon written notice to Landlord. Upon such assignment, Tenant shall be relieved of all liabilities and obligations hereunder and Landlord shall look solely to the assignee for performance under this Lease and all obligations hereunder. Tenant may sublease the Premises, upon written notice to Landlord. Additionally, Tenant may, upon notice to Landlord, mortgage or grant a security interest in this Lease and the Antenna Facilities, and may assign this Lease and the Antenna Facilities to any

4

Site Name:  Steubenville Clock Tower

Site Number:  OHJEF-0001

mortgagees or holders of security interests, including their successors or assigns (collectively "Mortgagees"), provided such Mortgagees agree to be bound by the terms and provisions of this Lease.  In such event, Landlord shall execute such consent to

leasehold financing as may reasonably be required by Mortgagees.  Landlord agrees to notify Tenant and Tenant's Mortgagees simultaneously of any default by Tenant and to give Mortgagees the same right to cure any default as Tenant or to remove any property of Tenant or Mortgagees located on the Premises, except that the cure period for any Mortgagees shall not be less than thirty (30) days after receipt of the default notice, as provided in Section 9 of this Lease.  All such notices to Mortgagees shall be sent to Mortgagees at the address specified by Tenant.  Failure by Landlord to give Mortgagees such notice shall not diminish Landlord's rights against Tenant, but shall preserve all rights of Mortgagees to cure any default and to remove any property of Tenant or Mortgagees located on the Premises as provided in Section 17 of this Lease.

17.  Successors and Assigns.  This Lease and the Easements granted herein shall run with the land, and shall be binding upon and inure to the benefit of the parties, their respective successors, personal representatives and assigns.

18.  Waiver of Landlord's Lien.  Landlord hereby waives any and all lien rights it may have, statutory or otherwise, concerning the Antenna Facilities or any portion thereof, which shall be deemed personal property for the purposes of this Lease, whether or not the same is deemed real or personal property under applicable laws, and Landlord gives Tenant and Mortgagees the right to remove all or any portion of the same from time to time, whether before or after a default under this Lease, in Tenant's and/or Mortgagee's sole discretion and without Landlord's consent.

19.  Rental Stream Offer.  If at any time after the date of this Lease, Landlord receives a bona fide written offer from a third party seeking an assignment of the rental stream associated with this Agreement ("Rental Stream Offer"), Landlord shall immediately furnish Tenant with a copy of the Rental Stream Offer.  Tenant shall have the right within thirty (30) days after it receives such copy and representation to match the Rental Stream Offer and agree in writing to match the terms of the Rental Stream Offer.  Such writing shall be in the form of a contract substantially similar to the Rental Stream Offer.  If Tenant chooses not to exercise this right or fails to provide written notice to Landlord within the thirty (30) day period, Landlord may assign the rental stream pursuant to the Rental Stream Offer, subject to the terms of this Agreement.

20. Sale of Property.

(a)  Landlord shall not be prohibited from the selling, leasing or use of any of the Property except as provided below.

(b) If Landlord, at any time during the Term of this Lease, decides to rezone or sell, subdivide or otherwise transfer all or any part of the Premises, or all or any part of the Property, to a purchaser other than Tenant, Landlord shall promptly notify Tenant in writing, and such rezoning, sale, subdivision or transfer shall be subject to this Lease and Tenant's rights hereunder.  In the event the Property is transferred, the new landlord shall have a duty at the time of such transfer to provide Tenant with a completed IRS Form W-9, or its equivalent, and other related paperwork to effect a transfer in Rent to the new landlord.

(c) Landlord agrees not to sell, lease or use any areas of the Property for the installation, operation or maintenance of other wireless communications facilities if such installation, operation or maintenance would interfere with Tenant's Permitted Use or Antenna Facilities as determined by radio propagation tests performed by Tenant in its sole discretion, any such testing to be at the expense of Landlord or Landlord's prospective purchaser, and not Tenant.  If the radio frequency propagation tests demonstrate levels of interference unacceptable to Tenant, Landlord shall be prohibited from selling, leasing or using any areas of the Property for purposes of any installation, operation or maintenance of any other wireless communications facility or equipment.

(d)  The provisions of this Section shall in no way limit or impair the obligations of Landlord under this Lease, including interference and access obligations.

21.  Miscellaneous.

(a) The prevailing party in any litigation arising hereunder shall be entitled to its reasonable attorneys' fees and court costs, including appeals, if any.

(b) Each party agrees to furnish to the other, within twenty (20) days after request, such truthful estoppel information as the other may reasonably request.

(c) This Lease constitutes the entire agreement and understanding of the parties, and supersedes all offers, negotiations and other agreements.  There are no representations or understandings of any kind not set forth herein.  Any amendments to this Lease must be in writing and executed by both parties.

(d) Each party agrees to cooperate with the other in executing any documents (including a Memorandum of Lease in substantially the form attached hereto as Exhibit C) necessary to protect its rights or use of the Premises.  The Memorandum of

5

Site Name:   Steubenville Clock Tower

Site Number:   OHJEF-0001

Lease may be recorded in place of this Lease by either party.  In the event the Property is encumbered by a mortgage or deed of trust, Landlord agrees, upon request of Tenant, to obtain and furnish to Tenant a non-disturbance and attornment agreement for

each such mortgage or deed of trust, in a form reasonably acceptable to Tenant.  Tenant may obtain title insurance on its interest in the Premises.  Landlord agrees to execute such documents as the title company may require in connection therewith.

(e) This Lease shall be construed in accordance with the laws of the state in which the Property is located.

(f) If any term of this Lease is found to be void or invalid, such finding shall not affect the remaining terms of this Lease, which shall continue in full force and effect.  The parties agree that if any provisions are deemed not enforceable, they shall be deemed modified to the extent necessary to make them enforceable.  Any questions of particular interpretation shall not be interpreted against the draftsman, but rather in accordance with the fair meaning thereof.  No provision of this Lease will be deemed waived by either party unless expressly waived in writing signed by the waiving party.  No waiver shall be implied by delay or any other act or omission of either party.  No waiver by either party of any provision of this Lease shall be deemed a waiver of such provision with respect to any subsequent matter relating to such provision.

(g) The persons who have executed this Lease represent and warrant that they are duly authorized to execute this Lease in their individual or representative capacity as indicated.

(h) This Lease may be executed in any number of counterpart copies, each of which shall be deemed an original, but all of which together shall constitute a single instrument.

(i) All Exhibits referred to herein and any Addenda are incorporated herein for all purposes.  The parties understand and acknowledge that Exhibit A (the legal description of the Property) and Exhibit B (the Premises location within the Property), may be attached to this Lease and the Memorandum of Lease, in preliminary form.  Accordingly, the parties agree that upon the preparation of final, more complete exhibits, Exhibits A, and/or B, as the case may be, which may have been attached hereto in preliminary form, may be replaced by Tenant with such final, more complete exhibit(s).  The terms of all Exhibits are incorporated herein for all purposes.

(j) If Landlord is represented by any broker or any other leasing agent, Landlord is responsible for all commission fees or other payment to such agent, and agrees to indemnify and hold Tenant harmless from all claims by such broker or anyone claiming through such broker.  If Tenant is represented by any broker or any other leasing agent, Tenant is responsible for all commission fees or other payment to such agent, and agrees to indemnify and hold Landlord harmless from all claims by such broker or anyone claiming through such broker.

The effective date of this Lease is the date of execution by the last party to sign (the "Effective Date").

LANDLORD:   Eastern Gateway Community College

By: _____

Printed Name: _____Laura M. Meeks_____

Its: _____President_____

Date: _____1 - 12 - 15_____


TENANT:   Southern Cross Tower Group INC,

By: _____

Printed Name: _____Stephen J Palac, Jr_____

Its: _____President_____

Date: _____1 - 13 - 15_____

6

Site Name:  Steubenville Clock Tower

Site Number:  OHJEF-0001

## LANDLORD ACKNOWLEDGMENT

STATE OF _Ohio_ )
)  ss:
COUNTY OF _Jefferson_ )

On the _12_ day of _January_, 2015 before me, personally appeared Dr. Laura M Meeks, PH.D., President, who acknowledged under oath, that she is the person/officer named in the within instrument, and that she executed the same in her stated capacity as the voluntary act and deed of the Landlord for the purposes therein contained.

Sarah Fletcher
Notary Public In and For
the State of Ohio
My Commission Expires
January 20, 2019

Notary Public: _Sarah Fletcher_

My Commission Expires: _01/20/2019_

## TENANT ACKNOWLEDGMENT

STATE OF _Ohio_ )
)  ss:
COUNTY OF _Trumbull_ )

On the _13_ day of _January_, 2015, before me personally appeared Stephen J. Paine, Jr, who acknowledged under oath that he is the President of Southern Cross Tower Group, INC, the Tenant named in the attached instrument, and as such was authorized to execute this instrument on behalf of the Tenant.

AMY S CLARK, NOTARY PUBLIC
In and for the State of Ohio
My Commission Expires Nov. 1, 2015

Notary Public: _Amy S Clark_

My Commission Expires: _11-1-15_

7

Site Name:   Steubenville Clock Tower
Site Number:   OHJEF-0001

**EXHIBIT A**
Legal Description

The Property is legally described as follows:

**[DEED TO FOLLOW]**

8

# EXHIBIT C

| | |
|---|---|
| Services Contracts | None |
| Utility Contracts | None |
| Maintenance Contracts | None |
| Management Contracts | None |
| Equipment Leases | None |

- Lease by and between Jefferson Community College and Southern Cross Tower Group, Inc., assigned to Vertical Bridge Engineers, LLC

- Oral agreement by and between Jefferson Community College and Steubenville West End Fire Station – no written Lease