**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **STUDENT RESOURCE CENTER, LLC,** | : |
| | : |
| **Plaintiff,** | : |
| | : **Case No. 2:22-cv-02653** |
| | : |
| **v.** | : |
| | : **Judge Algenon L. Marbley** |
| **EASTERN GATEWAY COMMUNITY** | : |
| **COLLEGE,** | : **Magistrate Judge Chelsey M. Vascura** |
| | : |
| **Defendant.** | : |
| | : |

**OPINION & ORDER**

This matter comes before this Court on Plaintiff Student Resource Center's ("SRC")
Motion for Summary Judgment. (ECF No. 85). For the reasons that follow, the Motion is
**GRANTED IN PART** and **DENIED IN PART.**

## I.     BACKGROUND

This case centers on a contract dispute between Plaintiff Student Resource Center ("SRC"),
a private educational services company, and Defendant Eastern Gateway Community College
("EGCC"), a public two-year college based in Steubenville, Ohio. In June 2017, SRC and EGCC
entered an agreement to "collaborate on implementation of an online strategy" to support the
parties' Free College Benefit Program ("FCBP"). (ECF No. 85-1). To better understand the
parties' obligations under the Agreement and the alleged breaches giving rise to this lawsuit, a
brief review of the history of the FCBP business model is in order.

### 1.    The Free College Benefit Program Business Model

Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070-1099c-2, established
several loan and grant programs to assist eligible students with offsetting the costs of higher

education. In the late 1980s and early 1990s, the Senate's Permanent Subcommittee on Investigations determined that unethical admissions and recruitment practices, among other things, were undermining the integrity of the federal student financial aid programs. *See* Abuses in Federal Student Aid Programs, S. Rep. No. 58, 102d Cong., 1st Sess., at 1-2, 8 (1991). A year later, Congress amended and extended the Higher Education Act, known as the Incentive Compensation Ban, to include a new prohibition on the use of commissioned salespersons and recruiters. H.R. Rep. No. 102-447, at 10, 1992 U.S.C.C.A.N. 334, at 343. A school's participation in federal student aid programs thereafter became conditioned upon the school's agreement that it:

> will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance. . . .

20 U.S.C. § 1094(a)(20); *see also* 34 C.F.R. § 668.14(b)(22) (implementing regulations). In March 2011, the Department of Education (the "Department") published a Dear Colleague letter discussing trends it had observed among stakeholders. Letter GEN-11-05, Implementation of Program Integrity Regulations ("Dear Colleague Letter"), at 8-14, https://fsapartners.ed.gov/sites/default/files/attachments/dpcletters/GEN1105.pdf. One such trend was the practice of "tuition sharing," in which third parties charged schools a percentage of recruited students' tuition as a way of assuming the business risk associated with student recruitment. *Id.* at 11. These third parties typically combined student recruitment services with other services not covered by the Incentive Compensation Ban, such as advertising, marketing, counseling, and support services to admitted students, among other things. *Id.* The Department advised that it "generally views the payment based on the amount of tuition generated as an indirect payment of compensation based on success in recruitment and therefore a prohibited basis upon which to measure the value of the services provided." *Id.* Nonetheless, the Department noted that

2

"payment based on the amount of tuition generated by an institution" does not violate the Incentive Compensation Ban "if that payment compensates an unaffiliated third party that provides a set of services that may include recruitment services." *Id*.

### 2.   *The Parties' 2017 Agreement*

In compliance with the Incentive Compensation Ban, SRC and EGCC entered a contract on June 30, 2017 ("Collaboration Agreement"). The Agreement began with reciting the parties' "desire to collaborate on implementation of an online strategy" that includes "[a]ssissting in the development and marketing of high quality online courses and programs to members of unions," "[a]ccelerating the growth of EGCC's online offerings," "identifying additional offerings . . . that meet unmet needs within available markets," "providing professional development opportunities for full-time and adjunct faculty related to online teaching," "providing professional development opportunities for full-time and adjunct faculty related to online teaching," and "assist[ing] with faculty development, marketing, recruiting, enrollment, and academic support, e.g. mentoring and online tutoring." (ECF No. 85-1). Collectively, these activities were referred to as the "Collaboration." The Agreement also recited EGCC's "desire[] to establish a free college benefit (the 'Initiative') under the auspices of EGCC for the purposes of facilitating the Collaboration and providing new online educational instruction and services to participating students." (ECF No. 85-1).

As part of the Agreement, and through what came to be known as the Free College Benefit Program ("Program" or "FCBP"), SRC was responsible for outreach and marketing, including developing and promoting online courses and programs to members of unions and professional organizations; expanding EGCC's offerings by targeting adult learners; identifying untapped student markets; and providing professional development opportunities related to online teaching for faculty. (*See* ECF No. 85-1 § 2.3). EGCC, on the other hand, held the operational reins,

3

maintaining educational approvals; developing the course materials and curricula; recruiting faculty; establishing student admission standards; and managing general administrative and other services like finances and human resources. (*See generally id.* § 2.2).

Through the FCBP, unions, professional organizations, and their members benefited from free or significantly discounted education. FCBP revenues came from federal student financial aid programs, primarily under the Pell Grant Program, 20 U.S.C. §§ 1070 *et seq.*, which EGCC would receive and pay to SRC for its services. By June 1, 2022, ninety-five percent (95%) of SRC's revenues came from the FCBP.

Towards the end of 2020, EGCC's accrediting body, the Ohio Higher Learning Commission ("HLC"), raised concerns about EGCC's educational practices. On November 9, 2021, HLC placed EGCC on probation because it was out of compliance with criteria for accreditation. (ECF No. 28, ¶ 35). In March 2022, SRC removed then-CEO Michael Perik and replaced him with Phillip Braithwaite, after it was discovered that Perik was allegedly assisting EGCC's President Michael J. Geoghegan in hiding from Sterling, a company interested in purchasing SRC, that EGCC had been placed on probation. (*Id.*, ¶¶ 114 – 16). On May 12, 2022, SRC received a Notice of Breach from EGCC stating that SRC had breached the Agreement by replacing CEO Perik without notifying EGCC in advance. (ECF No. 58 at 1; 28 ¶ 6)).

On June 30, 2022, SRC filed this action and moved for a preliminary injunction seeking to enjoin EGCC from terminating the Agreement pursuant to EGCC's Notice of Breach and to enjoin SRC from breaching the Agreement's non-compete provision. (ECF Nos. 1 & 2). On July 11, 2022, this Court granted SRC's motion, enjoining EGCC from (1) "terminating the Agreement as set in motion by the Notice of May 12, 2022"; and from (2) "breaching the Agreement's non-competition provisions by starting and operating a competing business while the Agreement remains in effect." (ECF No. 14 at 15–16). Shortly thereafter, on July 18, 2022, the

4

Department of Education issued a Cease-and-Desist letter to EGCC stating that the Free College Benefit program violated Title IV's prohibition against assessing higher charges to Title IV scholarship recipients than those charges assessed to non-Title IV recipients. (ECF No. 28, ¶ 85). On August 23, 2022, this Court expanded the preliminary injunction to require EGCC to pay SRC approximately $2.36 million of allegedly withheld profit-sharing payments for the semesters prior to December 31, 2021. (*Id.*, ¶ 71).

On September 12, 2022, EGCC filed its answer and asserted counterclaims for declaratory judgment and breach of contract. (ECF No. 24). Specifically, EGCC sought a declaration "that SRC has breached the Collaboration Agreement, has been overpaid and that EGCC is entitled to terminate the Collaboration Agreement." (*Id.* ¶ 46). As to breach, EGCC asserted that SRC materially breached Section 8 of the Agreement "by engaging in discussions with Acadeum and Brazosport College (and likely others) for the purpose of entering into a competing collaboration in violation of the [] Agreement's noncompetition provisions"; and Section 3.1 of the Agreement by "submitting operating expense reimbursement requests for SRC Controlled Collaboration Activities that are excessive, not normal and customary and/or for services that were not (or could not) be rendered during the relevant time period" and by "submitting operating expense reimbursement requests for SRC Controlled Collaboration Activities and demanding payment of these expenses without approval of the Operating Committee and/or without an approved Annual Budget or Joint Marketing Plan for fiscal year 2023." (*Id.* ¶¶ 50–53).

On October 10, 2022, SRC filed its First Amended Complaint ("FAC") (ECF No. 28). In Count I, SRC alleged that it did not materially breach § 2.5 of the Agreement when it replaced Perik without notice to EGCC. Counts II – V alleged breach-of-contract claims, specifically, in Count II, a breach of contract claim for approximately $2.36 million in past due profit-sharing payments and $300,000 in operating expenses from May to June 2022; in Count III, a breach of

contract claim for failure to comply with § 8's non-compete provision for contacting SRC's union partners directly and attempting to poach SRC staff; in Count IV, a failure to pay just under $700,000 in operating expenses and just under $7 million in profit-sharing invoices; and in Count V, a breach of contract claim for failure to provide student enrollment data to SRC and being in violation of the Agreement requiring compliance with DOE regulations. (*Id.*, ¶¶ 121–68).

On October 31, 2022, EGCC moved to dismiss and strike SRC's FAC (ECF No. 33) and, a couple of days later, SRC moved to dismiss EGCC's counterclaims. (ECF No. 34). Prior to these motions, however, EGCC had obtained a preliminary injunction—in a separate case—enjoining the DOE from enforcing the Cease-and-Desist letter based on the DOE's failure to provide proper notice. (*See Eastern Gateway Community College v. Miguel Cardona, et al.*, Case No. 2:22-cv-3326-JLG-EPD, ECF No. 37 (Oct. 21, 2022)).[1] On January 13, 2023, EGCC moved to vacate this Court's order granting the preliminary injunction. (ECF No. 39).

On June 20, 2023, SRC sought leave to file a second amended complaint ("SAC") for the purpose of: (1) alleging that the Agreement had not terminated in October 2022 upon its filing of the FAC but remains in effect; and (2) amending the FAC to add another breach of contract claim and an unjust enrichment claim for unpaid expenses from September 2022 to the present. (ECF No. 58 at 2). On August 9, 2023, the Magistrate Judge denied SRC's request (ECF No. 58), and SRC promptly objected (ECF No. 59).

On September 25, 2023, this Court issued an order that, among other things: (1) denied in part EGCC's motion to strike and dismiss SRC's FAC; (2) granted in part and denied in part SRC's

---

[1] EGCC alleged that, shortly thereafter, it reached out to SRC to resume performance of the Agreement. (ECF No. 59 at 6). Although SRC maintained that it never stopped performance, SRC responded on October 27, 2022 and noted in the letter that EGCC was in default of the Agreement because of past-due operating expense invoices and that SRC needed assurances that EGCC was not in violation of Title IV. (*Id.*).

motion to dismiss EGCC's counterclaims;[2] and (3) denied EGCC's motion to vacate the preliminary injunction. On October 23, 2023, Defendant EGCC moved to dismiss and partially strike SRC's Second Amended Complaint. (ECF No. 67). In its motion, EGCC also asserted amended counterclaims. (*Id.*). On November 13, 2023, SRC moved to dismiss EGCC's amended counterclaims. (ECF No. 70).

On May 1, 2024, SRC moved for summary judgment on Counts I through VI of SRC's Second Amended Complaint and Counts I and II of EGCC's Amended Counterclaim. (ECF No. 85). EGCC objected to certain evidence submitted by SRC in support of its motion for summary judgment (ECF No. 98) and further opposed summary judgment (ECF No. 111). SRC responded to the objections and filed its reply in support of summary judgment (ECF No. 127).

On June 5, 2024, SRC moved for prejudgment attachment (ECF No. 106), which this Court granted (ECF Nos. 145, 149). On August 15, 2024, this Court also resolved several motions that were filed prior to SRC's motion for summary judgment. (ECF No. 143). Specifically, this Court denied EGCC's motion to dismiss Count II of SRC's SAC; denied EGCC's motion to strike Paragraphs 26-30 and 54 of SRC's SAC; granted SRC's motion to strike paragraphs ¶¶ 22, 38-49, 52, 55, 57-58, 62, 64-66 of EGCC's amended counterclaims; and denied SRC's motion to dismiss Count II of EGCC's amended counterclaims. (ECF No. 143).

On September 26, 2024, this Court held a telephonic status conference and re-opened discovery to allow EGCC to re-depose Aimee Leishure for the limited purpose of examining the damages analyses contained in her declaration, as filed in support of SRC's motion for summary judgment. (ECF No. 148). This Court also permitted the parties to file supplemental summary judgment briefs following Ms. Leishure's deposition. (*Id.*).

---

[2] Specifically, this Court dismissed EGCC's claim for unjust enrichment and for breach of Section 8 of the Agreement; and denied the motion to dismiss EGCC's claims for breach of Section 2.6 of the Agreement.

On October 18, 2024, EGCC filed its supplemental memorandum opposing SRC's motion for summary judgment (ECF No. 155), to which SRC responded (ECF No. 156). On December 27, 2024, the parties presented oral argument on SRC's Motion for Summary Judgment. This matter is now ripe for resolution.

## II.     STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact[,] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v. SuperValu Holdings, Inc.*, 669 F.3d 714, 716-17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the non-moving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment.  *Id.* at 249-50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that after the burden shifts, the non-movant must "produce evidence that results in a conflict of material fact to be resolved by a jury").  In considering the factual allegations and evidence presented in a motion for summary judgment, the

Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009).

## III.    LAW AND ANALYSIS

As detailed above, SRC asserts six claims in its Second Amended Complaint: one for declaratory judgment and five for breach of contract. EGCC's first counterclaim likewise seeks declaratory judgment, while its second counterclaim alleges breach of contract.

The Declaratory Judgment Act provides that federal courts, "[i]n a case of actual controversy within its jurisdiction . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Under the Act, courts enjoy "substantial discretion in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). Any such declaration "shall have the force and effect of a final judgment or decree and shall be reviewable as such" and may be granted if it will serve a useful purpose in clarifying and settling the legal relationship in issue, and terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. *Grand Trunk Western R.R. Co. v. Consolidated Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). Courts consider the following five factors in determining whether declaratory relief is appropriate:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

*Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984).

9

Breach of contract, on the other hand, requires the moving party to prove by a preponderance of the evidence that: (1) a contract existed; (2) the non-breaching party fulfilled its contractual obligations; (3) the breaching party unlawfully failed to fulfill its contractual obligations; and (4) the non-breaching party suffered damages as a result of the breach. *Mikulski v. Centerior Energy Corp.,* 501 F.3d 555, 561 n.3 (6th Cir. 2007); *see also Hitachi Medical Sys. Am., Inc. v. Choe,* 2011 WL 4632033 (N.D. Ohio 2011). "Generally, a material breach of contract will entitle a party to stop performance." *Kerner v. ETI Env't*, No. 2:09-CV-01092, 2011 WL 5506107, at *3 (S.D. Ohio Nov. 9, 2011) (quoting *Marion Family YMCA v. Hensel,* 178 Ohio App.3d 140, 142, 897 N.E.2s 184 (Ohio App. 3d Dist. 2008) (internal quotation marks omitted)). "A material breach of contract is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Id.* (internal quotation marks and citation omitted).

### A. Count I – Declaratory Judgment that SRC Did Not Breach the Agreement by Terminating Michael Perik as SRC's CEO

SRC argues that it is entitled to summary judgment on Count I of its SAC, which seeks a declaration that—contrary to EGCC's May 2022 Notice of Breach (*see* ECF No. 11-3)—SRC's termination of Michael Perik as CEO did not constitute a material breach of the Collaboration Agreement. (*See* ECF No. 85, at 26–27; ECF No. 66 ¶¶ 135–41). In support, SRC cites the preliminary injunction issued in July 2022—which prohibited EGCC from terminating the Agreement based on the May 2022 Notice—and urges this Court to "finalize [that] prior ruling" because "no new facts bear on this issue." (ECF No. 85, at 34–35).

As this Court has observed, however, "[t]he consideration that SRC had a strong likelihood of success on the merits" of its declaratory judgment claim at the preliminary injunction stage "is 'distinctly different from an *actual* success on the merits.'" (ECF No. 63, at 19–20) (quoting

*Ramsek v. Beshear*, 468 F.Supp.3d 904, 914 (E.D. Ky. 2020)). This Court "did not assess whether SRC actually committed a material breach by firing CEO Perik" when it enjoined EGCC from terminating the Agreement based on its May 2022 Notice. It simply noted that, because Perik's termination was "the first alleged breach in the timeline of events" and "goes to whether EGCC had the right to terminate the Agreement based on an uncured breach by [SRC]," declaratory judgment on this question would "serve[] a useful purpose" by "clarify[ing] the legal relationship between the parties." (*Id.*). In other words, SRC established a strong likelihood that declaratory judgment would be an appropriate remedy—not necessarily a strong likelihood of showing that Perik's firing was not a material breach.

In any event, however, EGCC's opposition fails to counter SRC's entitlement to declaratory judgment and waives its challenges to the claim. As the Sixth Circuit repeatedly cautions: "[A]t the summary judgment stage, the non-moving party can forfeit an argument if they fail to respond to the moving party's arguments." *Adkins v. Marathon Petroleum Co., LP*, 105 F.4th 841, 854 (6th Cir. 2024) (quoting *Palma v. Johns*, 27 F.4th 419, 429 n.1 (6th Cir. 2022) (internal quotation marks omitted)); *see also Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited."); *Alexander v. Carter for Byrd*, 733 F. App'x 256, 261 (6th Cir. 2018); ("When a plaintiff fails to address [a claim] in response to a motion for summary judgment, the claim is deemed waived . . . . Where claims are so waived, district courts in the Sixth Circuit grant summary judgment as a matter of course." (internal quotation marks and citations omitted)).

Moreover, on the merits, the relevant factors weigh in favor of issuing a declaratory ruling. As this Court previously observed, Perik's termination was the "first alleged breach in the timeline of events" and "goes to whether EGCC had the right to terminate the Agreement based on an uncured breach by [SRC]." (ECF No. 63, at 21). A declaration that SRC *did not* breach the

11

Collaboration Agreement by terminating Perik helps clarify the legal relations at issue, particularly between the parties in May 2022 and removes any uncertainty as to whether the contract was in effect.

Accordingly, this Court **GRANTS** SRC's Motion for Summary Judgment as to Count I of the SAC. A declaratory judgment—that SRC's termination of Michael Perik as CEO did not breach the Collaboration Agreement—shall issue.

### B. Count II – EGCC's Breach of Section 3 of the Agreement by Failing to Pay Operating Expenses Prior to September 2022 and Profit-Sharing Payments Prior to Spring 2022

SRC contends that EGCC breached the Agreement by failing to make two sets of payments to SRC. The first is $300,000 in "operating expenses" that SRC maintains it incurred in furtherance of the Collaboration prior to September 2022. The second is $2,357,153.08 in unpaid "profit-sharing expenses" incurred prior to Spring 2022.

#### 1. *$300,000 in Operating Expenses Prior to September 2022*

The $300,000 at issue here relate to "Union Privilege allocation payments" that SRC allegedly incurred prior to September 2022. As Mr. Braithwhaite explained in his deposition, Union Privilege (which also goes by "Union Plus") is a "non-profit that provides benefit programs like health and life insurance to union members and their families." (*See* ECF No. 90-1, 32:21–32:2). According to Mr. Braithwhaite, Union Privilege's relationship vis a vis SRC was that of a "benefit management company that markets [SRC's] education programs to their members and their families" which then "results in the prospective students" that SRC refers to its academic partners. (*Id.*, 34:21 –35:11). When asked about the source of the $300,000 obligation, Ms. Leishure stated in her deposition that SRC had paid the $300,000 "to subsidize marketing on the Union Privilege/Union Plus." (See ECF No. 90-11, 19:8–11). Although she did not know whether that was outlined in any memorandum of understanding between SRC and Union Privilege/Union

Plus, she explained that "Union Privilege/Union Plus invoiced [SRC], and it was approved by the CEO at the time, who was Michael Perick"; the $300,000 was then "paid by SRC to Union Privilege/Union Plus while [] Perick was still CEO, and I billed it to EGCC, the collaboration, in spring of 2022." (*Id.*, 19:19 –20:5). SRC contends that EGCC's failure to reimburse SRC for the $300,000 Union Privilege/Union Plus payments violates Section 3.1 of the Agreement, which provides:

> **3.1 Operating Expenses**. The Collaboration shall be responsible for the payment of all normal and customary operating expenses incurred in furtherance of the Collaboration, including but not limited to, costs and expenses relating to SRC Controlled Collaboration Activities,[3] to the extent set forth in the Initial Budget[4] or Annual Budget[5] (as hereinafter defined) (hereinafter "Operating Expenses"). Operating Expenses shall be paid out of the Collaboration Account in the priority set forth in Exhibit B upon

---

[3] Section 2.3 of the Agreement provides that "SRC, directly or indirectly through its subcontractors, shall perform the following with respect to the Collaboration, as determined by agreement of the Operating Committee (collectively, 'SRC Controlled Collaboration Activities'): "(a) Assist in the development and marketing of high quality online course and /or program offerings along with necessary services in support of student success inclusive of addressing the development needs of some students; (b) Accelerate the growth of EGCC's online offerings through strategies specific to attracting adult learners interested in online learning options; (c) Identify additional online offerings not currently available through EGCC that meet unmet needs within the defined markets; (d) Provide professional development opportunities for full-time and adjunct faculty related to online teaching, learning and student success; (e) Provide support of all ancillary efforts around making on line products available including assistance with faculty development, marketing, recruiting, enrollment, and academic support, e.g. mentoring and online tutoring; (f) Provide an up-start investment strategy for launching the online initiative with no upfront capital investment by EGCC, but with a contractual agreement specific to addressing profit and losses." (ECF No. 85-1 § 2.3).

[4] "Initial Budget" refers to the budget "set forth in the economic model attached as Exhibit A . . . ." (ECF No. 85-1 § 1.18). Exhibit A, as submitted to this Court, only states "See attached." It is unclear what attachment is being referenced. (See ECF No. 85-1 at 24).

[5] "Annual Budget" means "the annual operating and capital budget agreed to by the Parties for each Fiscal Year, as may be amended by mutually written consent of the Parties, as more particularly described in Section 7.2." (Id. § 1.13). Section 7.2, in turn, dictates the "Annual Budget Approval Process," which requires EGCC to "provide SRC with projected Student Enrollment Data for each Educational Program and projected Fees for the following academic year" three months before each academic year begins. To the extent the parties cannot agree on a budget two months before that date, the Agreement provides that "the Annual Budget in effect [at that time] shall be the Annual Budget for the following academic year until . . . the [] Parties mutually agree to a new Annual Budget." (Id. § 7.2). This Annual Budget includes: "a projected income statement including an operational and capital expenditure budgets for the forthcoming academic year; a projected cash flow statement on a semester basis; projected student enrollment numbers for each Educational Program and other additional data reasonably necessary for budgetary planning purposes (collectively, the "Enrollment Data") as more fully set forth in . . . Exhibit A; projected Fees and Revenues as more fully set forth . . . Exhibit A; projected Collaboration costs and expenses incurred by the Parties; and such other items reasonably requested by either Party." (Id.).

approval of the Operating Committee.[6] Each Party shall be responsible for the payment of all expenses incurred by such Party that are not set forth in the Initial Budget or Annual Budget. The Annual Budget may be amended as mutually agreed upon in writing by SRC and EGCC. If the Revenue[7] collected by EGCC from the Educational Programs[8] are insufficient to cover the Operating Expenses as set forth in the Initial Budget or Annual Budget, as the case may be, and provided that such insufficiency is not caused by EGCC's failure to comply with the terms of this Agreement, then (a) SRC shall be responsible for paying the amount of the Operating Expenses each year that are not covered by said Revenue; and (b} EGCC shall not be liable or have to pay for any Operating Expenses not covered by the Revenue collected from the Educational Programs.

---

[6] Section 2.6 of the Agreement establishes the "Operating Committee," providing in relevant part that "[t]he Collaboration shall be conducted under the direction of a joint operating committee comprised of one (1) representative of SRC and one (1) representative of EGCC." (*Id*. § 2.6).

[7] "Revenue" is defined as:

(a) all related charges, fees (as more specifically noted in 1.15 *supra*), grants (including. but not limited to so-called Pell Grants), collections, and revenue recognized or collected by EGCC with respect to Initiative Students, including, without limitation, participation or material fees, tuition, or rental payments;

(b) State Subsidy relating to Initiative Students; provided, however, State Subsidy shall only be included in Revenue for purposes of calculating amounts due pursuant to Exhibit B when and if such Revenue is actually collected by EGCC;

(c) any other subsidies received from any municipal, state, or federal agency, board, entity, or from any other source from or on behalf of Initiative Students;

(d) any other Fees and revenue collected by EGCC as a result of Tuition Reimbursement Plans; and

(e) any other Fees arising from the enrollment of Initiative Students.

(ECF No. 85-1 § 1.29).

"Fees" means "all tuition charges, fees, and subsidies collected by EGCC in order to participate in the Educational Programs as more fully set forth in the economic model attached as Exhibit A, subject to changes that may be negotiated in the future to account for changes in fees or structure." (ECF No. 85-1 § 1.15).

"Initiative Students" means "those EGCC students enrolled in an Educational Program pursuant to the Initiative, including those EGCC students who enrolled in Initiatives program." (*Id*. § 1.21).

"Tuition Reimbursement Plans" means "employer tuition reimbursement plans and/or programs for which Initiative Students arc eligible. The Parties shall work together to maximize the collection of Revenue from Tuition Reimbursement Plan arising from Initiative Students. EGCC will require eligible Initiative Students to apply for benefits from such Tuition Reimbursement Plans." (*Id.* § 1.34)

[8] "Educational Programs" means "the online educational programs offered by EGCC through the Initiative to provide online degrees, certificates and courses as more fully set forth in the economic model attached as Exhibit A, as may be amended from time to time." (*Id.* § 1.13).

14

(ECF No. 85-1 § 3.1).

EGCC does not dispute that, under the Agreement, it is required to pay SRC all "normal and customary operating expenses" incurred in furtherance of the collaboration. It argues, however, that the $300,000 in Union Privilege allocations are not "reimbursable operating expenses because they are not expenses related to the collaboration." (ECF No. 111, at 20–21). Citing a declaration by Robert Semich, Controller of EGCC since 2017 and its Chief Financial Officer since August 2023, EGCC contends that the Union Privilege allocations were scholarships that SRC provided to Union Privilege members and/or their families who were not EGCC students and were never in the collaboration budget and had not been paid before. (*Id.*). As such, EGCC argues that these expenses were "not normal and customary operating expenses incurred in furtherance of the collaboration and were not reimbursable under the Agreement." (*Id.*). Mr. Geoghegan's deposition supports that position, as he maintains that he "withheld payment for payments to the union foundation . . . because I can't pay for scholarships for non-EGCC students," and "on the prior three billings there is a line item for union privilege, and I had never paid that before. It had never been in the budget. So I didn't know what union privilege was so I didn't pay for it." (ECF No. 16 at 138).

In reply, SRC maintains that no triable issue exists regarding the $300,000 payment "because EGCC's only rebuttal to SRC's argument is a self-serving declaration that EGCC crafted *after* SRC moved for summary judgment and that contradicts the declarant's prior deposition testimony as well as the documentary evidence." (ECF No. 127, at 7). SRC further notes that Mr. Semich's declaration contradicts the "face of the invoice Ms. Leishure submitted on July 11, 2022, for the $300,000 in Union Privilege fees that were charged to SRC in support of the Collaboration" which shows that "these charges are for marketing fees related to EGCC's FCBP (not scholarships)." (*Id.* at 7 – 8). Citing Ms. Leishure's deposition testimony and related exhibits, SRC

15

asserts that the invoice "shows that EGCC previously paid $25,000 for these marketing fees in the past" and that "these charges were reflected in the Annual Budget." (*Id*.). Upon review of the cited documents, this Court notes that the invoice billed to EGCC that SRC contends Mr. Semich's declaration contradicts was part of an e-mail exchange between Ms. Leishure and Mr. Geoghegan, in which Mr. Geoghegan states:

> I do not understand the Union Plus Marketing Fees. These were not included in the FY22 collaboration budget. Is there an agreement between SRC and Union Plus regarding these fees? If so, please send to me along with supporting documentation.

(ECF No. 127-2 at 2). Ms. Leishure's response, in part, explains:

> The earlier invoices (prior to April) were approved by Michael Perik. Michael told me we could bill them to the collaboration when the college had sufficient funds to pay us. The CFO of UnionPlus (Steve Goldsmith) is the one who sends me the invoices.

(*Id*.). Mr. Geoghegan proceeds to forward the e-mail to Mr. Perik asking: "Is this correct?" (*Id*.). But the e-mail chain cuts off there. Given the conflicting testimony, as well as the inconclusive documentary records that SRC cites, summary judgment is improper. A genuine issue of material fact exists as to whether the Union Privilege fees constitute "operating expenses" as defined by the Agreement and if they were contemplated by the Annual Budget.

### 2. *$2,357,153.08 in Profit-Sharing Payments Prior to Spring 2022*

Separately, SRC argues that EGCC breached the Agreement by failing to pay $2,357,153.08 in profit-sharing payments to SRC for semesters prior to Spring 2022. As relevant here, Section 3.3 of the Agreement provides: "The Collaboration shall pay SRC pursuant to the terms set out in Exhibit B." (ECF No. 85-1 § 3.3.). Exhibit B, in turn, lists six provisions pertaining to "Operating Expenses Reimbursement and Service Fee Payment." (See ECF No. 85-1 at 25). SRC contends that, EGCC's failure to pay the profit-sharing amounts prior to Spring 2022, EGCC breached Sections 2 and 3 of Exhibit B, which govern "Reimbursement of SRC Operating

16

Expenses" and "Payment of SRC Fees." (*See* ECF No. 85-1 at 25, Ex. B §§ 23). Like Count I, EGCC's response does not challenge SRC's entitlement to summary judgment on this claim. This Court therefore considers EGCC to have waived any such challenge and finds in SRC's favor on its breach-of-contract claim for $2,357,153.08 in profit-sharing payments.

Accordingly, this Court **GRANTS** SRC's Motion for Summary Judgment on Count II of its SAC; **DENIES** summary judgment on SRC's breach-of-contract claim for $300,000 in Union Privilege allocation payments prior to September 2022; and **GRANTS** summary judgment on SRC's breach-of-contract claim for $2,357,153.08 in profit-sharing payments prior to Spring 2022.

### C. Count III – EGCC's Breach of Section 8 of the Agreement by Bringing SRC's Services In-House and by Contracting with Employee Benefit Services

SRC urges that summary judgment is warranted on its claim that EGCC breached the non-compete provision of the Agreement, which provides:

> [N]either SRC nor EGCC shall take any action for the purpose of entering into any joint venture, collaboration or similar arrangement that is competitive with the Educational Programs provided by the Collaboration to union members; provided however, if SRC wishes to pursue an agreement with a 4 year institution of higher learning that compliments the Collaboration, it shall seek written permission, in advance, from EGCC and such permission shall not be unreasonably withheld.

(ECF No. 85-1 § 8). SRC's argument that EGCC breached this section is two-fold. First, SRC contends that, upon Perik's departure from SRC, "Geoghegan began laying the groundwork to bring SRC's services in-house to squeeze SRC out of business." (ECF No. 85 at 41). In support, SRC relies on documents "found on Geoghegan's laptop"—one titled "EGCC FY23 Budget Proposal Move SSC & SRC Operations Inhouse" and another noting how EGCC "would rely on the unions and their control over their own websites to bring SRC's work in-house without disruption" and further predicting that "[t]his insourcing will result in the review/elimination of the bundled services exemption SRC needs to function, as outlined by the DOE, which will impair

17

SRC's ability to deliver any level of customer service[.]" (*Id.*). SRC, however, has not met its burden to show that EGCC's plans to take certain services in-house were "for the purpose of entering into [a] joint venture, collaboration or similar arrangement" as to be barred by the non-compete provision. Indeed, EGCC cites evidence to the contrary, suggesting that the purpose of its efforts to take services in-house was "to address HLC's concerns about EGCC's utilization of third-party enrollment and academic advisors through SRC . . . ." (ECF No. 111, at 27).

SRC's second argument—that EGCC breached the non-compete provision by contracting with Employment Benefit Services ("EBS")—fares no better. SRC explains that "[t]he terms of the EBS agreement overlapped with the services SRC provided to EGCC under the Agreement." (*Id.* at 42). The record, however, is insufficient to conclude as a matter of law that EGCC's hiring of EBS breached the non-compete clause. EGCC notes that, unlike SRC, EBS is "a provider of health and life insurance benefits to unions" and is therefore not SRC's "competitor." (*Id.* at 24-25). EGCC also maintains that hiring EBS was meant to "build and repair EGCC's brand and the FCBP with key constituent groups" and thus "primarily involved the marketing and promotion of EGCC and the FCBP with EBS's union members and lobbying efforts in Washington, D.C." (*Id.*). Because factual issues remain as to the purpose of the EBS contract and whether the services covered thereunder competed with SRC's services, SRC is not entitled to summary judgment on its claim that EGCC breached its non-compete obligations.

Accordingly, this Court **DENIES** SRC's Motion for Summary Judgment as to Count III of the SAC.

### D. Count IV – EGCC's Breach of Section 3 of Exhibit B by Failing to Reimburse SRC Profit-Sharing Payments for Fiscal Years 2022 and 2023

Like Count II, Count IV's breach of contract claim arises from Exhibit B to the Agreement. Specifically, SRC argues that EGCC breached Section 3 of Exhibit B by failing to pay profit-

sharing payments to SRC for Fiscal Year 2022 ($7,056,205) and Fiscal Year 2023 ($2,330,867).

Section 3 of Exhibit B provides:

### 3. Payment of SRC Fees

> Within thirty (30) days of the end of the Summer and Fall Semesters, EGCC will provide SRC with a semester reconciliation of the Revenue collected and Operating Expenses paid in each such semester ("Semester Reconciliation"). The Semester Reconciliations shall be in accordance with GAAP. If there is a surplus of funds remaining in the Collaboration Account as shown by the Semester Reconciliation ("Surplus"), EGCC will distribute the Surplus from the Collaboration Account as follows: 50% to SRC and 50% to EGCC. EGCC will also make Surplus payments at the end of the Spring Semester; however, the Spring Semester Surplus payments will be made promptly after the receipt of final numbers generated as part of EGCC's audited statements, but no later than September 30 of the following Fiscal Year.

Based on "EGCC's own records," SRC calculates that "EGCC owes SRC $6,941,363.03 for these profit-sharing payments." SRC contends that, for Fiscal Year 2022, "EGCC paid SRC $551,527.93 on September 30, 2022 based on its belief that this amount represented SRC's portion of profit-sharing payments for Fiscal Year 2022." (ECF No. 85 at 20) (citing Leishure Dec., ¶ 10)). But this amount, according to SRC, "did not represent the entirety of what was owed to SRC" and was based on "several improper and unsupported accounting adjustments." (*Id*.). In opposition, EGCC maintains that triable issues preclude summary judgment on this claim. Specifically, EGCC notes that the adjustments to the cost allocation, that SRC now takes issue with, had taken place "in 2021 when [EGCC and SRC] were negotiating the Fiscal Year 2022 budget and considering the findings in the HLC's November 9, 2020 mid-cycle review." (ECF No. 111 at 26). EGCC further asserts that these "changes to the FCBP were fully supported by SRC's former management to address HLC's concerns and be removed from probation." (*Id.*).

This Court finds that triable issues of fact exist as to whether EGCC's profit-sharing

19

payments for Fiscal Years 2022 and 2023 fell short and thus breached the Agreement. Contrary to SRC's argument, EGCC cites both deposition and court testimony in support of the factual disputes between the parties. While SRC's witnesses may be of a different opinion, credibility determinations are not appropriate when resolving summary judgment motions.

Accordingly, this Court **DENIES** SRC's Motion for Summary Judgment as to Count IV of the SAC.

### E.  Count V – EGCC's Breach of Other Sections of the Agreement

SRC argues that DOE's Cease-and-Desist Letter in July 2022 demonstrate that EGCC was in violation of Title IV and thus EGCC breached its representations and warranties set forth in Section 4 of the Agreement which, in relevant part, provide:

> **4.3. Consents**. Except as set forth on Schedule 4.3, no authorization, consent, approval, permit or license of, or filing with, any Governmental Authority, Educational Agency or any other Person, is required to authorize, or is required in connection with, the execution, delivery and performance of this Agreement or any other agreements contemplated hereby or thereby on the part of EGCC.
>
> **4.4 Educational Approvals**. EGCC has (a) all approvals required pursuant to its policies and procedures to offer the Initial Educational Programs and (b) all material Educational Approvals, to offer the Initial Educational Programs and to award Title IV Program funds and other student financial assistance in connection with such Initial Educational Programs.
>
> **4.5 No Violation**. [. . .] EGCC is not in violation of any judgment, decree, order, statute, rule, regulation, standard or policy of any Governmental Authority or Educational Agency having jurisdiction over EGCC, which violation could reasonably be likely to have a material adverse effect on EGCC, the Collaboration or the Initiative.

In opposition, EGCC maintains that the July 18, 2022 Cease-and-Desist Letter cannot bet evidence of any material breach of the representations and warranties in §§ 4.3, 4.4, 4.5 and 4.8 of the Agreement, as those representations were made on June 30, 2017. (ECF No. 111, at 23-24).

20

EGCC's position is well-taken. Representations and warranties made at the start of a contract do not extend to future performance unless there is an explicit agreement to that effect. *See, e.g., Standard All. Indus., Inc. v. Black Clawson Co.*, 587 F.2d 813, 820 (6th Cir. 1978) (UCC case). Here, there is nothing in the Agreement that speaks to the survival of representations and warranties after execution of the Agreement. *See Arcade Co. v. Arcade, LLC*, 105 F. App'x 808, 810 (6th Cir. 2004) (addressing a contract provision, non-existent in this case, that explicitly stated that the "representations, warranties, obligations, covenants, agreements, undertakings and indemnifications of the parties ... shall survive the closing" and whether that provision supported a finding that the parties intended to modify statutes of limitations).

As such, SRC is not entitled to summary judgment on its breach-of-contract claim as to Section 4 of the Agreement. Accordingly, this Court **DENIES** SRC's Motion for Summary Judgment as to Count V.

### F.  Count VI – EGCC's Breach of Exhibit B by Failing to Reimburse SRC Operating Expenses from September 2022 to May 2023

In Count VI, SRC alleges that EGCC failed to pay SRC $908,749.62 in Operating Expense reimbursements from September 6, 2022, through May 23, 2023, pursuant to Section 2 of Exhibit B to the Agreement, which provides:

### 2. Reimbursement of SRC Operating Expenses

> SRC will invoice the Collaboration for its Operating Expenses incurred in the previous month. SRC will be paid by the Collaboration from the Collaboration Account within five (5) days of the receipt of the monthly deposit of Revenue from the EGCC for all open invoices that are part of the Initial Budget or Annual Budget and for which the Collaboration has been invoiced, **assuming there are sufficient funds in the Collaboration Account**. Provided however, EGCC agrees that SRC Operating Expenses shall only be reimbursed in the event that content fee obligations to BNED LC have been satisfied and no amounts are due and outstanding. Should there not be sufficient funds to pay

21

> SRC's monthly installment of Operating Expenses, any
> outstanding amounts due to SRC will be accrued and paid at
> such time as the Collaboration Account has sufficient funds.

(ECF No. 85-1 at 25, Ex. B § 2). SRC argues it is entitled to summary judgment on this claim

because the evidence establishes that, at EGCC's request, SRC continued to provide its services

under the Collaboration Agreement between September 6, 2022 through May 23, 2023, which

resulted in $908,749.62 of Operating Expenses that EGCC has refused to reimburse. This amount,

according to SRC, "corresponds to over a dozen invoices submitted to EGCC during that

timeframe for SRC staff members who scheduled appointments for over 25,533 reenrolled

students." (See ECF No. 127 at 13 (citing 86-4, Leishure Decl. ¶ 9)). SRC maintains that these

employees "were needed to support the volume of EGCC students that were re-enrolling at

EGCC." (*Id.* (citing ECF No. 90-11, Leishure Dep., 39:17-20)). Specifically, as stated in Ms.

Leishure's declaration, these costs were incurred as follows:

> [F]rom September 6, 2022 through May 23, 2023, SRC
> employed seven full-time staff members who supported
> EGCC and the Collaboration. Those staff members
> scheduled appointments for over 25,533 re-enrolled students
> and met biweekly with EGCC staff.

(ECF No. 86-4 ¶ 9).

EGCC, on the other hand, contends that the issuance of the Department of Education's

Cease-and-Desist Letter in July 2022 "put the FCBP 'on ice' as neither EGCC nor SRC could

continue the collaborative program, making it impossible to continue the Agreement." (ECF No.

111 at 7 (citing ECF No. 90-1, Braithwaite Dep., at 52:9-12, 56:12-57:21, 72:15-21; ECF No. 85-

2, Geoghegan Dep., at 275:21-24))). EGCC claims SRC failed substantially to perform its

obligations under the Agreement after July 18, 2022, when it "ceased recruiting and enrolling new

students and marketing the FCBP." *Id.* (Braithwaite Dep. at 95:3-8, 96:9-14).

But two facts are undisputed. First, neither party disputes that the DOE letter—though later

22

enjoined—found that the FCBP "violates the Title IV prohibition against assessing charges to Title IV recipients that are higher than those charges assessed to non-Title IV recipients," ordered EGCC to "cease providing the Free College Benefit program as currently implemented," and further directed EGCC to "not disburse Pell funds to any new students enrolling in the Free College Benefit Program until it is redesigned to charge full tuition and fees to all non-Pell eligible students." (*Id.*). Second, even EGCC acknowledges that SRC continued to perform other contractual obligations after July 2022, like "updating its union partners on the status of the FCBP and managing existing students in the FCBP through SRC's academic advisors." (See ECF No. 111 at 7) (internal quotation marks and citation omitted).

"When the facts presented are undisputed, whether they constitute a performance or a breach of a written contract, is a question of law for the court." *Luntz v. Stern*, 135 Ohio St. 225, 20 N.E.2d 241 (Ohio 1939). So long as the party obligated to perform under the contract "makes an honest effort to do so, and there is no willful omission on its part," substantial performance is "all that is required to entitle the party to payment under the contract." *Cleveland Neighborhood Health Serv., Inc. v. St. Clair Builders, Inc.*, 64 Ohio App.3d 639, 644, 582 N.E.2d 640 (Ohio Ct. App. 1989) (citing *Ashley v. Henahan*, 56 Ohio St. 559, 569, 47 N.E. 573 (Ohio 1897)). Substantial performance means "that mere nominal, trifling, or technical departures are not sufficient to break a contract, and that slight departures, omissions and inadvertencies should be disregarded.'" *Id*. (quoting *Kichler's, Inc. v. Persinger*, 24 Ohio App.2d 124, 126, 265 N.E.2d 319 (Ohio Ct. App. 1970)).

Given the finding and directive from the U.S. Department of Education, this Court concludes that a trier of fact may find that SRC was not in breach when it ceased its recruiting and marketing efforts but continued its other contractual obligations. This conclusion would be bolstered by Section 9 of the Agreement, which provides:

23

> [I]n the event that either Party reasonably determines that the performance of any particular service by either Party is in violation of such legal or accreditation requirements, the Parties agree that such service shall be promptly modified to the extent reasonably necessary to secure continued compliance with such legal and accreditation requirements.

(ECF No. 85-1, § 9(a)). In line with this contractual obligation, it is possible that SRC modified its services arguably to maintain compliance with the U.S. Department of Education's directive. While such a decision may not constitute breach, or at least not one that is substantial enough as to bar SRC's entitlement to payment under the Agreement, the October 27, 2022 correspondence from SRC's counsel to EGCC's counsel gives this Court some pause with respect to the timeline (September 2022 to May 2023) for which SRC seeks to recover and SRC's duty to mitigate. (*See* ECF No. 109-5). In Ohio, "[t]he general rule is that an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St. 3d 270, 276 (Ohio 1999); *Kanistros v. Holeman*, 2005 Ohio 660, (Ohio Ct. App. 2005) ("In an action for breach of contract, those damages that a plaintiff could have avoided with reasonable effort and without undue risk or expense cannot be charged against a defendant; to that extent, a plaintiff has a duty to mitigate damages.").

As stated in the October 2022 letter, after EGCC purportedly "reached out to [SRC] requesting it to resume performance under the Collaboration Agreement in light of the court's Opinion and Order in *Eastern Gateway Community College v. Cardona*, Case No 2:22-cv-3326 (ECF No. 37)," SRC's counsel wrote to EGCC notifying it that EGCC is in material breach of the Collaboration Agreement and that SRC would not perform until certain demands for cure were met. (*See* Braithwaite Dep. Ex. J, ECF No. 109-5). The letter remarked that "this request for assistance" from EGCC demonstrated the "frivolous nature" of EGCC's counterclaim," because on the one hand, EGCC's counterclaim alleges material breach by SRC for deficient performance

of its services, "while on the other hand[,] EGCC begs for the resumption of these exact same services now that EGCC's need for them has resumed." (*Id.*). SRC's counsel proceeded by outlining EGCC's other shortcomings under the Agreement, including its failure to pay profit-sharing and operating expenses owed to SRC, and ultimately declared that "EGCC's actions constitute an ongoing material breach of the Collaboration Agreement" and that "EGCC must reimburse SRC for its unpaid operating expenses and profit share amounts before addressing EGCC's requests for support." (*Id.*). EGCC admits that it did not cure any of SRC's alleged breaches and thus maintains that the Agreement terminated in December 2022.

Whether the Agreement terminated in December 2022 is a disputed issue of material fact that directly bears on the amount of Operating Expense reimbursements (if any) that SRC was entitled to from September 6, 2022, through May 23, 2023. As explained *infra,* factual disputes also remain regarding whether SRC's failure to designate Operating Committee members from March 23, 2022, through August 31, 2022, prevented the parties from substantially performing their obligations under the Agreement—including approving the Operating Expenses for Fiscal Year 2023 that SRC seeks to recoup. As such, this Court **DENIES** SRC's Motion for Summary Judgment as to Count VI of the SAC.

### G. Counterclaim I – Declaratory Judgment that SRC Breached the Agreement, SRC was overpaid, and that, as a result, EGCC can terminate the Agreement

In its Amended Counterclaims, EGCC contends that factual questions exist regarding whether "SRC has breached the Collaboration Agreement and has been overpaid, [whether] EGCC was entitled to terminate the Collaboration Agreement pursuant to its May 12, 2022 Notice and, if not, whether the Collaboration Agreement terminated pursuant to SRC's October 27, 2022 Notice." (*See* ECF No. 67). As SRC reiterates, and this Court now rules (*see* Part III.A *supra*), EGCC was not entitled to terminate the Agreement pursuant to its May 12, 2022 Notice.

25

Nonetheless, factual questions remain as to whether SRC's October 27, 2022 written notice of material breach to EGCC terminated the Agreement. (*See* ECF No. 39-1, at ¶ 14; ECF No. 39-4; ECF 90-1, at 82:6-23; ECF No. 109-5). As Mr. Braithwaite testified in his deposition, these demands were that: EGCC reimburse SRC for invoiced operating expenses and profit share amounts in excess of $7,000,000; provide SRC with "written assurance" that it is in "present compliance with all Governmental Authority or Educational Agency judgments, decrees, orders, statutes, rules, regulations, standards, or policies;" agree to indemnify and hold SRC harmless from unspecified claims; and provide SRC with "written explanation of how [EGCC] intends to address and resolve the concerns identified by the United States Department of Education's July 18, 2022 [Cease-and-Desist] letter." (*Id.*)

SRC nonetheless contends that "EGCC's argument admits that it materially breached the Agreement, yet EGCC claims its material breach of the Agreement bars SRC from recovery (or at least creates a genuine dispute of material fact)." (ECF No. 127, at 24). But by the express terms of the Agreement, SRC's written notice of material breach to EGCC on October 27, 2022, would have arguably triggered the Agreement's automatic termination on December 31, 2022 (following a 60-day cure period). As relevant here, Section 10 of the Agreement provides:

> 10.2 Termination. This Agreement shall be terminated prior to expiration of the Term as follows:
>
> * * *
>
> (b) by either Party for material breach of any of the terms hereof by the other party if such breach shall not have been cured within sixty (60) calendar days after written notice of breach is delivered to the defaulting party (or, it such breach requires more than sixty (60) days to cure, if such cure is not commenced within sixty (60) days and thereafter diligently prosecuted);

EGCC concedes that it "did not commence to cure the alleged material breaches within the

allotted 60-day cure period" and, as a result, "by express operation of Agreement's termination provision, the Agreement immediately terminated after the end of the cure period at 12:01 a.m. on December 31, 2022." (*Id.* at 20).

Whether EGCC did in fact materially breach the Agreement, as the October 2022 Notice alleges, thereby triggering the Agreement's termination provision, is disputed. This question thus remains a matter for the trier of fact to decide. *See Hanna v. Groom*, 10th Dist. App. No. 07AP-502, 2008-Ohio-765, ¶ 16 ("Whether a material breach has occurred ordinarily is a question of fact for the fact-finder."); *Klaus v. Hilb, Rogal & Hamilton Co. of Ohio*, 437 F. Supp. 2d 706, 731 (S.D. Ohio 2006) ("The determination whether a material breach of an agreement has occurred is generally a question of fact.").

Because a genuine dispute of material fact exists regarding when the Agreement terminated on or before December 31, 2022, whether SRC is entitled to any operating expense reimbursement or profit sharing after December 31, 2022, also remains unresolved. This precludes summary judgment in SRC's favor on Counterclaim I. Accordingly, this Court **DENIES** SRC's Motion for Summary Judgment as to Counterclaim I.

### H. Counterclaim II: SRC's Breach of the Agreement

EGCC's breach of contract counterclaim charges SRC with a number of contractual violations: (1) material breach § 2.6(a) of the Agreement by failing to timely designate new representatives to the Operating Committee; (2) material breach of §§ 2.3 and 2.5 of the Agreement by submitting operating expense reimbursement requests for SRC Controlled Collaboration Activities that were excessive and for services that were not rendered during the relevant time period; (3) material breach of § 3.1 of the Agreement and Exhibit B's requirement that SRC pay all operating expenses not covered by FCBP revenue; and (4) material breach of § 8 of the Agreement by taking action for the purpose of entering into a competitive collaboration with

27

William Woods and other academic partners during periods of time when enrollment in the FCBP was below 23,000 students (i.e., between June 6, 2022 and August 14, 2022 and after January 9, 2023). SRC argues that it is entitled to summary judgment on Counterclaim II in its entirety.

1. *SRC's Breach of Section 2.6(a) by Failing to Timely Designate a Representative to the Operating Committee*

In Counterclaim II, EGCC charges SRC with materially breaching the Collaboration Agreement by failing to designate a replacement representative to the collaboration's Operating Committee from March 23, 2022 through August 31, 2022. Specifically, EGCC claims that SRC breached Section 2.6(a), which provides:

> The Collaboration shall be conducted under the direction of a joint operating committee comprised of one (1) representative of SRC and one (1) representative of EGCC (the "Operating Committee"). Each Member Party may designate up to three (3) individuals, who may at any given time, individually serve as the representative for a Member Party during meetings of the Operating Committee. Each Member Party may change its designated representatives to the Operating Committee from time to time, in its sole discretion, effective upon notice to the other Member Parties of such change. These representatives shall have appropriate credentials, experience and knowledge, and ongoing familiarity with the Collaboration. Additional representatives or consultants may from time to time, by mutual consent of the Member Parties, be invited to attend Operating Committee meetings, subject to such representative's or consultant's written agreement to comply with the confidentiality requirements of Section 14. Each Member Party shall bear its own expenses related to the attendance of such meetings by its representatives.

(ECF No. 85-1 § 2.6(a). Citing the Collaboration Agreement, EGCC explains that the Operating Committee is "the governing body of the FCBP collaboration under which material decisions affecting the collaboration is made." (*See* ECF No. 111 at 13–14 (citing ECF No. 85-1, at § 2.6)). Specifically, the Agreement provides that the Operating Committee "shall confer regarding the status of the Collaboration, review relevant data and the progress of the applicable activities under the Collaboration, and consider and advise on any operational issues that arise relating to the

28

Collaboration that may be referred to, or invited for referral by, the Operating Committee." (ECF No. 85-1 § 2.6(c)). The Operating Committee must: approve changes to SRC Controlled Collaboration Activities (*see id.* at § 2.3); approve changes to the most important and material Collaboration Activities (*see id.* at § 2.4) and direct and approve the payment of all operating expenses and other expenditures from the Collaboration Account (*see id.* at § 3.1 and Ex. B to the Agreement). According to EGCC, "SRC's failure to designate a representative to the Operating Committee from March 23, 2022 through August 31, 2022, left the collaboration without a governing body and rendered it unable to make material decisions affecting the collaboration, including approvals to pay operating expenses." (ECF No. 111 at 14).

SRC, on the other hand, contends that "[o]n March 28, 2022, Geoghegan's executive assistant cancelled all subsequent Operating Committee meetings," and Mr. Geoghegan explained in his deposition that the Operating Committee meetings were cancelled "because we [EGCC] weren't meeting with them [SRC] anymore." (Geoghegan Dep. 157:17-25). In addition to cancelling the Operating Committee meetings, SRC contends that "EGCC also admitted that it never asked SRC for notice of who SRC would designate on the Operating Committee and never rescheduled the meetings after SRC designated new representatives to the Operating Committee." (See ECF No. 85 (citing Geoghegan Dep., 161:1-14)). According to SRC, it made "several attempts to resume Operating Committee meetings with EGCC but the school refused to do so." (*Id.* (citing Leishure Dec., ¶ 18)). At oral argument, EGCC maintained that SRC failed to designate new representatives upon terminating the prior members which, regardless of EGCC's removal of appointments from calendars, constituted a material breach of § 2.6(a).

Given these opposing positions and the evidence set forth by both sides, there are material factual disputes regarding SRC's failure to designate Operating Committee members thus precluding summary judgment on this question.

### 2. *SRC's Alleged Breach of §§ 2.3, 2.4, and 3.1 of the Agreement*

EGCC also alleges SRC has materially breached the Collaboration Agreement, §§ 2.3, 2.4 and 3.1, by submitting operating expense reimbursement requests between September 2022 and May 2023 for SRC Controlled Collaboration Activities that are excessive, not normal and customary, and/or for services that were not (or could not), by refusal to perform or otherwise, be rendered during the relevant time period. (*See* ECF No. 67 ¶ 62). EGCC separately purports that SRC breached § 3.1 because the reimbursements that SRC requested were made without an approved Annual Budget or Joint Marketing Plan for Fiscal Year 2023. (*Id.* ¶ 63).

SRC, on the other hand, contends that it is entitled to summary judgment on these claims because, under § 7.2 of the Agreement, the Annual Budget for Fiscal Year 2022 carried over to Fiscal Year 2023 because "EGCC refused to engage with SRC and response to its proposed Fiscal Year 2023 Annual Budget and joint marketing plan." (*See* ECF No. 85 at 53). As discussed *supra*, however, there are factual disputes regarding whether SRC's failure to designate Operating Committee members from March 23, 2022, through August 31, 2022, prevented the parties from substantially performing their obligations under the Agreement—including approving an Annual Budget for Fiscal Year 2023. As this Court explained in its prior order, the success of these claims "hinges on a factual question: whether the breach occurred prior to or after September 12, 2022." (ECF No. 143 at 19). Accordingly, SRC is not entitled to summary judgment on EGCC's breach-of-contract counterclaim regarding §§ 2.3, 2.4, and 3.1.

### 3. *SRC's Breach of § 8 of the Agreement by Collaborating with Academic Partners*

In its prior orders, this Court has already disposed of EGCC's argument regarding SRC's breach of Section 8, finding that "the terms of § 8 plainly give SRC the authority to enter into the arrangements in question." (*See* ECF No. 143, at 11–14 (denying EGCC's motion to alter court's order "dismissing EGCC's Counterclaim II as it relates to SRC's alleged breach of § 8 of the

30

Collaboration Agreement" because "EGCC failed to raise these arguments when it was required to do so and because the terms of § 8 plainly give SRC the authority to enter into the arrangements in question"); *see also id.* at 17 ("Having already disposed of the arguments regarding § 8 . . . this Court will not rehash them here."); ECF No. 63 at 27 (granting "SRC's Motion to Dismiss Counterclaim II as it relates to § 8's non-compete provision").

"[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Eaton v. Ascent Res. - UTICA, LLC*, No. 2:19-CV- 3412, 2021 WL 858517, at *3 (S.D. Ohio Mar. 8, 2021) (quoting *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017). Because this claim had already been disposed of, this Court need not address this claim on summary judgment.

Accordingly, this Court **DENIES** SRC's Motion for Summary Judgment as to Counterclaim II.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff Student Resource Center's Motion for Summary Judgment (ECF No. 85) is **GRANTED IN PART** and **DENIED IN PART**:

- **GRANTED** in SRC's favor as to Count I of the SAC;
- **DENIED IN PART** and **GRANTED IN PART** in SRC's favor as to Count II:
    o **DENIED** on SRC's claim for $300,000 in operating expenses prior to September 2022;
    o **GRANTED** in SRC's favor on its claim for $2,357,153.08 in profit-sharing payments prior to Spring 2022;
- **DENIED** as to Count III of the SAC;
- **DENIED** as to Count IV of the SAC;
- **DENIED** as to Count V of the SAC;
- **DENIED** as to Count VI of the SAC;
- **DENIED** as to Counterclaim I; and
- **DENIED** as to Counterclaim II.


**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  January 6, 2025**